737 A.2d 55

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JESSE
TIMMENDEQUAS, DEFENDANT–APPELLANT.

Argued December 1, 1998—Decided August 11, 1999.

516

520

528

*William R. Smith* and *Jay L. Wilensky,* Assistant Deputy Public Defenders, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

In May 1997, a jury convicted defendant Jesse Timmendequas of the capital murder of Megan Kanka, committed in the course of a kidnapping and sexual assault. Following a penalty-phase proceeding on the capital-murder conviction, the court sentenced defendant to death. He appeals directly to this Court as of right. *See R.* 2:2–1(a)(3). We affirm defendant's conviction for murder and his sentence of death.

I.

*Procedural History*

On October 19, 1994, Jesse Timmendequas was charged with: knowing or purposeful murder of Megan Kanka by his own conduct, in violation of *N.J.S.A.* 2C:11–3a(1) or (2) (count one); felony murder, in violation of *N.J.S.A.* 2C:11–3a(3) (counts two and four); first degree kidnapping, in violation of *N.J.S.A.* 2C:13–1b (count three); and first degree aggravated assault, in violation of *N.J.S.A.* 2C:14–2a(1) (counts five, six, seven and eight).

On November 18, 1994, the Mercer County Prosecutor's Office filed a Notice of Aggravating Factors. The aggravating factors were: (1) the murder was committed to escape detection, apprehension, trial, punishment or confinement for the aggravated sexual assault and/or kidnapping of the victim, *N.J.S.A.* 2C:11–3c(4)(f); and (2) the murder was committed in the course of the commission of an aggravated sexual assault and/or kidnapping of the victim, *N.J.S.A.* 2C:11–3c(4)(g).

On June 29, 1995, defendant moved to change the trial venue from Mercer County. On October 20, 1995, the trial court granted the motion, setting venue in Camden County. On December 15, 1995, the State moved for reconsideration, asking the court either to empanel a foreign jury or change the venue to a county contiguous to Mercer. On December 21, 1995, the court granted the State's motion, holding that a foreign jury would be empaneled from Camden County. The court then invited the parties to submit briefs on the option of empaneling a foreign jury from a contiguous county. On January 29, 1996, the court chose Hunterdon County as the source of the foreign jury.

Pre-trial hearings also were held on various evidentiary issues. Defendant's motion to employ a struck jury system and to permit attorney participation in *voir dire* was granted. The court ruled that all of defendant's statements to police were admissible. The court also dismissed defendant's motions: to suppress evidence obtained during a consent search and a search authorized by warrant; to dismiss the indictment due to prosecutorial misconduct before the grand jury; to select a fourteen-person jury; and to consolidate all murder offenses.

The court further denied defendant's motion to exclude from the jury pool all jurors with knowledge of "Megan's Law," holding that the court would advise prospective jurors of defendant's prior record. That record included convictions for the aggravated sexual assault of a young girl in 1982, sexual assault and attempted aggravated assault in 1982, and theft of a vehicle in 1980. Defendant sought interlocutory relief from the Appellate Division. The Appellate Division declined to intervene, but directed the trial court not to advise jurors of defendant's prior convictions. It also ordered the court to prepare in writing the questions it intended to ask potential jury members. A subsequent application for interlocutory relief based on the trial court's prepared questions was denied by the Appellate Division. Defendant's motion with this Court for leave to appeal also was denied.

Jury selection for the trial began in Hunterdon County on January 13, 1997. On April 15, 1997, defendant moved for recon-

sideration of the change of venue decision and requested that jury selection be moved to Camden County. That motion was denied. A jury was selected on April 21, 1997, following individual interviews of 331 prospective jurors. Defendant subsequently renewed his change of venue motion; again, it was denied.

The guilt phase was held from May 5 to May 30, 1997. Defendant was convicted on all counts. The penalty phase was held from June 9 to June 20, 1997. Defendant alleged as mitigating factors: that he was under the influence of extreme emotional disturbance, pursuant to *N.J.S.A.* 2C:11–3c(5)(a); that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect, pursuant to *N.J.S.A.* 2C:11–3c(5)(d); and twenty-two circumstances of his upbringing under the "catch-all" mitigating factor, *N.J.S.A.* 2C:11–3c(5)(h).

The jury concluded that the aggravating factors outweighed the mitigating factors. "By virtue of the verdict," the court sentenced defendant to death. On July 30, 1997, defendant was sentenced on the non-capital counts of the indictment. The felony murder convictions, counts two and four, were merged into murder (count one). Defendant was sentenced to life imprisonment on that count, in the event that his death sentence was vacated. Counts five through eight, the aggravated sexual assault convictions, were merged with the kidnapping conviction (count three). Defendant was sentenced to life imprisonment on the kidnapping charge, with 25 years of parole ineligibility, to run consecutive to count one. Defendant was also required to pay a Violent Crimes Compensation Board penalty of $100. Defendant filed a Notice of Appeal.

## II.

### The Trial

A. *Guilt Phase*

The victim, Megan Kanka, lived at 32 Barbara Lee Drive in Hamilton Township with her parents, Maureen and Richard Kan-

ka, and her two siblings. Defendant lived diagonally across the street at 27 Barbara Lee Drive with Brian Jenin, Joseph Cifelli and Cifelli's mother.

Megan's mother was the first witness for the State. She testified about the events on July 29, 1994, the night of Megan's disappearance. Mrs. Kanka testified that she laid down to relax at approximately 6:30 p.m. While she was resting, Megan went down the street to visit a friend. When Mrs. Kanka got up, she could not find Megan. The Kankas asked neighbors if they had seen Megan. A number of the neighbors, including defendant, told Mrs. Kanka that they had seen Megan in the neighborhood earlier that day. Defendant also told the Kankas he had seen Megan before dinner when she and her friend Courtney stopped to talk to him about his new boat, which was on the street in front of his house.

Shortly after Megan's disappearance, Mrs. Kanka called the police. When they arrived at Barbara Lee Drive, she gave them a photograph of her daughter and a description of the clothing Megan was wearing. She also gave the police a pair of shorts resembling those that Megan was wearing when she disappeared.

Hamilton Township Patrol Officer Paul Seitz testified that he and Officer Mike Smith arrived at the Kanka's residence at 8:49 p.m. After searching the Kanka's house and property, and questioning some of the Kankas' neighbors, Seitz spoke with defendant. Defendant told the officer that he had seen Megan riding her bicycle at 2:30 p.m. that day. When asked if he had seen Megan at any other time (because his statement conflicted with what other neighbors had said and what he had said earlier), defendant stated that he had seen Megan riding her bicycle in front of her house between 5:30 p.m. and 6:00 p.m. Defendant also told Seitz that his roommates, Cifelli and Jenin, were out shopping between 5:30 p.m. and 7:00 p.m. and would not have seen Megan.

Officer Nelson then testified that at approximately 10 p.m., he and three other officers approached 27 Barbara Lee Lane to

obtain consent to search the house. Mr. Cifelli, the owner, agreed to let them search the house, yard and boat for Megan. They did not find her. During the course of the search, Officer Nelson noticed heavy brown blankets being washed in the washing machine. Although he found it to be unusual, none of the residents at 27 Barbara Lee Lane was a suspect at the time of this first search.

At approximately 12:30 a.m., Detectives O'Dwyer and Kieffer and Detective Sergeant Stanley obtained a signed consent from owner Cifelli to search the home again. Jenin, Cifelli and defendant also were questioned individually at that time.

During the search, O'Dwyer found "what appeared to be four pairs of women's underwear," one having a teddy-bear pattern, under the bed in Cifelli's room. The officer read Cifelli his *Miranda* rights and Cifelli waived his rights. Cifelli explained that the underwear belonged to an ex-girlfriend. O'Dwyer soon realized that the underwear was adult-sized and did not believe it was connected to Megan's disappearance. Cifelli gave officers an alibi and receipts proving he and Jenin were not at home at the time of Megan's disappearance.

The officers then interviewed Brian Jenin. They did not administer *Miranda* rights since, according to O'Dwyer, the search of Jenin's room disclosed nothing suspicious and the police were just trying to obtain information. Jenin's account was consistent with Cifelli's.

After questioning Cifelli and Jenin, the officers then called defendant into the room. They did not read defendant his *Miranda* rights because nothing suspicious had been found in his room and the police were just seeking information. Defendant related that he had gone out that day with Jenin and Cifelli to purchase a boat, and then washed it in front of his home. He spoke to Megan, who he knew as a "neighborhood child," and her friend Courtney between 5:00–5:30 that day while he was washing the boat. Jenin and Cifelli were out running errands at the time.

O'Dwyer testified that defendant was shaking and perspiring heavily throughout the course of the interview. When Kieffer sat down next to defendant, defendant crossed his arms and legs and turned away. Based on defendant's account, his nervousness, and his assertion that he was alone at the time of Megan's disappearance, the officers thought defendant should be re-interviewed at headquarters. Defendant agreed to accompany the officers, but wanted to drive himself. The officers followed behind in their vehicle. The officers felt no need to speak with Cifelli or Jenin again.

When they arrived at the station at approximately 2:50 a.m., Defendant was read his *Miranda* warnings. He signed a form stating that he understood and waived his rights. He never asked for a lawyer or said that he did not want to talk. He said he would help in any way that he could.

Defendant gave police a written statement documenting his whereabouts on the 29th. The statement conflicted with previous accounts defendant had given to the officers. In particular, defendant wrote that he had seen the victim a second time on the 29th, at 6:30 p.m. He had previously told Kieffer that he had seen her only once, earlier in the afternoon by his boat.

At approximately 4:00 a.m., defendant signed a form consenting to a search of his vehicle. Detective O'Dwyer, while looking for latent fingerprints, found a brown toy chest and a piece of black felt in the back of defendant's pickup truck. Defendant, who was present during the search, volunteered that he recently had cut his hand on the curtain rod that hung in front of the glass separating the passenger and cap portions of the truck. Defendant had an injury on the palm of his hand, but O'Dwyer found no blood or skin on the curtain rod. At 4:00 a.m., after the search, defendant left headquarters, promising to return the next day for more questioning.

Detective Martin Ingebrandt testified that he was called into headquarters at approximately 5:30 a.m. to help with the Kanka investigation. At approximately 7:00 a.m., Ingebrandt was sent to

defendant's house to obtain consent to search the boat in the yard. Cifelli signed the consent and the officers began to search the boat for prints.

Detective Ingebrandt testified that when they walked over to the boat, there was no garbage on the curb at 27 Barbara Lee Drive. During the course of the search, Ingebrandt noticed someone, whom he later learned was defendant, walking a puppy down Barbara Lee Lane. A few minutes later, Ingebrandt noticed three garbage cans between the curb and the side of the boat that had not been there before. The officers obtained Cifelli's consent to search the garbage. At about 9:15 a.m., the officers returned to headquarters with the garbage. Nothing was confiscated from the boat.

Upon searching the garbage, the officers found a rope with some knots tied in it and a substance that appeared to be dried blood on it, the waistband of a small pair of pants appearing to be for a child, and a piece of material that matched the waistband. Unsuspicious items were found as well.

At approximately 10:00 a.m., Ingebrandt and Butera brought the articles of clothing to the Kankas for identification. Mrs. Kanka confirmed that the articles of clothing were Megan's. The Kankas then went to police headquarters to make a statement.

At 12:17 p.m. on the 30th, Pukenas and McDonough interviewed defendant. They read defendant his *Miranda* rights. Defendant signed a form stipulating that he understood his rights and waived them. After questioning defendant, Pukenas asked him to write a statement detailing his activities on the 29th, which defendant did while Pukenas and McDonough waited outside. Pukenas noticed differences between defendant's first and second written statements. Pukenas also noted that defendant kept focusing on the 6:00 to 6:30 p.m. time frame, mentioning it three or four times, even though the detectives had not asked him to highlight that period. After detectives reviewed defendant's statement with him, questioning continued. At that point, Pukenas showed defendant either the clothes or the photographs of the clothes. Defen-

dant identified them as rags from his job and continued to deny any involvement in Megan's disappearance.

Pukenas and McDonough questioned defendant until approximately 6:35 p.m., allowing him two twenty to twenty-five minute breaks, though he remained in the conference room throughout. Towards the end of this period of questioning, at approximately 6:20 p.m., Pukenas' notes indicate that defendant asked to speak to his roommate, Jenin. Jenin was brought into the interview room, accompanied by Kieffer. Jenin spoke first saying to defendant, "They got you, they got you, they got you. You're going to need a friend on the outside, I'll be that friend." In response, defendant put his head down and then looked up and said, "She's in Mercer County Park." He then proceeded to tell the detectives that Megan was dead and that he had put a bag over her head. He agreed to show the police where she was. Pukenas denied that Jenin was told to ask defendant where the body was or what to say.

Police drove defendant to the park. Once inside, defendant brought the detectives directly to the body. The victim was lying in tall weeds concealed from view, with a plastic bag over her head. On the car ride back to headquarters, defendant, at the officers' request, recounted what happened.

Defendant made a written statement at Pukenas's request back at headquarters. It was approximately 7:30 p.m. In this statement, which was read to the jury, defendant relayed the following: on the 29th, the victim wanting to see defendant's puppy came over to defendant's house while his roommates were out; defendant brought Megan into the bedroom and started to touch her; the victim screamed and tried to get away; afraid that she would tell her mother, defendant grabbed the victim, ripping her shorts; defendant then grabbed a belt and put it around the victim's neck, pulling her back in the room; she fell and started to bleed; to stop the bleeding and to prevent the blood from getting on the carpet, defendant placed a plastic bag over her head; he used a second plastic bag to tie off the first; at this point, Cifelli and Jenin

arrived home; thinking the victim was dead, defendant put her in a large toy box, which he had converted to a tool box, and carried her downstairs; as defendant put the box in the van, he thought he heard the victim cough.

Defendant wrote that he was going to dump the body near the power lines, but saw a police car there. Instead, he took the victim to Mercer County Park. As defendant was pulling her out of the box, he placed his fingers in her vagina, "played with her a little" and then dumped her in the weeds. He left the park and went to WaWa, where he bought cigarettes and a paper. He then returned home. Upon arriving home, defendant ripped up the victim's shorts that were in his bedroom and went outside. Mrs. Kanka asked defendant if he had seen the victim. Defendant said that he had seen her by the neighbor's driveway. Defendant then helped look for the victim by handing out fliers.

After writing out his statement, defendant's clothes were removed and he was fingerprinted. [1] At 4:00 a.m., while taking consensual nail clipping from defendant, Officer Wilkins noticed what appeared to be a bite mark on defendant's hand. He took photographs of the mark and measured it with defendant's consent. Dr. Haskell Askin, a forensic odontologist, performed a bite-mark analysis of defendant's hand. He determined that the victim had bitten defendant, leaving the mark.

Dr. Raafat Ahmad, the Mercer County Medical Examiner, performed an autopsy on the victim's body. Dr. Ahmad testified that he found, among other things, petechial hemorrhages in both eyes, a telltale sign of death by strangulation. He found a ligature mark on the neck that was consistent with the leather belt found in defendant's room. The victim had bruising and contusions under her chin, consistent with an object or hand placed on the neck. The victim received a blunt trauma to the eye, caused either by a fist or by striking the head against an object. There was also bruising on the back, arms and legs, indicating the victim had been grabbed and held on her back with someone on top of her. Some of the abrasions could have been caused by rubbing against the carpet.

Internally, the victim had bruises on her colon and right kidney, probably caused by separate blows and/or someone's weight on top of her. There was a tear in the hymenal margin and penetration of the vagina caused by a finger or penis. Additionally, there were two tears in the mucosa covering the anus, indicating penetration by a penis. Severe hemorrhaging was caused by three separate blows to the head with a blunt object.

Dr. Ahmad concluded that the cause of death was mechanical strangulation with the leather belt, constricting oxygen to the brain, causing brain death within three to four minutes. The plastic bags hastened, but were not the cause of death.

Upon reviewing the autopsy, Detective Stanley reread *Miranda* rights to defendant. Again, defendant waived his rights. Stanley told defendant that based on the autopsy reports, he knew defendant was not telling them everything. Stanley said he knew about the sexual assault and blunt trauma to the head. Defendant then admitted to sexually assaulting Megan.

. Officer Stanley administered *Miranda* rights again and obtained another waiver. Stanley then took defendant's formal statement, which was read to the jury at trial. The substance of that statement, as it differed from his first formal statement, is as follows: when Megan tried to leave defendant's room, a struggle ensued; as she fell to the floor, the victim hit her head on the door frame and her face on the dresser; defendant then slapped her face, causing her mouth to bleed; he pulled her pants down and tried, unsuccessfully, to penetrate her vaginally with his penis; he penetrated her with his finger instead. Defendant denied trying to penetrate the victim anally, but "may have slipped" while trying to penetrate her vaginally. During this time, the victim was unconscious but breathing. She was still breathing after he put the bags over her head. Stanley added that after signing this last statement, defendant, in a "flat and unemotional" tone, said he felt he had been "slipping for a while," meaning "getting those feelings for little girls ... for a couple of weeks or a couple of months."

Forensic analysis of the evidence found the following: the tool box in defendant's truck contained an Allen wrench set similar to the wrenches found near Megan's body; an investigator from the FBI DNA Analysis Unit who performed DQ Alpha polymarker testing on rug cuttings from defendant's room concluded that Megan's markers were consistent with two of the rug samples; blood stains found on defendant's belt were consistent with Megan's DNA markers; over 99% of the Caucasian population could be excluded from the possibility of matching Megan's DNA markers; there was insufficient seminal fluid to perform a DNA test on the anal swabs.

A forensic chemist and a forensic scientist analyzed the trace evidence. They concluded that the shorts found in the garbage contained fibers chemically and physically consistent with fibers found on defendant's bedroom rug, the sleeping bag, and in the lint trap of defendant's dryer. Fibers found on the sweat pants matched those taken from Megan's blouse. Over thirty hairs found near defendant's bed, on a dishcloth, on the carpet, and in the black felt cloth had the same physical and microscopic qualities as Megan's. There were four head hairs on Megan's blouse that were consistent with defendant's hair and inconsistent with Cifelli's and Jenin's. A pubic hair on Megan's blouse compared favorably to defendant's. The forensic chemist examining fluid evidence found blood on defendant's bed sheets, the black belt, swabs taken from defendant's bedroom door, oral and anal swabs taken from the victim, and on her blouse and earring.

Defendant did not testify or present witnesses in the guilt phase. His defense was presented through cross-examination and by argument. The jury found defendant guilty on all counts.

### B. *Penalty Phase*

### 1. *Defendant's Case*

In the penalty phase, defendant presented two witnesses who testified to mitigating factors: Carol Krych, a forensic social

worker; and Dr. John Podboy, a clinical and forensic psychologist. Defendant also exercised his right of allocution.

The first witness, Ms. Krych, holds a master's degree in counseling, an international certification in drug and alcohol counselling, and has worked as a forensic social worker for nineteen years. Her testimony was based on over two years of investigation into defendant's social history, from birth to the age of seventeen. According to Krych, defendant clearly had a dysfunctional family life. His mother Doris was a promiscuous alcoholic who had a total of ten children by seven men. Several of her children had been placed for adoption or foster care. Doris was not certain when all of her children were born or who their fathers were. An evaluation of Doris by the United Family and Children's Society prepared in 1955 described her as "quite limited mentally and emotionally," "promiscuous," "amoral," and from a "deprived background."

In 1960, while living with one William Neill, an excessive drinker who had a criminal record and "abused" Doris, she began a relationship with a man named Skip. Jesse was born to Skip and Doris on April 15, 1961. Although Doris was pregnant with Jesse, she accompanied Skip around the country, as he was "basically running from the law." She drank throughout the pregnancy, although she did "cut down." Doris became pregnant with Paul, Jesse's brother, shortly after Jesse's birth.

Doris told Krych that she and Skip lived with her parents on their return to New Jersey. Thereafter they lived in a series of homes, one of which was a "shack." They obtained clothing from "rummage sales," the electricity was frequently off, and the children were cold, dirty and hungry. Although Skip was a painter, Doris said he was "basically . . . a con man" who did not work full-time. The evidence also established that he was a drinker with a criminal record and a tendency toward violence.

Krych's testimony and report drew heavily on school records. Although acknowledging that "conflicting materials" exist, Krych testified that defendant had been diagnosed with emotional prob-

lems and was classified as "educably retarded" by a child study team. He had multiple social, emotional and academic problems. He was never given follow-up counseling or psychological evaluation in the school system. Krych further asserted that Jesse lacked adequate medical care as a child, based on the fact that Doris had no memory of a family physician and included no medical records in the documents she gave to Krych.

Krych conducted extensive interviews with Paul as well. Two of those interviews were taped with Paul's consent and shown to the jury. Paul acknowledged that he had a history of "severe" alcohol and drug addiction, which he attributed to "having such terrible memories." Krych testified that Paul and "other sources" told her that Skip had sexually molested Jesse and Paul several times each week for many years. Paul stated that Skip had drowned a pet dog to scare the boys, forced them to eat a pet rabbit, and cut the head off a cat. Paul also related that when Jesse was eight or nine years of age, the two saw Skip rape a 7–year–old girl in his truck. Skip threatened them and ordered them not to tell anyone.

Krych acknowledged that Paul was "now" saying that Jesse "should be put to death." She noted that this apparent change of heart occurred after Paul discovered that Skip was alive. Paul had told a friend of Skip's, whom Krych had contacted, that "the person that had done this to him could come after and get him."

Dr. Podboy, relying on Krych's report to form the basis of his testimony (he never evaluated defendant), testified that defendant suffers from pedophilia, along with disorders of reading, math, and written expression. Podboy found "probable generalized anxiety, perhaps including post-traumatic stress disorder" and "schizoid personality disorder in defendant." The expert also noted borderline retardation and fetal alcohol effect. He concluded that support from defendant's family was inadequate and that his overall functioning level was 50/100. Podboy testified that if a child's mother drinks and neglects her child between the ages of birth and 5–7, the child will experience difficulties with trust, sex roles

and self-control. If a child 5–7 years old is sexually abused, the child's moral development can be substantially impaired.

Dr. Podboy testified that at the time of the crime, defendant was under "extreme emotional disturbance" and was "unraveling psychologically." Defendant's "capacity to appreciate the wrongfulness of his conduct" was "very much impaired," as was his ability to "conform his conduct ... to the requirements of the law." Defendant had strong urges to be with underage females. His reckless conduct resulted from his desire to satisfy those urges.

Podboy concluded that although defendant demonstrated an ability to engage in knowing and purposeful behavior, his level of functioning was "pretty primitive." Defendant's powerful compulsion resulted from being abused. Low IQ and genetic defects also may play a role. The doctor went on to state that the results of a "SPECT" evaluation, measuring blood flow in regions of the brain, showed a possible serious problem with defendant's brain that could reflect a "vascular insult," "congenital abnormality," or a "post-traumatic insult."

Finally, Podboy testified that defendant's sexual intent towards the victim was separate from her death. Her death was caused by a reflexive response to the panic defendant felt when the victim attempted to flee.

### 2. *The State's Case*

The State relied on evidence presented in the guilt phase to support the aggravating factors. To rebut defendant's mitigating evidence, the State cross-examined defendant's witnesses and presented four rebuttal witnesses of its own—Dr. Sadoff, a forensic psychologist, and three law enforcement officers. Mr. Kanka also read a victim impact statement to the jury.

On cross-examination, Krych acknowledged that no one outside the family ever had corroborated the stories of sexual and physical abuse told to her by family members. Krych also conceded that

there was no evidence in the record supporting the contention that defendant set fires, was cruel to animals, behaved inappropriately or exposed himself to girls. She further acknowledged that she had not incorporated academic progress reports in her findings, including a 1969 school report that concluded that defendant was making exceptional progress, and that there were records showing defendant had a family doctor, a family dentist, and had received all his vaccinations.

Dr. Sadoff testified that there was no support for the mitigating factors of extreme emotional disturbance or mental disease or defect. Defendant's statements about his conduct during the murder revealed that he acted in a logical manner to prevent detection and was in control of the situation. The doctor added that defendant's IQ was borderline, but not so low as to render him unable to function or appreciate the nature of his conduct.

Detectives Raymond and Cowen of the Mercer County Prosecutor's Office stated that Krych's claims that defendant's mother was drunk all the time were disputed by people who knew the family during defendant's childhood. Similarly, witnesses interviewed by the detective disputed claims that defendant's house and clothes were disheveled.

Raymond also testified about the eight meetings he had with Paul Timmendequas. Raymond reported that during their first meeting, Paul said that he thought defendant should die and wanted to "pull the switch." He also told Raymond that everything he said to the defense had been "twisted around." In one meeting, Paul told Raymond that he and defendant had been physically abused by Skip and that Doris had broken defendant's arm when defendant was seventeen. Paul later denied the physical abuse and said that he had been drunk when he made the video tapes with Krych.

The jury unanimously found that the State had proven both aggravating factors beyond a reasonable doubt. With respect to the mitigating factors, four jurors found that defendant was under the influence of extreme emotional disturbance, two jurors found

that he suffered from mental disease or defect, and varying numbers of jurors found ten of the twenty-one catch-all mitigating factors.[1] They were as follows: defendant (1) did not plan in advance to kill or seriously injure the victim (twelve jurors); (2) felt remorse (six jurors); (3) was subjected to years of sexual and physical abuse by his father, including but not limited to fondling, forced oral sex, anal penetration, and beatings by his father's hand or a strap (three jurors); (4) was exposed to domestic violence between his mother and several of her paramours (twelve jurors); (5) was born to a father who had a history of incarceration, drank excessively and totally disregarded the needs of his family and

---

[1] Those catch-all factors not found by any of the jury members are: defendant (1) had a willingness to cooperate with law enforcement authorities, demonstrating a recognition and affirmative acceptance of personal responsibility for his criminal conduct; (2) did not purposefully cause the victim's death; (3) was influenced by panic in causing the death of the victim; (4) had a childhood and adolescence characterized by exposure to domestic violence, criminal activity, substance abuse, instability of the home, emotional and physical neglect and severe physical abuse; had a life void of any normalcy; had parents who did not serve as role models of normal behavior and treated him terribly; lived in a family that was extremely poor and primarily existed on public assistance, especially during the time that Charles Hall was in the home; (5) witnessed his father brutally abuse his brother and mother, both sexually and physically; (6) witnessed his father brutally rape a neighborhood girl when defendant was approximately eight years old, and was threatened not to tell about it; (7) witnessed his father torture and kill several of his pets in an effort to silence him; was told by his father that his father would kill him or his mother if he ever told anyone about the sexual abuse; (8) was subjected to physical abuse at the hands of his mother whose instability and inability to control her temper resulted in her beating him regularly, breaking his arm on one occasion; (9) was actively rejected by his mother and siblings because of his resemblance to his father; (10) was forced to assume the role of care giver due to his mother's inability and unwillingness to properly care for her children; (11) suffered several head injuries resulting from two car accidents; (12) never had his basic physiological and psychological needs met by his parents, including housing, food, clothing, hygiene, educational and medical needs; received no love, no emotionally healthy male or female role models and no support or guidance; had his basic needs completely ignored by his mother and father; (13) despite being evaluated and classified as mentally retarded with emotional problems by the public school's child study team, received no follow-up services such as counseling or further psychological evaluation.

even their lives (eleven jurors); (6) was born to a promiscuous mother who had ten children by seven different men and gave up or had to relinquish seven of these children to the State (twelve jurors); (7) was raised in an atmosphere that did not provide him with stability, having moved twenty-one times by the time he was seventeen years old (twelve jurors); (8) was born to a mother who was emotionally unfit and unable to meet his physical and emotional needs and caused him to suffer from fetal alcohol effect due to her drinking throughout her pregnancy (four jurors); (9) suffered traumatic loss when his stepfather, the only father figure who did not abuse him, died (seven jurors).

The jury also found its own mitigating catch-all factor, 25(a), on which they unanimously agreed: "Jesse Timmendequas' childhood and adolescence were characterized by exposure to domestic violence, criminal activity, substance abuse, instability of the home, emotional and physical neglect and possible physical and sexual abuse. His parents did not serve as role models of normal behavior and treated him poorly. Also, the family was poor and received public assistance."

The jury found beyond a reasonable doubt that the aggravating factors, both individually and collectively, outweighed the mitigating factors, thereby fixing defendant's sentence as death. This appeal followed.

## III.

### Pretrial Issues

#### A. Change of Venue Motion

Defendant moved for a change of venue because of the extensive publicity surrounding this case. In the motion he cited 437 separate articles [2] from the *Trentonian* and the *Trenton Times,* Mercer County's two leading newspapers. He claimed those

---

[2] "Articles" includes stories, columns, cartoons, advertisements, letters to the editor, etc.

articles prevented him from receiving a fair trial in Mercer County.

The pretrial publicity in this case was constant, prolonged and horrendous. The *Trentonian*, a Mercer County newspaper, referred to defendant as "scum," a "predator," a "piece of trash," an "animal," a "pervert," a "dirtball," a "sicko," a "monster," and a "bottom-feeder." The articles often assumed defendant's guilt and disclosed defendant's prior sex offense convictions, including the fact that he had refused psychological treatment while serving a previous sentence. The *Trentonian* frequently stressed that defendant had confessed to the crime, and many articles called for his execution. The case also received nationwide publicity as a result of the activity associated with Megan's Law.

A criminal defendant is guaranteed the right to trial by a fair and impartial jury. *State v. Harris*, 156 *N.J.* 122, 142, 716 *A.*2d 458 (1998). *U.S. Const.* amend. XIV; *N.J. Const.* art. I, ¶ 10. The concept of impartiality requires that "the jury's verdict be based on evidence received in open court, not from outside sources." *Harris, supra*, 156 *N.J.* at 140–43, 716 *A.*2d 458. A trial court, therefore, must take "significant precautions to minimize adverse pretrial and mid trial publicity that is capable of affecting juror perception of the case." *State v. Feaster*, 156 *N.J.* 1, 50, 716 *A.*2d 395 (1998).

In determining whether to grant the motion for change of venue, the trial court analyzed the publicity in accordance with five factors laid out in *State v. Koedatich*, 112 *N.J.* 225, 271, 548 *A.*2d 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L. Ed.*2d 803 (1989) (*Koedatich I*). The court held that first, the extent of the coverage was "significant." Though not comparable to the "'stream of invective' and 'vengeance seeking crusade' found by the trial court in *State vs. Harris* ...," the court nevertheless found that "the totality of the coverage and its nature" had "been constant and prolonged...." Even State officials had commented on the case in various media sources. The court further observed that this case is different from *Harris*,

*supra,* in that "the parents of Megan Kanka have worked with singular purpose towards the goal of generating passage of legislation that would require registration of sex offenders, together with community notification." Second, the court noted that the nature and gravity of the offense cannot be more serious than in a death penalty case. Third, the trial court recognized that the size of the Mercer County community and its potential exposure to media coverage regarding the case were serious concerns. Fourth, the court considered the respective standing of the deceased and the accused. Megan Kanka had become a national figure after her death. As a result, defendant "has a high profile," especially in Mercer County. Finally, with respect to community hostility, the court observed that although there had not yet been crowds or major protests in the courtroom, "that does not mean that the community ... and surrounding municipalities do not feel and harbor a silent rage against the defendant."

Based on its findings, the trial court properly recognized that the media coverage created a realistic likelihood of prejudice to defendant. *See Harris, supra,* 156 *N.J.* at 142–46, 716 *A.*2d 458; *State v. Biegenwald,* 106 *N.J.* 13, 32–35, 524 *A.*2d 130 (1987) (*Biegenwald II* ). Accordingly, the trial court ordered a change of venue to Camden County pursuant to *Rule* 3:14–2.

### B. *Reconsideration of Change of Venue Order*

At the conclusion of the change of venue motion, the State requested a hearing on the location chosen by the court. It had not yet presented evidence on demographics and wanted the opportunity to provide information about other counties as potential locations. The court signed the order changing venue to Camden, but permitted the State to submit a motion for reconsideration of the place of venue.

On November 21, 1995, the State filed for reconsideration of the Order changing venue to Camden. The State requested that the court empanel a foreign jury from Camden in lieu of changing trial venue. In the alternative, the State asked the court to move the

trial to a county more convenient to the victim's family (suggesting Burlington, Middlesex or Hunterdon Counties).

The State argued that the court should reconsider its holding in light of the constitutional rights of the victim's parents. The Victim's Rights Amendment, the State argued, required the court to take into account the "extreme hardship" that would result if the Kankas had to travel to Camden County daily to watch defendant's trial. The State submitted affidavits from Mr. and Mrs. Kanka stressing the emotional and financial burdens that would be placed on the couple if the trial were moved to Camden. The State originally had not argued that point in response to defendant's motion.

The court granted the State's motion and ordered that a foreign jury be empaneled in Mercer County from Camden County. Although still concluding that "[t]here is a realistic likelihood of prejudice from pretrial publicity in Mercer County[,]" the court recognized the importance of protecting the victims' rights. Changing venue would violate the Victim's Rights Amendment of the *N.J. Const.*, art. I, ¶ 22, as it would impose great hardship on the victim's parents. The court further observed that the neighborhood in which the Camden County courthouse sits is dangerous, thereby taking a greater toll on the victim's family and other members of the public who wished to attend the trial. The savings in time and costs also would be significant. Finally, the court stressed the competency of the staff and security at the Mercer County courthouse, noting that the administrators' experience in handling the *Harris* trial would ensure that the proceedings would be adequately safeguarded. The court did "not see any diminishment of the defendant's rights" resulting from a reversal of the decision to change venue.

Defendant now asserts that the trial court's decision to reconsider the change of venue motion was incorrect because: (1) interlocutory motions of reconsideration in criminal matters are not allowed; and (2) the Victim's Rights Amendment does not apply to the question of whether there should be a change of

venue or an empanelment of a foreign jury. Defendant claims those errors violated due process and his constitutional right to a fair trial.

### 1. *Interlocutory Motion to Reconsider*

■ *Rule* 1:7–4 provides that "[u]pon motion made not later than 10 days after service of the final order or judgment . . ., the court may grant a rehearing. . . ." [3] However, Pressler, *Current N.J. Court Rules,* comment 3 on *Rule* 1:7–4[1] (1995) states:

> It is also important to note that the 10–day provision of both this rule and *R.* 4:49–2 apply only to final orders and judgments. *Reconsideration of interlocutory orders, up to the time of final judgment is entered, is a matter within the sound discretion of the trial court to be exercised in the interests of justice.* (emphasis added).[4]

Defendant relies on dicta in *State v. Fitzsimmons,* 286 *N.J.Super.* 141, 147, 668 *A.*2d 453 (App.Div.1995), *rev'd o.g.,* 143 *N.J.* 482, 672 *A.*2d 1165 (1996) to argue that reconsideration motions are inapplicable to criminal matters. In that case, the Appellate Division stated that "[t]here is no corollary rule [governing motions for reconsideration] applicable to practice in the criminal courts." *Ibid.* We disagree. This Court has never questioned the appropriateness of interlocutory motions to reconsider in criminal matters. A motion to reconsider an interlocutory order, such as a change of venue, may be filed in the court's discretion up to the time the final judgment is entered.

### 2. *Victim's Right Amendment*

■ Defendant also contends that the trial court improperly considered the impact changing venue to Camden County would have on the victim's family, both financially and emotionally. The Victim's Rights Amendment was approved by New Jersey voters in 1991. That Amendment provides that:

---

[3] *R.* 1:7–4(b) was amended, effective September 1, 1998. The new rule extends the time period to move for a rehearing from ten to twenty days.

[4] This quotation can be found in Comment 2 of the 1999 rules.

> A victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system. A victim of a crime shall not be denied the right to be present at public judicial proceedings except when ... the victim is properly sequestered in accordance with the law.... A victim of a crime shall be entitled to those rights and remedies as may be provided by the Legislature.
>
> [*N.J. Const.*, art. I, ¶ 22.]

Defendant urges the Court to hold that the amendment merely allows victims to attend a trial and no more.

Defendant views the Legislature's commitment to victim's rights too narrowly. Over the past decade, both nationwide and in New Jersey, a significant amount of legislation has been passed implementing increased levels of protection for victims of crime. *State of New Jersey in the Interest of J.G., N.S. and J.T.*, 151 *N.J.* 565, 581–82, 701 *A.*2d 1260 (1997); *State v. Muhammad*, 145 *N.J.* 23, 33–34, 678 *A.*2d 164 (1996). Specifically, in New Jersey, the Legislature enacted the "Crime Victim's Bill of Rights," *N.J.S.A.* 52:4B–34 to –38. *Muhammad, supra*, 145 *N.J.* at 33, 678 *A.*2d 164. That amendment marked the culmination of the Legislature's efforts to increase the participation of crime victims in the criminal justice system. *Ibid.*

The purpose of the Victim's Rights Amendment was to "enhance and protect the necessary role of crime victims and witnesses in the criminal justice process. In furtherance of [that goal], the improved treatment of these persons should be assured through the establishment of specific rights." [5] *N.J.S.A.* 52:4B–35 (1985). One of the enumerated rights guaranteed for victims is "[t]o have inconveniences associated with participation in the criminal justice process minimized to the fullest extent possible." *N.J.S.A.* 52:4B–36(d).

Giving those words their ordinary meaning, we find that the Crime Victim's Bill of Rights was aimed at preventing the types of hardship argued by the State on behalf of the victim's family. The hardships documented in the Kankas' affidavits are

---

[5] *N.J.S.A.* 52:4B–37 defines victim as "the nearest relative of the victim of a criminal homicide." The Kankas clearly qualify as victims in this case.

significant. The trip to Camden would add two hours a day to the already substantial period of time spent away from their two young surviving children. The emotional toll of the trial and the financial expense of traveling would greatly add to that burden. Considerations of "fairness" and "respect," *supra*, justify the trial court's decision to balance the very real harms the Kanskas would suffer if venue were changed to Camden.

We recognize that the trial court also must give due respect to the Constitutional rights of defendant. In reversing the change of venue order, the trial court stated that "[t]he court does not see any diminishment of the defendant's rights . . ." resulting from the decision to empanel a foreign jury. The court explicitly stated that it was not favoring the rights of the victims over those of defendant. Rather, it was simply taking their concerns into consideration, as it had not done previously. Taking the concerns of the victim's family into account does not constitute error, *provided* that the constitutional rights of the defendant are not denied or infringed on by that decision. As we find no infringement upon defendant's constitutional rights, we reject this argument.

## C. *Option of Empaneling Foreign Jury*

In *State v. Harris, supra*, 156 *N.J.* at 146, 716 *A.*2d 458, we held that it was not reversible error to empanel a foreign jury rather than to change venue. Similar to here, *Harris* involved a capital murder case in which pretrial publicity created a realistic likelihood of prejudice to the defendant. We refused to reverse because the court had "used one of the trial management techniques specifically approved to ensure that a defendant's right to an impartial jury is not compromised." *Ibid.* We observed that the empanelment of foreign jurors was the first trial management technique suggested in *State v. Williams*, 93 *N.J.* 39, 67, 459 *A.*2d 641 (1983) (*Williams I*). Other "[a]vailable options include a change of venue, selection of a foreign jury, and augmentation of the jury pool." *Feaster, supra*, 156 *N.J.* at 50, 716 *A.*2d 395.

Nonetheless, we noted that "[i]n future capital cases a court should change the venue of a capital trial when there is a realistic likelihood that presumptively prejudicial publicity will continue during the conduct of a trial." *Harris, supra,* 156 *N.J.* at 147, 716 *A.*2d 458.

This trial was held before we decided *Harris.* Hence, when defendant was tried, "every intendment of our law was that the empanelment of a foreign jury be an adequate response to the realistic likelihood that the jury would be subjected to adverse trial publicity." *Ibid.* We adhere to our observation that the necessity of requiring a change of venue because of a "barrage of inflammatory reporting" imposes an added expense and inconvenience on the State and the victims of the crime. *Id.* at 147–48, 716 *A.*2d 458. In capital cases, we caution newspapers to refrain from the inflammatory reporting demonstrated by the *Trentonian* and the *Trenton Times* in this case and in *Harris.* However, we decline to reverse on this ground given the state of the law at the time of defendant's trial.

### 1. *Empaneling a Jury from Hunterdon County*

After having decided to empanel a jury from Camden County, the trial court agreed to hear subsequent argument from the State in favor of empaneling a jury from Hunterdon County. On January 29, 1996, the court granted the State's motion to empanel a jury from Hunterdon. Defendant argues that Camden County was the proper jury pool.

*Rule* 3:14–2 authorizes a change of venue or trial by a foreign jury "if the court finds that a fair and impartial jury cannot otherwise be had." However, that Rule does not offer any guidelines in selecting the county for venue or the source of a foreign jury. The Appellate Division, in *State v. Harris,* 282 *N.J.Super.* 409, 421, 660 *A.*2d 539 (App.Div.1995), *appeal after remand,* 156 *N.J.* 122, 716 *A.*2d 458 (1997), relying on the American Bar Association guidelines for venue and jury selection in choosing Hunterdon County, applied the following factors:

(1) The nature and extent of pretrial publicity, if any, in the proposed venue;

(2) The relative burdens on the respective courts in changing to the proposed venue;

(3) The hardships to prospective jurors in traveling from their home county to the site of the trial and the burden imposed upon the court in transporting the jurors; [6]

(4) The racial, ethnic, religious and other relevant demographic characteristics of the proposed venue, insofar as they may affect the likelihood of a fair trial by an impartial jury;

(5) Any other factor which may be required by the interests of justice.

[*Id.* at 421, 660 A.2d 539, (quoting *Criminal Justice Standards: Trial by Jury,* ABA Crim. Just. Sec. Standard 15–1.4 (*3d. ed.* 1993)).]

We find that the trial court did not abuse its discretion in empaneling a jury from Hunterdon County. The trial court applied the *Harris* factors in determining that Hunterdon County was the appropriate source for the foreign jury. The court first considered the nature and extent of pretrial publicity in the proposed counties. The *Trentonian* and, to a lesser extent, the *Trenton Times,* were the main sources of objectionable publicity about defendant. The circulation of the *Trentonian* and the *Trenton Times* in Mercer, Hunterdon, and Camden Counties was as follows:

Trentonian Circulation
1991

| | Mercer | Hunterdon | Camden |
|---|---|---|---|
| Circulation | 51,810 | 1,342 | 110 |

Times Circulation
1992

| | Mercer | Hunterdon | Camden |
|---|---|---|---|
| Circulation | 60,215 | 1,796 | under 25 |

In other cases we have upheld the empanelment of a jury from a county with a far greater circulation disparity than that present here. In *Harris,* the combined newspaper circulation figures were as follows: approximately 20,000 in Burlington County;

---

[6] This factor was inserted by the Appellate Division in lieu of the following third ABA factor: "[T]he relative hardships imposed on the parties, witnesses, and other interested persons with regard to the proposed venue;"

3,000 in Hunterdon County; and 250 in Camden County. We approved the empanelment of a Burlington County jury because "the net effect was not significantly different than if the jury had been from Camden County." *Id.* at 150, 716 *A.*2d 458. Similarly, in *Feaster, supra,* 156 *N.J.* at 51, 716 *A.*2d 395, we allowed the empanelment of a Salem County jury even though it had a higher level of publicity than the proposed county. (Observing Salem County "was by no means inundated with publicity about the murders.")

In this case, the combined circulation rates of the two papers for Mercer County were 34.3 percent; for Hunterdon County, 2.8 percent; and for Camden County, .03 percent.[7] Given the assumptions implicit in determining the extent of pretrial publicity, we disagree with the dissent's assertion that this factor weighs heavily in defendant's favor. *Post* at 661–62, 737 *A.*2d at 135–36 (Handler, J., dissenting). The circulation rates for Hunterdon County were significantly lower than those of Mercer County. Although Camden County had the lowest circulation rates, the net effect of a two percent disparity indicates that Hunterdon County also was clearly outside the circulation range of the Trenton newspapers. *Harris, supra,* 156 *N.J.* at 148–50, 716 *A.*2d 458 (noting defendant's argument that most effective method of minimizing potential prejudice is to pick jury from county where Trenton newspapers are not ubiquitous).

With regard to Factor 2, the court properly determined that empaneling a Hunterdon County jury would disrupt the judicial system in Hunterdon County far less than it would disrupt the Camden County judicial system. The trial court contacted Hunterdon County court officials and was assured that jury selection would not disrupt their caseload. Hunterdon County had no

---

[7] The Court and dissent arrive at different percentages because the dissent uses the number of households in each county as the divisor. *Post* at 657, 737 *A.*2d at 133 (Handler, J., dissenting). Because jurors are selected on an individual basis, and not as household entities, the Court uses as the divisor, the number of people in each county.

capital murder cases pending. By contrast, Camden County had five pending capital murder cases. Moreover, Camden County had 2,057 criminal cases pending indictment as of September 1995, while Hunterdon County had 147. Camden had 4,551 post-indictment cases pending, and Hunterdon County had 180. Clearly, the relative hardships imposed on the prospective courts favored Hunterdon County.

Factor 3, the relative burdens on the parties and other interested parties, also favored Hunterdon County. Traveling between Camden and Trenton takes about one hour. By contrast, a trip between Flemington, in Hunterdon County, and Trenton takes about 35 minutes. Obviously, those travel times would affect how long the trial could last each day. Moreover, the area in Camden where the jurors would be dropped off was relatively desolate. A local law enforcement officer described it as a dangerous area after hours. Given those circumstances, the court properly determined that the hardship would be less onerous for Hunterdon County jurors.

Concerning factor 4, defendant argues that the demographic characteristics of Camden County are more similar to those of Mercer County. As of 1990, Mercer County had a population of 325,824. Hunterdon's population was 107,776 and Camden's was 502,824. *1994–1995 New Jersey Municipal Data Book* (hereinafter, *"Data Book"*). Females comprised 52.6 percent of Mercer County, 50.1 percent of Hunterdon, and 51.9 percent of Camden counties. In 1989, the per capita income in Mercer was $18,936, $23,236 in Hunterdon and $15,733 in Camden. *Data Book* at 584–85, 578. The percentage of college graduates was 19.4 percent in Mercer, 23.4 percent in Hunterdon, and 13.4 percent in Camden. *Ibid.* Thus, in many demographic respects, Hunterdon County was more comparable to Mercer than Camden.

With regard to racial demographics, however, there was a disparity between the counties—Mercer had an 18.89 percent african-american population, Hunterdon had a 2.06 percent african-american population, and Camden had a 16.2 percent african-

american population. Defendant's jury pool in Hunterdon County contained only fifteen minority jurors in a pool of 715, substantially less than the african-american representation of 18.8 percent in Mercer County. Defendant argues that the court should have empaneled jurors from Camden County since it more closely reflected the racial composition of Mercer County. Failure to do so, he contends, violated his constitutional rights.

■ This Court has emphasized that a defendant has the "right to trial by an impartial jury drawn from a representative cross-section of the community." *State v. Gilmore,* 103 *N.J.* 508, 523, 511 *A.*2d 1150 (1986). Under *Rule* 3:14–2, a court must consider racial demographics in deciding whether to change the venue of a criminal trial or to empanel a foreign jury. *Harris, supra,* 282 *N.J.Super.* at 417, 660 *A.*2d 539. However, racial demographics should not be the sole factor in that decision. In selecting the county from which to draw a foreign jury, the court "should ... consider racial demographics together with all other pertinent factors[,]" especially the ABA factors. *Id.* at 419, 660 *A.*2d 539. "Racial demographics should be a particularly weighing factor in selecting the source of a foreign jury when the victim and the defendant belong to different races." *Id.* at 419–20, 660 *A.*2d 539. In this case, defendant and the victim were of the same race.

■ The Constitution does not guarantee a defendant a jury of any specific racial composition. *Taylor v. Louisiana,* 419 *U.S.* 522, 538, 95 *S.Ct.* 692, 702, 42 *L.Ed.*2d 690, 703 (1975). What the Constitution guarantees is that every defendant will be tried by an impartial jury whose members are selected pursuant to "nondiscriminatory criteria." *Batson v. Kentucky,* 476 *U.S.* 79, 85–86, 106 *S.Ct.* 1712, 1717, 90 *L.Ed.*2d 69, 80 (1986) (challenging prosecutor's use of peremptory strikes in discriminatory manner); *Holland v. Illinois,* 493 *U.S.* 474, 480–81, 110 *S.Ct.* 803, 807, 107 *L.Ed.*2d 905, 916–17, *reh'g den.* 494 *U.S.* 1050, 110 *S.Ct.* 1514, 108 *L.Ed.*2d 650 (1990).

To establish an Equal Protection violation, defendant must show purposeful discrimination in the decisionmaking process, *Whitus v. Georgia*, 385 *U.S.* 545, 550, 87 *S.Ct.* 643, 646, 17 *L.Ed.*2d 599, 603–04 (1967), that had a discriminatory effect on the outcome. *Wayte v. United States*, 470 *U.S.* 598, 608, 105 *S.Ct.* 1524, 1531, 84 *L.Ed.*2d 547, 556 (1985). Purposeful discrimination implies that the decisionmaker selected a particular course of action "at least in part 'because of,' not merely 'in spite of' its adverse effects . . ." *Personnel Administrator of Massachusetts v. Feeney*, 442 *U.S.* 256, 279, 99 *S.Ct.* 2282, 2296, 60 *L.Ed.*2d 870, 887–88 (1979). Thus, to prevail on this claim, defendant would have to show that the trial court's decision to empanel a jury from Hunterdon was motivated by a racially discriminatory purpose or because the court anticipated a racially discriminatory effect. Defendant has not proven such intent or effect.

The record is devoid of evidence remotely hinting that the trial court's decision to empanel a jury from Hunterdon County was animated by a discriminatory purpose. The court changed venue to ensure that the victim's family could exercise their State Constitutional right to be present at the trial. It also considered the fact that Hunterdon County is closer in proximity to Mercer County. That would mean more time for trial each day and less time that the jurors would have to travel. The court also took into account the juror's personal security. Jurors drawn from Camden would be dropped off in a dangerous area. Given the trial court's focus on relevant considerations, we find that the empanelment of a Hunterdon jury did not deprive defendant of equal protection.

Defendant also has failed to show he was deprived of rights under the Sixth Amendment. The Sixth Amendment, in pertinent part, provides that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." *U.S. Const.* amend. VI. "The fair cross-section venire requirement is obviously not explicit in this text, but is derived from the traditional understanding of how an 'impartial jury' is assembled." *Hol-*

*land, supra,* 493 *U.S.* at 480, 110 *S.Ct.* at 807, 107 *L.Ed.*2d at 916. The Constitution does not require that petit juries actually mirror the community or reflect the various groups in the population. *Holland,* 493 *U.S.* at 483, 110 *S.Ct.* at 808, 107 *L.Ed.*2d at 918; *Taylor, supra,* 419 *U.S.* at 538, 95 *S.Ct.* at 702, 42 *L.Ed.*2d at 703. It does not guarantee that every discrete group will be represented proportionally in the jury venire or on the petit jury. *Gilmore, supra,* 103 *N.J.* at 525, 511 *A.*2d 1150. The purpose of the cross-section requirement is to assure that defendant is tried before an *impartial* jury, which the Constitution demands. *Holland, supra,* 493 *U.S.* at 480, 110 *S.Ct.* at 807, 107 *L.Ed.*2d at 916.

There is no evidence that the racial composition of the jury venire affected the jury's ability to be impartial. This case does not involve any racial issue but rather involves human concerns that touch the hearts and minds of all people, regardless of their race, religion or gender. Given the overwhelming evidence against defendant, it is highly doubtful that a jury from Camden would have reached a different verdict or sentence. Moreover, there is no assurance that the composition of the jury pool would have been radically different in Camden County. Because the case received basically the same amounts of press coverage in both Camden and Hunterdon Counties, and the victim and the defendant were of the same race, the trial court properly decided that the disparate racial composition of the counties was an important, but not the critical factor. Absent a showing of illegal discrimination, defendant had no constitutional right to a jury from Camden County simply because it might have increased his chances of having more minorities on his jury.

We find little merit in the dissent's assertion that racial demographics outweigh the other demographic characteristics enumerated in *Harris* factor four. *Post* at 663–64, 737 *A.*2d at 137 (Handler, J., dissenting); *see Harris, supra,* 282 *N.J.Super.* at 421, 660 *A.*2d 539. "[W]here ... race is the demographic characteristic at issue, the change of venue *must* be to a county having the same racial demographics...." Pressler, *Current N.J. Court*

*Rules,* comment on *R.*3:14–2 (1998) (citation omitted) (emphasis added). Unlike *Harris,* race is not the demographic characteristic at issue. In *Harris,* the defendant, a black man, was charged with the capital murder and rape of a young white girl. *Id.* at 411, 660 A.2d 539. In this case, defendant and the victim were of the same race.

The dissent also asserts that the failure to empanel a jury from Camden constitutes a Sixth Amendment violation of such magnitude that it cannot be considered under the harmless error analysis. *Post* at 666–67, 737 A.2d at 138–39 (Handler, J., dissenting). In *State v. Bey,* 112 *N.J.* 45, 94, 95, 548 A.2d 846 (1988) (*Bey I*), we held that in capital cases "we shall continue to determine the reversibility on the basis of a qualitative determination that considers, in the context of the entire case, whether the error was clearly capable of affecting either the verdict or the sentence." We noted, however, that the only exception where harmless error analysis would not apply involves "constitutional violations ... [that] by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." (quoting *Satterwhite v. Texas,* 486 *U.S.* 249, 108 *S.Ct.* 1792, 1792, 100 *L.Ed.*2d 284 (1988)).[8]

We find that the alleged error of not having jurors empaneled from Camden was not clearly capable "by its nature of affecting either [defendant's] verdict or the sentence." As we stated in *Harris,* "The principal risk of jury contamination in this case arose in Mercer county and not in the home counties of the jurors. It made little difference whether the jurors were from Burlington or Camden Counties." *Ibid.* Once the initial taint is dispelled by the empanelling of a foreign jury, the source of that jury does not "by its very nature" render the trial process so fundamentally unfair as to require automatic reversal.

---

[8] Although *Satterwhite* involved a Sixth Amendment violation of a defendant's right to counsel, the Supreme Court applied a harmless error analysis in determining whether the defendant's capital conviction should be reversed.

## 2. *Effect on Jury*

 Moreover, defendant offers no evidence showing that any jury member actually was prejudiced by the trial being held in Mercer County. To the contrary, the evidence indicates that jury members remained untouched by press coverage throughout the trial.

Central to the court's decision to empanel a foreign jury was the fact that the Mercer County court administrators had substantial experience in the procedures necessary to protect jurors from trial-related publicity, gained while "host[ing]" the *Harris* trial. Jurors were picked up each morning and transported to Mercer County. Prior to trial, a special area on the fifth floor of the Mercer County Courthouse was designated for the jurors' use. The court repeatedly admonished jurors that it was vital for them to avoid any publicity about the case and to avoid discussing the matter with anyone.

When trial began on May 5, 1997, the trial court told the jurors to eat lunch inside the courthouse and to avoid any contact with outsiders. The court then asked if anyone had been subjected to accounts of the case. All jurors answered in the negative. The court told jurors to inform the court if any information about the case came to their attention during the trial. The court also told jury members to "have somebody screen [all media sources] for them." Every single day of the trial the court asked the jurors whether they had seen, heard, or read anything about the case. Every day, the answer was no.

Although defendant brought inflammatory news stories about the trial to the court's attention on an ongoing basis, there is no evidence that any of the jury members ever saw any inflammatory publicity. The court took great precautions to ensure that jurors remained isolated. For example, immediately before the penalty phase, the defense moved to terminate the trial and sentence defendant as a non-capital offender because of the *Trentonian*'s unprecedented coverage of the verdict. To see whether any juror was adversely affected by publicity and whether the jurors could

remain impartial during the penalty phase, the court individually questioned each juror. At the conclusion of the individual *voir dire*, the court determined that all jurors remained fair and impartial. The court continued to question jurors about their exposure to publicity throughout the penalty phase. The jurors each time indicated they had not viewed or read any information about the case.

It would have been preferable if the trial court had not reversed its decision to change venue. Nevertheless, because of the precautions taken by the trial court, the fact that empanelment of a foreign jury was a valid management technique at the time of the trial to avoid the effect of prejudicial pretrial publicity, and the lack of evidence indicating actual jury taint resulted from the trial being held in Mercer County, defendant's constitutional rights were not infringed upon. The court's decision to reverse its prior determination to change venue and to empanel a foreign jury was not reversible error.

The record reveals that the trial court took more than adequate measures to "minimize the danger that prejudice would infiltrate the adjudicatory process." *Harris, supra,* 156 *N.J.* at 149, 716 *A.*2d 458. The trial court carefully weighed the *Harris* factors in selecting a jury from Hunterdon. There is no evidence of purposeful discrimination or actual bias. Empaneling a jury from Hunterdon County did not infringe on or deny defendant's constitutional rights. Accordingly, the trial court's decision to change its original venue order is not an abuse of the trial court's discretion and is not reversible error.

## IV.

### Jurors' Knowledge or Suspicion of Defendant's Prior Criminal History As A Sex Offender

The court and counsel *voir dired* three hundred and thirty-two prospective jurors. Of that pool, only five stated they were unaware of defendant's prior convictions. Over defendant's objec-

tions, the court qualified sixty-six jurors who announced they could decide the case solely on the evidence adduced at trial and the court's instructions. Only two jurors on the deliberating panel did not suspect that defendant had a prior record. Nine deliberating jurors suspected that defendant previously had been convicted of a sex offense. One juror knew about the convictions.

At the conclusion of *voir dire*, defendant asked the court to dismiss the jurors and reconvene in Camden County. He argued that despite what jurors said, they really would not be able to set aside their knowledge of defendant's prior record. Defendant now claims he was denied a fair trial because the jurors who deliberated knew or suspected he had a prior record. We disagree.

### A. *The Law*

This Court in *Williams I, supra,* held that the trial court's responsibility to preserve the integrity of the jury "under both the federal and state constitutions ... is at its peak in cases involving the death penalty." 93 *N.J.* at 63, 459 *A.*2d 641; *see also State v. Ramseur,* 106 *N.J.* 123, 324, 524 *A.*2d 188 (1987), *cert. denied,* 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d 653 (1993). A "trial by an impartial jury ... goes to the very essence of a fair trial." *Williams I, supra,* 93 *N.J.* at 60, 459 *A.*2d 641. However, a jury with knowledge about a case still can be impartial. The right to an impartial jury does not require that jurors be totally ignorant of the facts and issues involved in a given case. *State v. Marshall,* 123 *N.J.* 1, 77, 586 *A.*2d 85 (1991) *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993), (*Marshall I* ); *Koedatich I, supra,* 112 *N.J.* at 268, 548 *A.*2d 939; *State v. Sugar,* 84 *N.J.* 1, 23, 417 *A.*2d 474 (1980). Indeed, "it is difficult to imagine how an intelligent venireman could be completely uninformed of significant events in his community." *United States v. Abello–Silva,* 948 *F.*2d 1168, 1178 (10th Cir.1991), *cert. denied,* 506 *U.S.* 835, 113 *S.Ct.* 107, 121 *L.Ed.*2d 65 (1992). It is sufficient "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *State v. Williams,* 113 *N.J.* 393,

429, 550 *A*.2d 1172 (1988) (*Williams II*) (quoting *Dobbert v. Florida*, 432 *U.S.* 282, 302, 97 *S.Ct.* 2290, 2303, 53 *L.Ed.*2d 344, 362 (1977)).

The Supreme Court has concluded that pretrial exposure to a defendant's prior conviction in the initial trial does not create an irrebuttable presumption of juror prejudice. *Patton v. Yount*, 467 *U.S.* 1025, 1035, 104 *S.Ct.* 2885, 2891, 81 *L.Ed.*2d 847 (1984). Properly motivated and carefully instructed jurors can, and have, exercised the discipline to disregard such information. *Cf. United States v. McVeigh*, 918 *F.Supp.* 1467, 1473 (W.D.Okla.1996), *aff'd*, 153 *F.*3d 1166 (10th Cir., 1998). We therefore reject a *per se* rule that presumes a juror is incapable of remaining impartial if he knows or suspects that a defendant has prior convictions.

"[T]o distinguish potential jurors who are able to put their opinions or prior knowledge aside from those who are unable to serve in an impartial fashion, the trial court must conduct a probing *voir dire* of [the] jurors." *Williams II, supra*, 113 *N.J.* at 429, 550 *A.*2d 1172. In determining whether a juror is predisposed to bias or prejudice, the trial court has a duty to evaluate the juror's entire response. *Ramseur, supra*, 106 *N.J.* at 257, 524 *A.*2d 188. Appellate courts should not disturb a trial court's determination of whether a jury can render an impartial verdict without careful consideration. *Williams II, supra*, 113 *N.J.* at 410, 550 *A.*2d 1172. "[T]his Court is 'perhaps too far removed' from the realities of the *voir dire* to appreciate the nuances concealed by a 'bloodless record'; therefore, deference to the trial court is usually prudent." *Williams II, supra*, 113 *N.J.* at 411, 550 *A.*2d 1172.

The question we must address is whether the trial court abused its discretion in determining that the seated jurors could disregard their suspicions and knowledge of defendant's prior convictions and render an impartial verdict. We reiterate that the Constitution does not require ignorant jurors, but only jurors who can lay aside any preconceived notions and judge the

defendant impartially. *Mu'Min v. Virginia,* 500 *U.S.* 415, 430, 111 *S.Ct.* 1899, 1906, 114 *L.Ed.*2d 493, 509 (1991); *Marshall I, supra,* 123 *N.J.* at 77, 86–87, 586 *A.*2d 85. A trial court's finding of impartiality must be given deference, and overturned only when manifestly erroneous. *Id.* 123 *N.J.* at 87, 586 *A.*2d 85.

### B. *Analysis*

Knowledge of Megan's Law and defendant's role in its enactment was widespread. However, the record supports our finding that defendant was afforded an impartial jury that decided the case on the evidence presented in court, rather than on information gained from publicity.

The victim's parents led a nationwide crusade to secure passage of sex offender notification laws. Their efforts culminated on May 7, 1996, when the United States Senate passed a law requiring each state to implement a sex offender notification system. Newspapers all over the State, from the *Trenton Times* to the *New York Times* to *USA Today,* carried the story. Many of the articles mentioned that defendant was the inspiration for the law and some explicitly referred to defendant's two prior sex offense convictions.

Prior to the commencement of *voir dire* on January 13, 1997, defendant preemptively moved to strike for cause all jurors who had knowledge of Megan's Law. Defendant argued that anyone with this knowledge would, at some point, make the connection between defendant and Megan's Law. From there, he or she could deduce that defendant had a prior record as a sex offender. Probing questioning to determine the extent of a jurors' knowledge, defendant argued, would not eliminate the problem and would most likely exacerbate it.

The court rejected defendant's motion, finding that the only way to ensure juror impartiality and to avoid the prospect that jurors made the forbidden connection mid-trial was to question the jurors extensively on their knowledge of Megan's Law and defendant's

prior history.[9] In his colloquy explaining the decision, the court stated,

> The gross prejudice that would be visited on the defendant, should this connection occur during the deliberation process, or at some other earlier point, and not disclosed, would certainly have the clear capacity to produce an unjust result. The potential for such a circumstance is real, and must be confronted in a forthright manner.

So, on the first day of jury selection, the trial court provided the pool of prospective jurors with an overview of the case, including the fact that it involved the murder and sexual assault of seven-year-old Megan Kanka.

The trial court then conducted an extensive and careful *voir dire* of each juror, taking approximately three months. Each juror was asked to fill out a lengthy questionnaire containing questions ranging from: their professional life; to the newspapers they read; to their knowledge and opinion of both the case and Megan's Law; to their thoughts on the criminal justice system and the death penalty; to their ability to remain fair and impartial.

Specifically, Question # 81 asked: "Do you believe or suspect that defendant ... has a criminal record?" If the juror answered "yes," she had to detail the sources of the belief or suspicion and answer whether she could put that belief aside and follow the court's instructions. Each juror also had to provide detailed information on the sources from which she received her news and whether she regularly read either of the Trenton papers. Each juror also was asked whether she had formed an opinion concerning defendant's guilt or innocence.

Next, the court and the attorneys engaged in an extremely detailed oral questioning of each potential juror, specifically probing any questionnaire answer that signaled potential bias. De-

---

[9] On April 15, 1997, defendant renewed his motion to strike all jurors who had a belief or suspicion that defendant had prior criminal record, arguing that 95 percent of the people filling out the questionnaires that had been reviewed thus far knew or suspected that defendant had a prior record. That motion was denied.

fense counsel was allowed to conduct additional questioning. Throughout the process, the court focused on the jurors' knowledge of defendant, the crime against Megan Kanka, Megan's Law, and their feelings and thoughts about each. On the basis of *voir dire*, the court qualified seventy-one jurors who either had no knowledge of defendant's prior convictions (five jurors) or who knew about the prior convictions but said they could be impartial (sixty-six jurors). The jury then was selected.

Throughout the trial, the court repeatedly expressed to the jury the importance of evaluating the case only on the evidence presented at trial. The court strenuously warned the jury to "insulate [themselves] from discussing the case, even with fellow jurors" and to insulate themselves "from radio, from television, sound bytes as well as from the newspaper and other media accounts...." At various points, the court admonished the jury to remember that "[n]ewspaper accounts, media accounts are not evidence ... They [are] often based upon second or third hand reports, on hearsay." Such evidence "simply is unreliable." The jury's "obligation is to decide this case on the basis of evidence that comes before you during the course of this trial ...."

In charging the jury, the court again explained the importance of using only the evidence presented at trial: "As you know, your obligation is to decide this case on the basis of evidence that comes before you during the course of this trial...." "You're judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence presented...."

> You must decide the case on the basis of the evidence without bias, without prejudice, without sympathy. We all have our predispositions, our prejudices, our sympathies, but they may not influence legal rulings in this courtroom, they may not influence the jury verdict. These things, bias, prejudice, sympathy, have no place in the jury deliberation room.

Again on May 30 the court reminded the jury to

> remain the kind of jury that you have been throughout these proceedings, following the instructions, paying close attention, deciding this case on the basis of the evidence that comes before you, not on the basis of opinion pieces, editorials, whatever it may be.

Based on our examination of the record, we conclude that defendant was tried by a fair and impartial jury at both the guilt and penalty phases of the trial. The *voir dire* process was carried out meticulously and thoughtfully to ensure that the jurors ultimately empaneled could render a fair and impartial verdict and sentence based solely on the evidence presented at trial. Many potential jurors admittedly could not set aside their knowledge of defendant's prior convictions. Those jurors were dismissed. The jurors who sat on the jury were subjected to painstaking questioning. Their answers convinced the court they could disregard defendant's prior record or their suspicion of that record and decide the case solely on the facts introduced into evidence at the proceeding. We will not overturn the court's decision merely because the jury might have known of defendant's prior convictions. There is no evidence that such information corrupted their deliberations. We will presume that the jury adhered to the court's instructions. *Muhammad, supra,* 145 *N.J.* at 52, 678 *A.*2d 164; *State v. Manley,* 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969).

In *Koedatich I, supra,* 112 *N.J.* at 285, 548 *A.*2d 939, the defendant also moved to excuse for cause any juror who read or heard about the case. In denying that request we stated: "[i]mplicit in defendant's contention that the trial court should have excluded for cause any juror who read or heard about the case is the notion that *voir dire* is an ineffective means of determining juror prejudice under such circumstances." *Ibid.* We declined "to adopt such a rule for which we find no support in this or any other jurisdiction. In fact, such a rule would be inconsistent with long-established precedent holding that acceptable jurors need not be entirely ignorant of the matter at hand." *Ibid.* (citing *Murphy v. Florida,* 421 *U.S.* 794, 799–800, 95 *S.Ct.* 2031, 2035–36, 44 *L.Ed.*2d 589, 594–95 (1975)).

We further disagree with defendant's assertion that *State v. Brunson,* 132 *N.J.* 377, 625 *A.*2d 1085 (1993) is applicable. In *Brunson,* we held that the State could offer into evidence only the number, degree, and date of defendant's prior convictions when

defendant had prior convictions for the offenses that were the same or similar to the offense charged. The State could not specify the offense. *Id.* at 391, 625 *A.2d* 1085. There is a difference, however, between allowing evidence of a prior conviction to impeach a defendant's testimony and allowing jurors who suspect or have knowledge of a defendant's prior conviction to serve on a jury.

Even where the jury has learned of defendant's prior convictions, we have refused to reverse when evidence of a defendant's guilt was overwhelming. In *Harris, supra,* 156 *N.J.* at 160, 716 *A.2d* 458, we held that "[t]he trial court did not abuse its discretion in failing to empanel two juries before trial" even though some or all of Harris' long list of prior convictions might have been brought to jurors attention during trial. *See also State v. Pennington,* 119 *N.J.* 547, 575 *A.2d* 816 (1990) (holding that prior murder convictions could be admitted into evidence to impeach testifying defendant in his capital murder trial). In *Pennington,* the jury learned of the defendant's prior murder conviction. *Id.* at 573, 575 *A.2d* 816. We refused to reverse because of "the practical recognition that in the context of the cumulative weight of [the defendant's] inculpatory statement, admission of that evidence would not have affected the jury's determination concerning [his] responsibility for the victim's death, ..." *Brunson, supra,* 132 *N.J.* at 392, 625 *A.2d* 1085 (explaining holding in *Pennington, supra* ). Similarly, in *State v. Rose,* 112 *N.J.* 454, 489, 548 *A.2d* 1058 (1988), due to the overwhelming evidence of guilt, we held that it was not reversible error to admit evidence in the guilt phase of defendant's past conduct. *Id.* at 508, 548 *A.2d* 1058 (reversing death sentence where court failed to give careful and precise limiting instruction).

Unlike *Harris, Pennington,* and *Rose,* defendant's prior convictions and "bad acts" were never admitted into evidence, nor mentioned by defense counsel or the State during trial or summation. The State did not even offer evidence of defendant's prior convictions in the penalty phase to rebut defendant's claim of

"remorse." Defendant also never requested that the case be tried by two juries. Given defendant's confession and the overwhelming evidence against him, suspicion or knowledge of defendant's prior convictions would not have affected the jury's determination of whether he killed Megan or the outcome of the penalty phase.

Moreover, in the absence of defense counsel's request for limiting instructions on the use of defendant's prior convictions, we do not find that the trial court should have given such instructions *sua sponte* in either the guilt or penalty phase. Defendant's prior convictions were brought to the jurors' attention only during *voir dire* as a screening mechanism to eliminate jurors who would be unable to decide the case based only on the evidence presented at trial. Defendant's prior convictions were never introduced into the record or confirmed by the court. Indeed, the trial court redacted as inadmissible all references in defendant's confession to his prior convictions. The court also repeatedly admonished jurors to consider only the evidence in the record. In light of those circumstances, compelling the trial court to issue instructions *sua sponte* would have marked an unwarranted intrusion into defense counsel's strategy and would have been damaging to defendant.

The court was faced with an unusual problem in this case. There was national and state-wide publicity regarding Megan's Law. Jurors knew about the law and defendant's role in its enactment. Under those circumstances, the court needed to screen jurors to ensure they could carry out their task of impartially judging defendant's guilt. Inquiring into jurors' knowledge about Megan's Law and defendant's prior criminal history was a reasonable way to deal with that problem and not an abuse of discretion.

We therefore conclude that allowing jurors to serve on the jury, despite suspicions that defendant previously had been convicted of sexual offenses, was not reversible error. We further conclude that to give limiting instructions *sua sponte* would have been inappropriate and would not have changed the outcome of the

penalty phase. There were sufficient indicia that the jury relied only on the evidence presented, and not on their suspicions of defendant's prior convictions in reaching their decisions.

## V.

### Prosecutorial Misconduct

Defendant also maintains that numerous instances of prosecutorial misconduct, in both the guilt and penalty phases of the trial, constitute reversible error.

The standard for reversal based upon prosecutorial misconduct is well-settled in the law. It requires an evaluation of the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial. We long have held that prosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial. *State v. Chew,* 150 *N.J.* 30, 84, 695 *A.2d* 1301 (1997) (*Chew I*); *State v. Roach,* 146 *N.J.* 208, 219, 680 *A.2d* 634, *cert. denied,* 519 *U.S.* 1021, 117 *S.Ct.* 540, 136 *L.Ed.2d* 424 (1996); *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.2d* 188. The "fair trial" test applies to alleged prosecutorial misconduct in both the guilt, *Koedatich I, supra,* 112 *N.J.* at 320–25, 548 *A.2d* 939, and penalty phases of a capital trial. *Pennington, supra,* 119 *N.J.* at 565, 575 *A.2d* 816; *Rose, supra,* 112 *N.J.* at 509–11, 548 *A.2d* 1058.

To justify reversal, the prosecutor's conduct must have been "clearly and unmistakably improper," and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense. *Roach, supra,* 146 *N.J.* at 219, 680 *A.2d* 634; *State v. Hightower,* 120 *N.J.* 378, 411, 577 *A.2d* 99 (1990); *Williams II, supra,* 113 *N.J.* at 452, 550 *A.2d* 1172. In determining whether the prosecutor's comments were sufficiently egregious to deny defendant a fair trial, we consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred. *State v. Scherzer,* 301 *N.J.Super.* 363, 433, 694 *A.2d* 196 (App.Div.1997). Specifical-

ly, the Court should consider "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." *Ramseur, supra*, 106 *N.J.* at 322–23, 524 *A.*2d 188; *Chew I, supra*, 150 *N.J.* at 84, 695 *A.*2d 1301.

█ Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. *Ramseur, supra*, 106 *N.J.* at 323, 524 *A.*2d 188. Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made. *State v. Irving*, 114 *N.J.* 427, 444, 555 *A.*2d 575 (1989). Failure to object also deprives the court of the opportunity to take curative action. *Ibid.*

█ Even if defense counsel fails to object,

[a] prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved. Absolute adherence to this duty is stringently compelled in capital cases where the penalty is death.

[*State v. Long*, 119 *N.J.* 439, 483, 575 *A.*2d 435 (1990) (citations omitted).]

## A. *Guilt Phase*

Defendant alleges numerous instances of prosecutorial misconduct in the guilt phase. Specifically, defendant alleges errors in the prosecutor's opening and closing statements, in her examination of witnesses and in comments denigrating the defense. The State claims, as a general defense, that the prosecutors' statements were based upon inferences reasonably drawn from the evidence presented and therefore, were proper.

█ Because defense counsel did not object to any of the prosecutor's opening remarks, or to many other remarks now claimed to constitute prosecutorial misconduct, defendant must demonstrate plain error to prevail. *State v. Irving, supra*, 114 *N.J.* at 444, 555 *A.*2d 575. Plain error is "error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury

fairly evaluate the merits of his defense." *Ibid.* (citations omitted).

### 1. *Opening Statement*

█ Defendant argues that the prosecutor introduced two themes in her opening statement that she returned to throughout the trial, which constituted error: defendant's sexual perversion before the crimes; and his lack of emotion after the crimes.

In her opening statement, the prosecutor described defendant's interest in Megan in the following way:

> This was not the first time that the defendant had noticed Megan. To the contrary, you will learn that that man, the defendant, had been watching that little girl for months. He had had his eye on Megan, his thoughts anything but pure. And so Megan walked into that house. She couldn't know that about the defendant. So when she walked, her head was filled with vision of a puppy. One can only imagine the visions that filled the defendant's head.

The prosecutor also described defendant's lack of emotion following the murder by: pointing out that defendant denied to the victim's mother that he had seen the victim; describing how defendant calmly and calculatingly placed the victim's body in a toy chest for disposal; and contrasting defendant's demeanor following the crime with the relatively emotional response of the investigating officers.

█ A prosecutor in her opening statement may state only those facts that she intends to prove in good faith. She also may argue all inferences that properly may be drawn from those facts. *Chew, supra,* 150 *N.J.* at 84, 695 *A.2d* 1301. As all damaging evidence is inherently prejudicial, the court affords the prosecutor considerable leeway in making her opening. *Ibid.* However, the court must patrol the boundaries of propriety to ensure that defendant's right to a fair trial is not compromised.

█ Evaluating the prosecutor's guilt phase opening statement in its entirety along with the trial court's curative instructions, we are unable to conclude that the statement, although at times improper, was so prejudicial as to deny defendant the right

to a fair trial. Most of the statements in the State's opening were a fair comment on the evidence actually produced at trial. The prosecutor commented on defendant's motive in kidnapping, sexually assaulting and murdering the victim. Although such information was highly prejudicial and inflammatory, it was excerpted from defendant's own confessions that were admitted into evidence. As we previously have recognized, admissions are always prejudicial. *State v. Kuske,* 109 *N.J.Super.* 575, 588, 264 *A.*2d 227 (App.Div.) *certif. denied,* 56 *N.J.* 246, 265 *A.*2d 701 (1970). Nonetheless, they are admissible evidence. *N.J.R.E.* 803(c)(25); *State v. Rechtschaffer,* 70 *N.J.* 395, 413–14, 360 *A.*2d 362 (1976). Therefore, we conclude that reference to an admissible portion of a defendant's confession in an opening statement is not reversible misconduct, even if prejudicial to the defense.

Moreover, the court's instructions mitigated the likelihood of error. The trial court clearly advised the jury that opening statements are not evidence. "Opening statements are a means to alert ... [jurors to] what the case is all about ... it's somewhat like a road map to tell you where ... the state is going to go, perhaps indicating the witnesses and the order of witnesses, what witnesses are expected to testify to. *But those are expectations. That's not evidence ....*" We presume that the jury followed the court's specific admonitions regarding the role of opening statements. *Feaster, supra,* 156 *N.J.* at 65, 716 *A.*2d 395. Therefore, we find no evidence that the prosecutors remarks substantially prejudiced defendant's right to a fair trial.

### 2. *Elicitation of Testimony Regarding Defendant's Demeanor*

▇ Throughout its examination of witnesses, the prosecution inquired into defendant's emotional state following the crime. Specifically, defendant objects to a number of remarks elicited from Detective Pukenas and Sergeant O'Dwyer.

Detective Pukenas testified that defendant recounted the murder to the accompanying officers in a "normal tone of voice." The Detective also stated that "I think he was the only one not crying."

Although this questioning may have crossed the bounds of propriety, the court issued the following curative instruction:

> That part, I think, the jury should be instructed to disregard. His emotional state at the time is relevant for you to understand, evaluate all of the testimony. His reaction is not, in my judgment. Please disregard the last statement. Go ahead.

The prosecutor then continued:

Q. Detective, did he ever in the car on the way back say that it was an accident?

A. He never said that.

Q. Did he ever say that he didn't mean to kill her?

A. He never indicated that at all.

Q. Did he ever say he was sorry that he killed her?

A. He never said that.

Q. Did he ever say any words whatsoever that indicated remorse?

A. Nothing like that at all.

On redirect, noted that at one point during the interrogation defendant was "talking a little bit more than he had prior to that ... [b]ut not in any tone of voice that would indicate remorse." The court sustained defense counsel's objection to the conclusory statement about remorse and told the jury to disregard it.

On direct examination of Sergeant O'Dwyer, the prosecutor elicited testimony regarding defendant's emotional state during the writing of the first confession. When the prosecutor asked whether there was any "point in time when [defendant] cried during this statement?" The trial court sustained the objection and stated "Please disregard that, ladies and gentlemen. Ms. Flicker, there was no reason for that question whatsoever."

The prosecutor then asked Sergeant O'Dwyer to read defendant's statement to the jury. While doing so, O'Dwyer broke down in tears. Beside himself, O'Dwyer accepted the court's invitation to take a break and continue his testimony the next day. The trial court assured defense counsel that if O'Dwyer continued to cry, someone else would read the statement. Defense counsel, noting that other officers also had become emotional while on the stand, suggested to the court that such testimony was a "farce." The trial court disagreed. The court then stated on the record that an "emotional moment" such as O'Dwyer's was to be expected

from time to time and admonished the jurors to set aside any emotional response to O'Dwyer's breakdown. The court reminded them to rely solely on the evidence.

The next morning, the court reminded jurors that O'Dwyer's response was not evidence and that they should rely solely on the evidence. The judge then asked if any juror had been affected. No juror responded.

Defendant alleges that the prosecutor's line of questioning improperly emphasized defendant's lack of remorse. He suggests that the prosecutor's primary purpose was to engender contempt for defendant. That is an improper motive. However, because defendant's confessions were critical to the State's case, we find that defendant's emotional state and state of mind when he confessed are relevant. They demonstrate that defendant's confessions were made knowingly, voluntarily and intelligently. They show that he was in full command of his faculties and not overcome by emotion. Moreover, the prosecutor's questions were based on evidence in the record, and each objection was supplemented with a curative instruction. For all those reasons, we do not find that the prosecutor's questions concerning defendant's demeanor and emotional state constitute plain error.

With respect to O'Dwyer's breakdown, we further find that any potential prejudice was ameliorated by the curative instructions given both immediately after and on the morning after the incident. The court also received affirmance from the jurors that they were not affected by emotional outbursts. At most, minimal prejudice resulted from that line of questioning.

### 3. Repeated Reference to Defendant's Concern Over His Hand and Related Anger Towards Victim

During the crime, the victim bit defendant's hand. At the police station, defendant stated at least three times that he was in considerable pain and blamed the victim for inflicting the wound.

Dr. Askin, a forensic dentist, examined defendant's hand at the station and performed bite-mark identification and analysis.

At trial, Sergeant Stanley testified about those events at the police station. He was asked:

Q: Was there any further mention of the hand?

A: Yes. He continued to complain about his hand being hurt and, again, he felt that Megan was responsible and he blamed her for that injury.

We reject defendant's argument that this line of questioning was prejudicial. Questions regarding defendant's hand constituted relevant evidence of how the crime occurred. The evidence also corroborates the forensic determination that the bite on defendant's hand was made by the victim.

### 4. *Repeated Reference to Dr. Askin's Removal of Victim's Lower Jaw*

Dr. Askin testified that he had removed the victim's lower jaw during the autopsy to make a model of her teeth. The prosecutor repeatedly referred to that fact throughout the questioning. The trial court called counsel to sidebar, where he reprimanded the prosecutor:

Let me tell you something I have a bigger problem with, and that's four times now you've asked questions that resulted in the responses, with the removal of the lower jaw. I asked you very specifically, was it relevant as to where the lower jaw was used for making the impressions. You said it was. It wasn't. I think that's inflammatory stuff.

The prosecutor's repeated reference to the fact that Dr. Askin removed the victim's lower jaw during an autopsy should not have been repeated. The trial court recognized as much and harshly reprimanded the prosecutor. The prosecutor promptly conformed his questioning to the court's instruction. We, therefore, conclude that at most, minimal prejudice resulted from this line of questioning.

### 5. *Reference to Defendant's Sexual Perversion*

The prosecutor asked Sergeant O'Dwyer to read portions of defendant's statement to the jury. Defendant argues that the

excerpts should have been excluded, as they portrayed him as a pedophile or sexual pervert. Specifically, defendant objects to the elicitation of the following portion:

Q: What was your intention of bringing her into the house?

A: My intentions were just to feel her up and kiss her and try to get her not to say anything. I didn't want to hurt her physically, but I knew I was hurting her mentally by what I was doing.

Q: What do you mean by feel her up?

A: Rub my hands up and down her legs and feel her butt. I learned that my main attraction to younger girls was the softness of their skin. . . . .

The statements clearly suggest that defendant was attracted to young girls and acted on those feelings. However harmful to defendant, we find the statements properly were admitted. The prosecution is allowed to vigorously and forcefully present the State's case. *Rose, supra,* 112 *N.J.* at 509, 548 *A.*2d 1058. Even if the statements were inflammatory, the prosecutor did not mischaracterize the evidence. The statements were defendant's own words and established his motive in committing the crime. Moreover, they were made knowingly and voluntarily.

We also reject defendant's argument that the statements improperly referred to uncharged misconduct. The court redacted all inadmissible portions of defendant's statement, *i.e.,* those that referred to his prior convictions. The admitted portions did not specifically inform the jury of defendant's prior crimes and went only to the evidence in this case. Introduction of this relevant evidence was not error.

6. *Elicitation of Testimony Regarding Prints of "Smaller Person" Found in Defendant's Bedroom*

The defendant also cites Officer Shaw's testimony regarding fingerprint evidence taken from defendant's bedroom as proof that the prosecution was "smearing defendant." Officer Shaw testified that he found a latent fingerprint on the dresser mirror during an authorized search of defendant's bedroom. Shaw described the evidence as "just a small portion of a print, as if it could have been made by a smaller person." Defense counsel

objected, but the court overruled his objection and allowed Shaw to explain that the fingerprint did not match the victim's.

In defendant's view, "[t]he implication of this testimony was clear: it suggested that defendant had had another child in his bedroom at some time." Thus, the testimony "impl[ied] that defendant had been guilty of other, similar misconduct." Defendant contends this deprived him of a fair trial.

We find that any prejudice resulting from this comment was minimal. Shaw's statement regarding the "smaller person" was contained in his police report detailing his investigation. It came out during that testimony and was not specifically elicited by the prosecution. Moreover, the prosecutor immediately dropped the inquiry, neither pressing Shaw nor returning to the subject thereafter. Because the comment was brief and was not pressed by the prosecution, it could not have produced an improper result given the overwhelming evidence against defendant.

### 7. Other Alleged Incidents of Misconduct

Defendant argues that the prosecution improperly: addressed defendant's change of appearance between the time of the crime and trial to depict defendant as the "village pervert"; used gloves when touching defendant's clothes but not the victims; elicited testimony that the victim's mother cried while talking to police; and disparaged defense counsel by questioning his investigative technique. The State maintains that questions regarding defendant's appearance established that defendant accurately was identified as the perpetrator of the crime.

Although the State's argument that identification was at issue in this case is not convincing, we find nothing overly suggestive in the prosecutor's questioning. Nor do we find that the fact that the prosecutor wore plastic gloves while handling defendant's clothes but not while handling the victim's clothes, had the capacity to deprive defendant of a fair trial. Neither was it improper for the prosecutor to elicit the fact that the victim's mother cried when she was shown pieces of her daughter's clothing. The

testimony simply explained police conduct. Moreover, any error resulting from this line of questioning was cured when the court promptly sustained defendant's objection. Finally, although defendant correctly objected to the prosecutor's suggestion that the defense had an obligation to examine the casts and photographs prepared by Dr. Askin, the trial court cured any prejudice in this regard with a prompt, accurate, and clear statement of the law.

### 8. *Guilt Phase Summation*

Defendant characterizes the guilt phase summation as "a moveable feast of prosecutorial misconduct." The inappropriateness of the summation, defendant claims, is by itself sufficient to warrant reversal of his conviction. He claims the following soliloquy both slanders his character and inflames the jury:

What kind of man could do such awful deeds? What kind of man could commit such evil acts? The kind of man who could cavalierly dump a child's body and make his next stop a WAWA. The kind of man who could, after executing her daughter, look Maureen Kanka in the eye, within minutes, and not flinch. The kind of man who had the unmitigated gall to offer to hand out fliers for the child whose life he had just snuffed out. The kind of man who, over the course of two days, could talk about the rape and murder and the brutalizing of a child and never show a shred of emotion. The kind of man who could talk about Megan's death and blame her because his hand hurt. The kind of man like the Defendant.

The Defendant killed to protect his own self interest. He killed, he claims to protect himself, because he didn't want Megan to get loose. He didn't want Megan to tell on him. He didn't kill in a rage. He didn't kill in a panic. He didn't kill by accident. This killing was so cold and so calculating that it is chilling in the extreme.

Defendant further claims the following statement was an allegation of uncharged misconduct:

He had been lusting for this child for weeks or months, as he told Sergeant Stanley on Sunday. He had been watching little girls for weeks and months, and getting those feelings for them. It is an image that is so appalling that it is hard to put into words. He had been lusting after this child.

Defendant also objects to the prosecutor's reference to the fact that defendant did not call to the stand individuals that he claimed actually committed the murders. The prosecutor stated, "based upon all you saw, and all you heard and all you know about his

activities, and all you know about his behavior, is there one bit of testimony to suggest [he was covering up for Jenin or Cifelli]?"

Finally, defendant objects to the prosecutor's finale:

Members of the jury, sexual violation in the park. Is there any image more despicable? Is there any act more depraved than that one? After all that he had done to that child, and he had to violate her one more time. He didn't rip the bags off her head to try to save her. He stuck his finger in her vagina. Can there by any question of his intent?

He dumps her, and then he drives off. This was a man who wanted to kill, intended to kill, meant to kill, chose to kill, and did kill purposely or knowingly by his own conduct.

. . .

In those statements, did you once, even once, hear him mention anything about Megan or concern for what she had suffered? Megan would never laugh and never smile again, and he was upset that his hand hurt. Megan lay dead and he blamed her for the wound on his hand. Megan was on a morgue table, and he wanted a band-aid.

. . .

A child playing with a dog. Is there any image that does more to evoke childhood than that one? It brings to mind all that childhood is, innocence, happiness, laughter, trust.

At this point defense counsel objected. The court expressed some concern about the "childhood" language but, noting no reaction from the jury when the language was spoken, overruled defense counsel's objection. The prosecutor continued:

Whenever you see such a scene again, in your mind's eye you will see Megan. You will see her laugh, you will see her smile, and you will think—

Defense counsel objected again; the trial court overruled his objection. The prosecutor continued and eventually concluded with:

There is only one word that can begin to do justice, and that one word must come from you. And that word is guilty. Guilty as to purposeful or knowing murder by his own conduct. Guilty as to every single count in the indictment.

Through your verdicts, I ask you to announce that the Defendant kidnaped, raped, sodomized and murdered Megan. Thank you.

Following summation, the trial court spoke to the jury. He said the summations on both sides were understandably emotional "because this is an emotional case." However, the prosecutor's last comments were "too emotional in nature." The court specifically told the jurors to disregard the portion of the summation asking "why, why, what Megan may be thinking of, things of that nature...."

After the jurors left the courtroom, defense counsel moved for a mistrial, noting that while she hated "to interrupt somebody's summation or somebody's opening," she wondered if she "was doing the right thing by sitting there and not objecting," given the "inflammatory" remarks of the prosecution.

The court denied the mistrial motion. He found that, overall, the prosecutor's comments were based on the facts in evidence and were not overly-inflammatory given the circumstances of the case. The trial court further noted that he had watched the jurors and had not observed any adverse affects.

When court reconvened the following day, the trial court admonished the jury that they were not to accept the comments made on summation as evidence. Rather, the court clarified, "if the recollection of the attorney with regard to evidence, the testimony presented before you does not coincide with yours, you are under a duty to disregard those comments and to rely on your own recollection ... because you are the sole judges of the facts." The trial court continued:

> But my instruction to you at this time is direct, and it's this: Please separate and completely disregard as you see fit, emotional words, words or phrases or images that have a tendency to inflame from descriptive language that has come before you that moves the argument of counsel forward, that is relevant to a discussion of the evidence and the inferences that may flow from the evidence. Language that goes to an understanding of that is certainly acceptable. Language that would inflame and serve no purpose, other than to generate sympathy or passion, has no place in the jury room, has no place in any decision that [you] make. So things such as bias, prejudice, sympathy must be excluded, and I instruct you to use your very good judgment when you are considering the summations of counsel in this regard.

 Prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries. We afford prosecutors considerable leeway in closing arguments so long as their comments are reasonably related to the scope of the evidence presented. *State v. Harris,* 141 *N.J.* 525, 559, 662 *A.2d* 333 (1995). *Ibid.* As Justice Clifford recognized in his dissent in *State v. DiPaglia,* 64 *N.J.* 288, 305, 315 *A.2d* 385 (1974):

> Criminal trials are emotionally charged proceedings. A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented.
>
> [citations omitted.]

 Nevertheless, the primary duty of a prosecutor is not to obtain convictions but to see that justice is done. *Ramseur, supra,* 106 *N.J.* at 320, 524 *A.2d* 188. "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *State v. Farrell,* 61 *N.J.* 99, 105, 293 *A.2d* 176 (1972) (quoting *Berger v. United States,* 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935)).

We agree that some portions of the prosecutor's summation were improper.

> Any capital trial will necessarily involve testimony and physical evidence pertaining to the victim. This evidence, though admissible, cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately intertwines irrelevant emotional considerations with relevant evidence. There are occasions when evidence relating to the victim's character and personality may be probative of critical aspects of the trial, *e.g.,* defendant's assertion of self-defense or provocation. Where, however, as in the matter before us, the victim's character has no bearing on the substantive issue of guilt or the penalty to be imposed, the prosecution may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury.
>
> [*Williams II, supra,* 113 *N.J.* at 451–52, 550 *A.2d* 1172.]

 As in *Williams II,* the prosecutor's remarks in this case contrasted the victim's life and dreams with the terror she felt at the moment of her death. And, as in *Williams II,* this prosecutor depicted the victim as an angel at the mercy of a defendant who was amoral, *e.g.,* by eliciting testimony at trial regarding defen-

dant's stoic demeanor following the crime and concern over his hand. *See Pennington, supra,* 119 *N.J.* at 566–567, 575 *A.*2d 816 (objecting to prosecutor using references to victim to inflame jury and divert its attention from material facts); *Marshall I, supra,* 123 *N.J.* at 161, 586 *A.*2d 85 (same).

In *Williams II,* the Court concluded that "[t]he prosecutor's remarks were clearly improper and should have been stricken from the record and the jury properly instructed to disregard them." 113 *N.J.* at 452, 550 *A.*2d 1172. As inappropriate as the prosecutor's comments were in this case, however, we are not persuaded that in the context of the entire trial the prosecutor's misconduct had the capacity to deprive defendant of a fair trial. First, unlike in *Williams II,* much of the prosecutor's comments were based on evidence at trial or were in response to defense counsel's summation, *i.e.,* statement that "[Defendant] had been lusting for this child for weeks or months" was based on evidence in record; statement that events leading up to victim's death were "so repulsive, so disturbing . . . that it permeates your very soul" merely depicted the State's evidence "graphically and forcefully"; statements regarding toy box, belt, and plastic bag placed over victim's head were proper reconstruction of murder and demonstration of defendant's intent to kill based on evidence in record; other statements reconstructing the murder were proper demonstration of defendant's intent to kill and based on evidence in record. The prosecutor's reference to defendant's failure to call Brian Jenin or Joseph Cifelli was in response to defense counsel's summation implying that Jenin and Cifelli were actually guilty of the crime.

Second, despite the flagrant misconduct in this case, the trial court was effective in diminishing its prejudicial effect. In most instances of misconduct, the court sustained proper objections by defense counsel and offered curative instructions. The court also reminded the jury in post-summation instructions that this was an emotional case and therefore, the summations were understand-

ably emotional as well. The court admonished the jury to determine guilt based on the evidence in the record.

Most importantly, evidence of defendant's guilt was overwhelming. The State's case was based primarily on the inculpatory statements made by defendant after the murder. Those statements were corroborated by other evidence and witnesses. In view of the overwhelming evidence against defendant, we find that the prosecutor's conduct in the guilt phase was not clearly capable of producing an unjust result. It was not so prejudicial as to deprive defendant of a fair trial. We, therefore, refuse to reverse on this ground.

### B. *Penalty Phase*

The standards that govern prosecutorial conduct at the guilt phase also apply at the penalty phase of a capital trial. *Pennington, supra,* 119 *N.J.* at 565, 575 *A.2d* 816. Because defense counsel did not object to many of the comments, we must evaluate the contentions under a plain error standard. Again, our task is to determine whether the prosecutor's misconduct was so egregious as to deprive defendant of a fair trial.

Defendant contends that the prosecutor's "overriding theme" during the penalty phase was disparagement of defense counsel and defense strategy. He specifically objects to four portions of the testimony: the opening statements; the cross examination of the defense experts; the direct examination of Sergeant Raymond; and the summation. The State responds that the challenged remarks merely reminded the jury that it was responsible for weighing the evidence presented.

### 1. *Opening Statement*

Defendant objects to the following comments in the prosecutor's opening statement:

> We are confident that when the smoke clears, much of defendant's evidence will be suspect in your eyes. When evaluating the reliability of the evidence that supports the mitigating factors, it's essential to take a couple of things into consideration.

First of all, one, when was the information reported? Was it in anticipation of this penalty phase or reported to an authority prior to the penalty phase being anticipated?

Defendant complains that the statement "misleads" the jurors by suggesting that defendant had some obligation to provide evidence regarding mitigating factors. He also argues that the phrase "when the smoke clears" suggests that the defense was deceptive and trying to hide the truth. The State counters that the remarks must be placed in the proper context. The prosecutor was asking the jury to consider the origin of the mitigation evidence presented by the defense.

We find nothing objectionable about the statements. It is not improper to ask the jury to consider the timing of evidence production. Documentary evidence in existence before defendant's prosecution would be more credible than evidence gathered in anticipation of the penalty phase of a capital murder case. The bias and interest of the person providing the information also is relevant.

The trial court advised the jury that the opening statements were not evidence. We further observe that defense counsel did not object to those statements. Placing the statements in context, the prosecutor's conduct does not require reversal of defendant's death sentence.

### 2. *Cross-examination of Krych and Podboy*

Defendant asserts that the prosecutor's cross-examination of defense mitigation expert, Carol Krych, and the defense psychologist, Dr. Podboy, was highly improper. We disagree.

Krych's testimony was evasive and the prosecutor sought to bring that out on cross-examination. The prosecutor also sought to demonstrate Krych's bias. Although the prosecutor's comment during Dr. Podboy's examination regarding defense strategy was improper, that comment was stricken. Therefore, no prejudice resulted from that incident. Inquiry into the circumstances of Podboy's diagnosis was otherwise proper.

The above instances do not warrant reversal of defendant's death sentence. The trial court sustained defense counsel's objections to improper cross-examination of Krych and Podboy and offered a curative instruction in each case. Accordingly, we find no prejudice capable of producing an unjust result.

### 3. Direct Examination of Sergeant Raymond

Sergeant Raymond was assigned by the Mercer County Prosecutor's Office to investigate defendant's background. Sergeant Raymond met with Paul Timmendequas, defendant's brother, eight times during his investigation. For the first time on appeal, defendant objects to the following testimony of Sergeant Raymond, taken from the interviews with Paul:

A. I quote, "I'm through doing anything for the defense." And I asked him, well, why are you through doing anything with the defense? And he said, "I've caught them in so many lies, I'm sick of them."

Q. Did he make comments about Lois and Carol [defense mitigation experts] being two-faced and willing to do anything to win this case?

MR. GREENMAN: Objection, Judge. Leading.

THE COURT: Objection sustained.

Defendant argues that that testimony discredited the defense team and suggested the defense was being deceptive. The State contends that Paul's statements about Krych and Nardone were relevant to the jury's consideration of the weight to be given to the expert's testimony. We agree. Sergeant Raymond provided evidence that was important for the jury to hear in determining whether defense witnesses were credible. *See N.J.R.E.* 607.

Defendant further argues that other excerpts from Raymond's testimony implied that the defense was concealing evidence. We find no merit to those contentions.

### 4. Penalty Phase Summation

Finally, defendant claims that the prosecutor's penalty phase summation was "an unmitigated assault" upon the character of defense counsel and the defense witnesses. Defendant argues

that the following passages imply that defense counsel was dishonest and trying to mislead the jury:

> Have you seen any of those photographs showing the residences, showing the family, showing the family gatherings? Do you think that those photographs documented that things were not as the defense would have you believe? Do you think that if those photos showed shacks and rags and squalor, don't you know you would have seen them? They would have been in here poster size. But you didn't see any of them. In fact, you didn't hear about those albums and that they existed and that Carol Krych had them until I brought it up on cross-examination.

> Again, members of the jury, think about what hasn't been given to you, what hasn't been revealed to you when you assess the integrity of the defense presentation.

Defendant claims those statements improperly suggest the defense was withholding unfavorable evidence.

The trial court directed the prosecutor not to comment on who the defense chose to call as experts. The trial court instructed the prosecutor to comment only on "the qualifications of experts and what they have said, and things of that nature." The court also instructed the jury that "[t]he defense decision-making as to who to obtain as experts, how to defend, how to structure the defense, those types of things are not for consideration for the jury and you should exclude any type of reference or any inference that could be made with regard to that. . . ." Defendant nevertheless contends that a stronger instruction was needed.

Defendant also challenges the prosecutor's discussion of witness Krych's testimony. The prosecutor stated:

> On direct examination she told you that she was a forensic social worker, and her job was to present you this fair and balanced picture of the defendant's background and childhood. What you didn't learn until cross-examination was that Ms. Krych was a capital mitigation specialist, and one who was handsomely paid for her role in this case. And ironically, if you will recall, she would not admit that she was a capital mitigation specialist until I confronted her with her own notes where she described herself that way.

> If the defense is so proud of that, then why did she take such pains to deny it under oath until I confronted her with it?

> Her role, her job in this case, I suggest to you, was to present a picture of the defendant as sympathetic as possible. It didn't matter if the truth had to be stretched. It didn't matter if information was left out or omitted. Truth became irrelevant.

Lastly, defendant challenges the prosecutor's discussion of Paul Timmendequas' statements. The prosecutor stated:

> You have also heard that [Paul] now believes that his brother should die for what he did. The defendant's own brother thinks he should die for what he did. This is very compelling, I would suggest.

. . . .

While conceding that evidence of Paul's change of opinion was fair game, defendant argues that the prosecutor went too far. The prosecutor was "essentially arguing that, if the defendant's own brother thought execution was appropriate, who was the jury to argue." Such an argument, he claims, is grounds for reversal.

Defendant also contends that the cumulative effect of the prosecutor's misconduct is so egregious that it mandates reversal of the death sentence. *See State v. Baker,* 310 *N.J.Super.* 128, 139–40, 708 *A.*2d 429 (App.Div.1998). In response, the State argues that the comments were grounded in evidence contained in the record. The State claims that the prosecutor was merely "comment[ing] about gaps in the defense presentation and the interest and bias of certain witness [sic]"—comments, arguably, which are "totally proper."

We find that much of the prosecutor's questioning was proper. The prosecutor asked the jury to "look at the mitigating, the entire presentation by the defense, *and evaluate the quality of the information* that was presented. . . ." The prosecutor asked the jury to consider the evidence that was elicited from defense witnesses on direct and cross-examination, and on rebuttal. The State's questioning revealed gaps in the defense's case. The State offered evidence calling into question the credibility of defense witnesses. It is not improper for the prosecution to suggest that the defense's presentation was imbalanced and incomplete.

Defendant's complaints regarding the prosecutor's comments about Carol Krych similarly are without merit. The prosecutor's comments regarding Krych were grounded in the record. Krych identified herself on direct examination as a forensic social worker.

On cross-examination, when confronted with documents in her own writing, she finally conceded that she was a capital mitigation specialist. Witnesses that she referred to in her report insisted they had been misquoted, and documents that contradicted the defense theory of defendant's background were not presented in the defense's case. The jury was entitled to know that information in determining the weight to give Ms. Krych's testimony.

The prosecutor's questions provided a basis for the jury to infer that Krych was biased and was presenting a picture of a defendant that was not completely accurate, albeit sympathetic. It does not denigrate the defense, as the State points out, to "speak frankly about what is manifest in the record." When deciding how much worth to give to the defense case, the jury clearly could consider whether it was receiving a full picture, as interest and bias are always relevant. *N.J.R.E.* 607; *State v. Gorrell*, 297 *N.J.Super.* 142, 149, 687 *A.*2d 1016 (App.Div.1996) (citation omitted). Because the prosecutor's comments were based on evidence in the record, and the reasonable inferences that could be drawn from that evidence, the prosecutor acted properly. *Harris, supra,* 156 *N.J.* at 194, 716 *A.*2d 458.

■ Lastly, the prosecutor's reference to the fact that Paul Timmendequas had changed his mind and wanted his brother to die was, at most, harmless error. The jury had been shown two tapes of interviews with Paul. The tapes discussed the boys' childhood and history of abuse. Based upon those tapes, the defense argued in summation that "if there's any doubt in your mind that Paul Timmedequas was telling the truth about the sexual abuse, I ask you to watch those tapes again." "Don't forget [what] Paul said with all the abuse...." "What reason would Paul have now to recant what he said on the tapes?"

The prosecution emphasized Paul's change of mind to establish that the presentation of defendant's background had been exaggerated. That is evidenced by the fact the prosecutor launched into a review of Paul's version of the boys' childhood immediately after pointing out that Paul had changed his mind. The statement

contradicted the picture of abuse painted by the defense, challenged the defense theory and rebutted the defense's evidence. It was drawn from evidence in the record. At most, the comment was harmless, since the jury knew from the tape that Paul had changed his mind and wanted defendant to die.

We disagree also that the prosecutor denigrated the defense by pointing out what evidence was not presented. In *Rose,* we held that the cumulative effect of prosecutorial misconduct warranted reversal. *Rose, supra,* 112 *N.J.* at 524, 548 *A.*2d 1058. Denigration of defense counsel was one ground for that decision. *Id.* at 518–19, 548 *A.*2d 1058. The *Rose* prosecutor implied that counsel told the experts what to say so that defendant would "beat the penalty." *Ibid.* We objected to the statement because it implied "that the expert's testimony was fabricated or contrived, with the assistance of defense counsel." *Ibid.* The prosecutor in that case also repeatedly referred to facts outside the record, referred to inadmissible evidence, and improperly asserted that the law "mandated the death penalty for [the] defendant." *Id.* at 514–24, 548 *A.*2d 1058. Such conduct, we concluded, clearly was outside the bounds of propriety.

■ Prosecutors must argue based on facts in the record. *State v. Moore,* 122 *N.J.* 420, 462, 585 *A.*2d 864 (1991). In *Moore,*comments to the effect that a defense expert was a "professional bleeding heart who was indeed duped by the defendant[,]" were deemed improper. *Id.* at 461–62, 585 *A.*2d 864. Comments "that the defense realized that the defense of insanity was meritless" also were improper expressions of the prosecutor's own conclusions. *Ibid.* While overruling the conviction on other grounds, we cautioned prosecutors not to denigrate defense counsel or witnesses based on their own feelings. *Ibid.* Similarly, in *State v. Bey,* 129 *N.J.* 557, 622, 610 *A.*2d 814 (1992) (*Bey III* ), we found it "unprofessional" for a prosecutor to argue that a defense expert had "a theory first and he [was] going to pick and choose facts to make the theory work". We did not, however, find it to be harmful error because it went to the weight to be given to the expert's testimony. *Ibid.*

We are satisfied that the prosecutor's comments in this case do not constitute reversible error. The prosecutor's comments are less prejudicial than those made in *Rose, supra,* 112 *N.J.* at 510–14, 548 *A.*2d 1058. The prosecutor here argued facts contained in the record. She urged the jury to carefully evaluate the mitigating evidence and its origins. She focused on the inconsistencies in the evidence and pointed out the flaws in the defense's theory. Although we strongly disapprove of attacks on the integrity of defense counsel, we do not think that is what occurred here.

The prosecutor sought to establish bias and interest. Under the New Jersey Rules of Evidence, a party can challenge credibility by introducing extrinsic evidence, *i.e.* proof by others that material facts are other than as testified to by the witness under attack. *State v. Silva,* 131 *N.J.* 438, 444, 621 *A.*2d 17 (1993). Indeed, it is essential for the jury to have such information when making credibility determinations. Accordingly, we find that the methods used by the prosecutor were entirely proper. *N.J.R.E.* 607.

After carefully examining the record and recognizing that some of the prosecutor's remarks were improper, nonetheless, we are fully satisfied "that it was the weight of the evidence, particularly the damning statements uttered by defendant himself, that led to this capital murder conviction rather than the prosecutor's improper comments...." *Feaster, supra,* 156 *N.J.* at 63–64, 716 *A.*2d 395. We conclude that the alleged misconduct was not "so egregious as to deny defendant a fair trial." *Moore, supra,* 122 *N.J.* at 462, 585 *A.*2d 864 (stating test for evaluating allegations of prosecutorial misconduct).

## VI.

### *Other Trial Evidence*

A. *Voir Dire Re: Victim's Age*

Defendant, for the first time on appeal, claims that the trial court committed plain error and his trial counsel rendered

ineffective assistance of counsel by failing to determine whether the age of the victim would adversely impact a potential juror's ability to deliberate fairly. We disagree. The lengthy jury questionnaire and the individual *voir dire* provided the court and counsel with more than enough information to determine whether the victim's age would cause potential jurors automatically to impose the death penalty or refuse to consider the mitigating factors presented by the defense.

### 1. *The Facts*

During juror orientation, the trial court informed each panel that the case involved the murder and sexual assault of a seven-year-old girl. Next, the court and the attorneys questioned 331 potential jurors in a lengthy *voir dire* based upon their review of an in-depth questionnaire filled out by each person. The process lasted from January 13 until April 21.

The oral and written *voir dire* was designed to weed out jurors who expressed any doubt about their ability to remain impartial. Question number seven of the jury questionnaire asked whether the juror had any children or stepchildren. If the juror answered yes, question eight followed up by inquiring about the age, sex, education and employment status of the child, and whether the child lived with the prospective juror. Question ten asked whether the juror had any grandchildren, and if so, their ages, sexes, education, employment status and whether they lived with the prospective juror. Question nine asked if the potential juror, or anyone close to her, had suffered the loss of a child, and if so, to describe how the loss occurred.

An entire section was devoted to the jurors' knowledge of Megan's Law. Jurors specifically were asked if their knowledge or suspicion that Megan's Law was an outgrowth of the case would prevent them from judging the case impartially. Questions 107 through 110 addressed whether the juror, or anyone she knew, had been a victim of child abuse or molestation, and whether the juror knew anyone who had ever been accused of committing child

abuse or molestation. The juror also was asked if she had attended any class on or had studied child sexual abuse. Questions 128 through 130 dealt with the possible admission of victim impact evidence. Jurors were asked if they could listen to such evidence and still fairly consider the mitigating evidence presented by the defense under the guidelines set forth by the court. Question 131 asked how the juror felt about the possibility that she might be shown disturbing photographs of the victim. Question 132 asked if there was anything not covered by the questionnaire that the juror felt might affect her ability to be fair and impartial.

Of those jurors questioned by the court, thirty-four were excused after indicating they would have problems being impartial because the case involved a child. The court specifically asked seventy-four of the remaining ninety-seven qualified jurors about their ability to remain impartial, given that the victim was seven years old. Nine of those jurors deliberated on the case. Defense counsel did not object to the court's *voir dire* about the juror's ability to remain impartial given that the victim was a child. Nor did counsel exercise any of the peremptory challenges allotted for defendant in jury selection.

### 2. *The Law*

To state a claim for ineffective assistance of counsel under the Sixth Amendment of the United States Constitution and Article I, paragraph 10, of the New Jersey Constitution, a defendant must first establish that counsel's representation fell below an objective standard of reasonableness. *State v. Fritz*, 105 *N.J.* 42, 67, 519 *A.*2d 336 (1987), (referencing *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and *United States v. Cronic*, 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984)). Second, he must show a reasonable probability that the result of the proceeding would have been different but for counsel's deficiencies. *Strickland, supra*, 466 *U.S.* at 691–96, 104 *S.Ct.* at 2066–69, 80 *L.Ed.*2d at 695–98. The reasonableness of counsel's

performance should be evaluated in light of all relevant circumstances at the time the alleged error occurred. *Id.* at 689–90, 104 *S.Ct.* at 2067–68, 80 *L.Ed.*2d at 694–95. The inquiry must include the possibility that counsel's decisions were based on sound trial strategy rather than incompetence or deficiency. *Id.* at 690–91, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695–96. Defendant bears the burden of proving that counsel's performance was unreasonable under the prevailing professional norms. *Id.* at 687–91, 104 *S.Ct.* at 2064–66, 80 *L.Ed.*2d at 693–95.

The purpose of *voir dire* is to ensure an impartial jury and a fair trial. *State v. Martini (Martini I),* 131 *N.J.* 176, 210, 619 *A.*2d 1208 (1993). In a capital case, the *voir dire* should probe the minds of prospective jurors to ascertain whether the jurors entertain any biases that would interfere with their ability to decide the case fairly and impartially. *State v. Erazo,* 126 *N.J.* 112, 129, 594 *A.*2d 232 (1991). The questions also should determine whether the circumstances of the crime would prevent the prospective juror from considering relevant mitigating evidence. *Martini I, supra,* 131 *N.J.* at 211, 619 *A.*2d 1208; *State v. Biegenwald,* 126 *N.J.* 1, 30–31, 594 *A.*2d 172 (1991) (*Biegenwald IV* ). A defendant's sentence should be affirmed if the *voir dire* was adequate to ensure that a fair and impartial jury was empaneled. *Id.* at 34–35, 524 *A.*2d 130.

In *Moore, supra,* 122 *N.J.* at 451, 585 *A.*2d 864, the Court stressed the importance of open-ended questions in *voir dire* regarding the status of the victims as it relates to any prejudice affecting the juror's ability to consider mitigating evidence. At issue was the trial court's refusal to allow defense counsel to probe prospective jurors on whether they would be unable to remain fair and impartial given that one of the victims was six months pregnant and the other was an infant. We refused to reverse, finding that the court's questioning otherwise had been probing enough to weed out prospective jurors who might have been biased by the facts of the case. *Id.* at 451–54, 585 *A.*2d 864.

Defects of the type in *Moore, supra,* can be cured "if the *voir dire* was otherwise so thorough and probing as to ensure that the jurors empaneled had the 'capacity to credit the evidence in mitigation,' *State v. Bey,* 112 *N.J.* 123, 154, 548 *A.*2d 887 (1988) (*Bey II* ), and the ability to perform their duties in accordance with the court's instructions and their oaths . . ." *Biegenwald IV, supra,* 126 *N.J.* at 34–35, 594 *A.*2d 172. The Court also has resisted reversing convictions due to inadequate *voir dire* with regard to victim status when it can be said that defense counsel had a strategic reason for not delving into the nature of the victim. *Marshall I, supra,* 123 *N.J.* at 93, 586 *A.*2d 85 (finding no abuse of discretion given that defense counsel requested that questions regarding death-qualification be limited as part of "well-considered strategic attempt to limit juror exposure to questions concerning capital punishment").

■ There is no merit to defendant's claim that counsel did not adequately delve into the impact the victim's age might have on jurors. Both the court and defense counsel extensively questioned the jurors regarding the fact the victim was a child. Only two jurors were not questioned extensively on that issue, Delventhal and Livecchi. Nothing in either jurors' statement raise questions about their ability to remain impartial.

In the first instance, Delventhal was asked if he could properly consider victim impact and mitigating evidence as instructed by the court. He answered that he could. Although defense counsel did not follow up and question Delventhal regarding his feelings on children, counsel probed whether the juror would consider mitigating evidence about the defendant and, if so, what type. Undoubtedly, counsel made a strategic decision not to go further with those questions because there was no indication from Delventhal that he would be unfriendly to the defense. In fact, Delventhal used to be a criminal defense attorney. More importantly, Delventhal was the only juror at that point who did not know of defendant's prior criminal record. Those facts presumably played

a role in defense counsel's decision not to object to Delventhal's qualification as a juror.

In Livecchi's case, there also was no evidence that she would have a problem remaining impartial. Although the court did not ask Livecchi the same in-depth questions regarding the victim's age as it had asked the other jurors, defense counsel probed the issue. Counsel questioned whether the Kankas' victim impact evidence would be overwhelmingly emotional for Livecchi. She answered "no." When pressed, she insisted that she would consider the mitigating evidence as carefully and as equally as she considered the family's impact statements. Based on Livecchi's oral and written answers, defense counsel and the court had no reason to believe the victim's age would interfere with Livecchi's ability to remain impartial. Defense counsel's failure to object to Livecchi's qualification likely was a strategic decision.

We conclude that the court adequately questioned the jurors regarding the possible bias that might result from their knowledge that the victim was seven years old. The court posed open-ended questions based on the answers the juror had given in the questionnaire. Defense counsel displayed no reluctance to question jurors extensively on the subject, indicating that counsel had strategic reasons for the omission in instances when it did not probe further. Every juror who said anything that would indicate bias was excused from the panel. In light of those facts, we find that no error was committed by the trial court.

Defendant's claim that he was denied effective assistance of counsel also is without merit. Counsel failed to elaborate on the court's questioning regarding the victim in only one instance, and there is a clear indication that that decision was strategic. Moreover, defendant offers no evidence to support the contention that but for counsel's deficiencies (if the Court were to find that there were any), the result of the proceeding would have been different. Defendant's claims, therefore, are rejected.

B. *Defendant's Motion for a Stay to Further Investigate and Challenge the Randomness of the Hunterdon County Jury Pool Selection Process*

1. *The Facts*

On April 18, 1997, defendant challenged the Hunterdon County's jury pool selection process on the ground that it was not random, as required by *N.J.S.A.* 2B:20–1. He asked for a stay in the proceedings pending further investigation and hearings on the matter.

In support of his motion, defendant relied solely on materials prepared by social psychologist John Lamberth, Ph.D. for a similar motion filed in the pending capital case of *State v. Robert Simon*.[10] Dr. Lamberth's statistical analysis of the jury pool in *Simon* revealed that, given the population of Hunterdon County, an extraordinary number of jurors were drawn from the same families. Lamberth offered no independent analysis of the jury pool in defendant's case. Defendant requested a stay so the defense expert could further investigate the County's compliance with statutory guidelines for jury pool selection under *N.J.S.A.* 2B:20–2, 20–3 and 20–4.

The trial court denied defendant's motion. The trial court observed that, pursuant to *Rule* 1:8–5, jury lists were made available to both parties on January 13, 1997, twenty days before *voir dire* commenced. One hundred and sixteen days had passed since that date. Moreover, defendant's motion offered no indication that defendant had attempted to view the information on Hunterdon County's jury selection procedures, as allowed by *N.J.S.A.* 2B:20–4(e)(2). Defendant's motion was based on a speculative certification challenging a jury in another case. Because defendant had failed to make out a *prima facie* case for a violation, the court concluded that relaxing the rules would indulge

---

[10] *State v. Simon* was argued on appeal as of right before this Court on September 29, 1998.

a fishing expedition: "There's nothing before me to suggest that random selection of the jury pool based upon electronic means was insufficient, was prejudicial, was not satisfactory." The court denied the motion, ruling that defendant had failed to show good cause to excuse the delay in filing.

### 2. The Law

■ Capital appeals require special attention to procedural fairness. *Williams I, supra,* 93 *N.J.* at 63, 459 *A.*2d 641.

[J]ury selection is an integral part of the fair process to which every criminal defendant is entitled. It is vital that juries be selected in a manner free from taint and suspicion. To that end the pertinent practice safeguards in the statute must be carefully observed. In capital cases, this responsibility is of the deepest concern.

[*Ramseur, supra,* 106 *N.J.* at 230, 524 *A.*2d 188 (citations omitted).]

*N.J.S.A.* 2B:20–4d guarantees an impartial jury panel by requiring that "[b]oth the drawing of names and the assignment of selected names to [jury] panels shall be public and random." Section 4e provides that

[t]he Assignment Judge may provide for the random selection of jurors, and their assignment to panels, by the use of electronic devices, if . . . (2) the specification of the method and any programs and procedures used to implement the method, including any computer programs which are utilized, are available for public inspection upon request.

Any party can challenge the jury array on the ground that the jurors were not "selected, drawn or summoned according to law." *R.* 1:8–3(b).

In *State v. Long,* 204 *N.J.Super.* 469, 482, 499 *A.*2d 264 (Law Div.1985), the court held that a defendant must challenge the petit jury within thirty days of entering an initial plea. (reading *R.* 1:8–3 and *R.* 3:10–2 *in pari materia* ). The court may enlarge the time period if good cause is shown. *Id.* at 483, 499 *A.*2d 264. If the defendant makes a *prima facie* showing of actual prejudice to his right to a fair and impartial jury, the court can relax the time period. *State v. Butler,* 155 *N.J.Super.* 270, 271, 382 *A.*2d 696 (App.Div.1978). Challenges asserting constitutional rights, however, "must be shown to rest on fact. Mere conclusions are inade-

quate." *State v. Robinson,* 128 *N.J.Super.* 525, 530, 320 *A.*2d 533 (Law Div.1974) (holding that defendant had not made out *prima facie* case for non-randomness in grand and petit jury selection process given that no figures or information regarding source of selection process were presented).

Where a defendant has ample opportunity to investigate improper jury pooling, courts likely will reject challenges to the jury array made in an untimely manner. *State v. McClain,* 263 *N.J.Super.* 488, 496–97, 623 *A.*2d 280 (App.Div.), *certif. denied,* 134 *N.J.* 477, 634 *A.*2d 524 (1993); *Robinson, supra,* 128 *N.J.Super.* at 529, 320 *A.*2d 533 (holding that because defense had many months to investigate jury pool selection procedures, challenge to array was properly denied). Time limitations on these challenges are strictly enforced to foster judicial efficiency. *Gerald, supra,* 113 *N.J.* at 128, 549 *A.*2d 792. Although a trial court does not abuse its discretion by granting untimely challenges to jury randomness, "acceptance of such eleventh hour claims is by no means constitutionally compelled." *Long, supra,* 198 *N.J.Super.* at 37, 486 *A.*2d 351.

Given the strict rules regarding jury pool sampling challenges, the trial court did not abuse its discretion in denying defendant's motion for a stay. Defendant failed to show good cause entitling him to an extension of time and he did not make a *prima facie* showing of prejudice. Defendant was given the panel list within the applicable twenty day period. Despite "ample opportunity" to challenge the array, the defense took few steps to investigate. Defendant never attempted to get information regarding the process Hunterdon County used in selecting its jury, pursuant to *N.J.S.A.* 2B:20–4e. Although he did present the analysis that Lamberth had conducted for the *Simon* case, showing that many members of the jury pool had the same last name, Lamberth did not analyze the data over time. Nor did Lamberth analyze the process used in defendant's case. In short, defendant's argument was based on speculation. He simply did not make out a *prima facie* case for non-randomness. *Cf. Long,*

*supra,* 198 *N.J.Super.* at 37, 486 *A.*2d 351 (allowing stay while noting that it had no obligation to accept untimely challenges). Therefore, the court was within its discretion in denying defendant's application for a stay.

## C. *Admissibility of Defendant's Statements*

### 1. *Defendant's Claims*

Defendant asserts that the trial court erred in refusing to suppress his confessions. Defendant argues that the statements fail to satisfy the basic criterion of voluntariness and were not the product of a valid waiver, given his mental limitations. With regard to his initial statement in Cifelli's bedroom, defendant argues that the officers were engaging in custodial interrogation. Therefore, the officers should have administered *Miranda* warnings. Defendant further asserts that, although he was read his rights at the police station, the second statement made there was tainted by the earlier statement made in Cifelli's bedroom. Accordingly, those statements must be suppressed as well.

Next, defendant contends the statement made when Brian Jenin entered the interrogation room should be suppressed on the ground that Jenin was acting as an agent for the State. Defendant also claims his request to speak with Jenin was tantamount to a request to end interrogation. Defendant asks the court to reverse the trial court's decision not to suppress all subsequent confessions as "poisonous fruit" derived from the tainted confession he made in response to Jenin's comment, "They got you, they got you, they got you."

Finally, defendant makes a "totality of the circumstances" argument. He contends that the statements cannot be considered voluntary in light of the long time period over which the interrogations took place, the late hours of the questioning, the fact he had little, if any, sleep, and his mental deficiencies. In addition to the physical deprivations suffered by defendant, he argues that the nature of the questioning was coercive and manipulative, and the use of the polygraph test exacerbated that coerciveness.

## 2. *The Facts*

Defendant's statements to the police, made over a three-day period beginning on the day of the victim's disappearance, were important to the State's case. At the *N.J.R.E.* 104 suppression hearing, state witnesses described the circumstances under which defendant made his statements. On the night of the victim's disappearance, Hamilton Township detectives O'Dwyer, Kieffer and their supervisor, Stanley, arrived at defendant's residence, 27 Barbara Lee Drive. Patrol officers conducting interviews in the area had information that a released sex offender, Joseph Cifelli, lived at 27 Barbara Lee Drive. After Cifelli signed a consent to search form, the three detectives searched the house in which defendant, Cifelli, Jenin, and Cifelli's mother lived.

Police initially considered Cifelli to be a suspect. They read him his *Miranda* rights and questioned him in his bedroom. Cifelli gave detectives an alibi and receipts to corroborate his account. He then informed the officers that defendant once had molested a seven-year-old girl.

Jenin was called into the bedroom next. The detectives testified that they did not administer *Miranda* warnings because Jenin was not considered a suspect at that time. The police were just gathering information. Jenin corroborated Cifelli's story.

Detectives then called defendant into the bedroom. Kieffer testified that at that time, defendant was no more a suspect than anyone else in the neighborhood. Therefore, the detectives did not administer *Miranda* warnings. Defendant was not told he was free to leave the room, but O'Dwyer testified that the questioning was "non-custodial."

According to O'Dwyer, defendant appeared very nervous and defensive and was perspiring heavily. When the detectives showed defendant a picture of the victim, defendant just stared at it. Detectives then asked defendant where he had been that day and when was the last time he had seen the victim. Defendant told the detectives that Megan stopped by his house with two

friends while he was outside washing his boat. They had a brief conversation and the girls left.

Defendant also was asked about his prior record. He told Kieffer that he had pushed a girl off a bike. When pressed by detectives, defendant admitted that he had tried to sniff her underwear. Defendant was asked if he would submit to a polygraph test. Defendant replied that, based on past experience, the machine did not work on him.

At approximately 1:45 a.m., the detectives asked defendant if they could question him further at headquarters. He agreed, but insisted on driving his own car. Defendant was permitted to drive himself to headquarters, followed "closely behind" by the detectives. Kieffer wrote in his report that defendant was asked to come to headquarters for further questioning "[d]ue to [his] demeanor [and] physical actions ... visible from the outset." It was not until the end of that initial questioning that police considered him a suspect.

At 2:30 a.m., upon arriving at headquarters, O'Dwyer read defendant his *Miranda* rights. O'Dwyer placed a copy of the form in front of defendant so he could read along. The detectives read defendant his rights because they "knew that there was something more involved," based on defendant's nervousness and "physical behavior." Defendant said that he understood his rights and signed a form to indicate such. Police also read him a waiver form. Defendant signed it, agreeing that he waived his rights. O'Dwyer and Kieffer witnessed his signature. The detectives testified that defendant did not ask any questions and expressed a desire to help. He was alert and did not appear to be under the influence of drugs or alcohol. The detectives made no threats or promises to induce defendant to sign the waiver.

Detectives resumed questioning at approximately 2:40 a.m. They asked defendant about his day and the last time he had seen the victim. Defendant then was asked to write down this account, which he was left alone to do. Defendant finished writing the statement at 3:50 a.m. The statement basically was consistent with

his oral statements. Defendant then consented to a search of his truck.

Defendant had been with O'Dwyer since 1:15 a.m. Although the detective had not seen him sleep at all during that time, O'Dwyer submitted that defendant was alert and understood all that was going on. Defendant never asked for an attorney at any point during the questioning. No promises or threats were made. He was not told that he would be treated more favorably if he cooperated. At 4:00 a.m., after detectives completed the search, defendant was permitted to leave headquarters with the understanding he would return later that day for a polygraph test.

The next day, July 30, at about 10:40 a.m., Kieffer, O'Dwyer and Stanley went to 27 Barbara Lane and asked Cifelli, Jenin and defendant to come to headquarters for more questioning. The three agreed to go and were transported in police vehicles. Cifelli and Jenin were questioned in separate rooms and defendant was placed in a room with two polygraph operators, Detectives Pukenas and McDonough, Pukenas testified that he filled out a polygraph *Miranda* form, which contained an authorization to disclose information resulting from the test. Pukenas read the form aloud and explained it to defendant. Pukenas described defendant as awake, calm, and alert. Pukenas maintained that defendant understood this was a non-stipulated polygraph test and could not be admitted at trial. At 12:24 p.m., defendant signed the form.

Pukenas first performed a background test on defendant to determine if he was mentally and physically suitable for the polygraph. Defendant responded that he had taken a polygraph test before. He stated that he never had been treated for a nervous condition, but he had received some psychological treatment at Avenel between 1979 and 1988. Defendant also stated that he was "a little tight" from "nerves," but had no other apparent physical ailments. Defendant told Pukenas that he had two-and-one-half to three hours of sleep the day before but had slept "real good for an hour." Defendant described himself as "a little bit" tired but "okay." When asked if he had eaten anything,

defendant said no and claimed he was not hungry. He accepted a Pepsi at 12:37 p.m. In response to questions regarding his educational background, defendant told the detective he had dropped out of 11th grade and obtained a GED.

After this preliminary questioning, Pukenas explained the polygraph test to defendant. Pukenas testified that defendant had no problems understanding and did not hesitate to take the test. Pukenas then asked defendant to write his account of the previous day's events and left the room.

When defendant completed his statement, Pukenas read it back to defendant. The two discussed it to make sure defendant had left nothing out. Although the statement contained a number of spelling and grammatical mistakes, the detectives testified that it was comprehensible. Nothing in the statement was explicitly inculpatory.

Pukenas then asked defendant a number of standard behavioral observation questions. Pukenas testified that these questions were not related, "on the whole," to the polygraph, but rather to "the whole day," or the "overall investigation." They then took a short break, during which time defendant used the bathroom. Pukenas then read defendant the questions he would ask during the polygraph test and advised him that they were the only questions he would ask. Defendant was still cooperative and showed no hesitation.

The test was administered three times, concluding at 2:25 p.m. Defendant's answers were consistent with his prior responses. Defendant then signed the polygraph charts. Shortly after 3:00 p.m., Pukenas informed defendant that he had failed the test. Pukenas explained that failure to pass meant that defendant was not being completely truthful. Defendant continued to deny involvement in the victim's disappearance.

Defendant used the bathroom at 4:12 p.m. and Pukenas brought him pizza and soda at 4:39 p.m. From 4:50 to 5:20 p.m., Detective Schwartz from Middlesex Borough, whom defendant knew from a

prior arrest, was alone with defendant. Pukenas asserted that Schwartz was "probably" questioning defendant during that time to elicit an admission.

Beginning at about 5:30 p.m., Pukenas and McDonough met with defendant alone. They told him that "certain things didn't look good in his favor." When asked if he would like to speak to a friend, like Jenin, defendant answered, "Sure, bring him in." The detectives went to find Jenin, while Schwartz came in to sit with defendant.

Pukenas and McDonough told Jenin they believed defendant had something to do with the victim's disappearance. Pukenas asked Jenin if he would like to speak to defendant, telling him that defendant wanted to speak to him. Pukenas testified that Jenin's talking to defendant was either Pukenas' or McDonough's idea, adding that he did not know what Jenin would say to defendant, nor did any of the detectives tell him what to say. Jenin told Pukenas he believed defendant was "probably guilty."

Jenin was brought into the room with defendant at 6:29 p.m. According to Pukenas, Jenin initiated the conversation with defendant, immediately saying defendant would "need a friend on the outside." He then said, "they got you, they got you, they got you." At that point, defendant made his first admission. Defendant told Jenin, "[s]he's in Mercer County Park." Pukenas testified that neither Jenin nor the detectives said, "Tell [me] . . . where the body is."

Pukenas asked defendant if there was a possibility that Megan was still alive. Defendant answered, "[n]o, she's dead. I put a plastic bag over her head." Defendant then agreed to accompany the officers to the park. Pukenas testified that defendant was not asked any questions in the car, nor was he threatened. Defendant volunteered that he had been able to take the victim to the park, go to a WaWa and return home in 15 minutes.

At the park, defendant led the officers directly to the victim's body. In the car on the way back from the park, the detectives

asked defendant what had occurred. Defendant then gave his account of the events on the day of the incident. Again, Pukenas testified that they made no threats and used no coercion.

Back at headquarters, Pukenas asked defendant to write a statement about the events that occurred on the day the victim disappeared. The detective did not administer *Miranda* warnings at that time. Pukenas testified that defendant still appeared awake, alert, and not confused. Defendant wrote out his statement. At the same time, Pukenas went to the detective bureau and wrote a report detailing defendant's oral statements in the car. In the car, defendant admitted to sexually touching Megan, killing her when she tried to get away, carrying her body outside the house in a toy box, and bringing her to the park. Pukenas testified that defendant appeared sufficiently awake to give a formal statement. Defendant never asked for an attorney or if he could stop talking. Defendant never complained about how police treated him the entire time he was in custody.

After reading defendant's written statement, O'Dwyer went to speak with defendant. Defendant was given the opportunity to use the restroom and smoke. He was asked if he wanted food. He accepted only a soda. O'Dwyer testified that defendant was alert, seemed to have no difficulty understanding the questions posed to him, and exhibited no hesitation in answering. O'Dwyer observed that defendant appeared less nervous than before— almost relieved. Defendant was offered breaks during the session but did not ask to eat or use the bathroom.

At 8:25 p.m., O'Dwyer read defendant his rights. O'Dwyer testified that defendant had no questions; he felt that defendant "knowingly and voluntarily waived his rights and agreed to speak...." Defendant's oral responses were then typed into the computer.

After the final statement was printed, O'Dwyer showed it to defendant, read him his rights again, and asked if he understood them. Defendant initialed the line on the form reading, "do you wish to give a statement at this time[ ]" The statement was

marked "concluded" at 9:55 p.m. Defendant was asked to read the statement and make any changes he wanted. Defendant initialed the bottom of each page, making no changes and asking no questions. Shortly after midnight, defendant was arrested on a complaint sworn out by Kieffer. Defendant was then placed in a cell and presented with charges. He was fingerprinted at 1:30 a.m., and was asked for his consent to take fingernail clippings at 4:00 a.m.

At 4:00 p.m. on the following day, defendant consented to and was examined by Dr. Haskell Askins, a forensic dentist. Defendant agreed to have his teeth and right hand photographed. This took about 45–60 minutes, during which time Kieffer observed that defendant was awake, alert and cooperative.

At 4:55 p.m. defendant gave yet another statement. This statement was prompted by the discovery of evidence at Megan's autopsy that contradicted defendant's previous accounts. Kieffer handed defendant a rights form and told him to read it to himself. Defendant appeared to be awake and paying attention, according to the detective. Kieffer was convinced that defendant understood his rights and waived them voluntarily.

After Kieffer told defendant of the autopsy findings, defendant stated that he had not been entirely truthful the day before but that he would be. The detectives questioned defendant for thirty minutes. Defendant gave a complete account of the incident, admitting to hitting the victim and attempting to have sexual intercourse with her.

Kieffer then re-read defendant his rights. Defendant signed a waiver form and made another formal statement. He asked the officers no questions. When the statement was printed, defendant read it over and initialed each page. He then made a few other assertions about the incident and stated, "I feel better after telling you the rest of the truth about what happened."

At the suppression hearing, the trial court held that all of defendant's statements were admissible. First, the court found

that defendant was competent to waive his constitutional rights. He had a GED, could read and write, and "understood all that occurred about him." Defendant's actions also demonstrated his cleverness and ability to deal with the police.

With regard to the questioning at defendant's home, the court held that the setting was not custodial. The questioning was brief and non-coercive; defendant could have ended the encounter at any point. *Miranda* warnings, therefore, were not required and subsequent statements were not tainted by the failure to *Mirandize* defendant.

With regard to defendant's formal statements, the court found that adequate warnings were administered and defendant voluntarily, knowingly and intelligently waived his rights. The court found the police witnesses to be "credible" and believable. There was no evidence that the police intimidated, threatened, deceived or coerced defendant or overbore defendant's will. The court also rejected the claim that the statements should be suppressed because of defendant's lack of sleep, delay in arraignment, and lack of warning of potential death penalty charges. Defendant's motion was denied in its entirety.

### 3. *The Law*

Confessions obtained by police during custodial interrogation are barred from evidence unless the defendant has been advised of his constitutional rights. *Miranda v. Arizona*, 384 *U.S.* 436, 444, 86 *S.Ct.* 1602, 1612, 16 *L.Ed.*2d 694, 707 (1966); *State v. Cooper*, 151 *N.J.* 326, 354, 700 *A.*2d 306 (1997); *Chew I, supra*, 150 *N.J.* at 60–61, 695 *A.*2d 1301. A waiver of rights is valid only if it is made "voluntarily, knowingly and intelligently." *Miranda, supra*, 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706–07; *State v. Galloway*, 133 *N.J.* 631, 657, 628 *A.*2d 735 (1993).

In order to survive a suppression challenge, the State must prove beyond a reasonable doubt that the confession was voluntary and not the product of official misconduct. *Galloway, supra*, 133 *N.J.* at 654, 628 *A.*2d 735. The court must look at the

totality of the circumstances, including the characteristics of the defendant and the circumstances of the interrogation. *Cooper, supra,* 151 *N.J.* at 356, 700 *A.*2d 306; *Galloway, supra,* 133 *N.J.* at 654, 628 *A.*2d 735. Among the factors to consider in determining voluntariness are the suspect's age, education, intelligence, previous encounters with law enforcement, advice received about his or her constitutional rights, the length of detention, the period of time between administration of the warnings and the volunteered statement, and whether the questioning was repeated and prolonged in nature or involved physical or mental abuse. *Galloway, supra,* 133 *N.J.* at 654, 628 *A.*2d 735; *State v. Miller,* 76 *N.J.* 392, 402, 388 *A.*2d 218 (1978); *State v. J.G.,* 261 *N.J.Super.* 409, 424, 619 *A.*2d 232 (App.Div.1993), *certif. denied,* 133 *N.J.* 436, 627 *A.*2d 1142 (1993). The court must be satisfied that the statement was made of the defendant's own rational, free and unconstrained choice. *United States v. Bethancourt,* 65 *F.*3d 1074, 1078 (3d Cir.1995), *cert. denied,* 516 *U.S.* 1153, 116 *S.Ct.* 1032, 134 *L.Ed.*2d 109 (1996); *see also State v. DiFrisco,* 118 *N.J.* 253, 257, 571 *A.*2d 914 (1990) (*DiFrisco I* ). Confessions are not voluntary if derived from "very substantial" coercive tactics that overbear the suspect's will. *Galloway, supra,* 133 *N.J.* at 654–56, 628 *A.*2d 735.

### 4. *Defendant's Statement in Cifelli's Room*

 The *Miranda* requirement is triggered by "custodial interrogation," *i.e.,* questioning by law enforcement officers after a suspect has been deprived of freedom of action in a significant way. *Miranda, supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706; *State v. Smith,* 307 *N.J.Super.* 1, 8–9, 704 *A.*2d 73 (App.Div.1997), *certif. denied,* 153 *N.J.* 216, 708 *A.*2d 67 (1998); *State v. P.Z.,* 152 *N.J.* 86, 102–03, 703 *A.*2d 901 (1997). In determining whether the defendant would have felt free to leave, the court should consider the nature and degree of pressure applied to detain the suspect, the duration of the questioning, the physical surroundings, and the language used by police. *Smith, supra,* 307 *N.J.Super.* at 9, 704 *A.*2d 73. If the questioning is simply part of an investigation and is not targeted at the individual

because she or he is a suspect, the rights provided by *Miranda* are not implicated. *State v. Pierson,* 223 *N.J.Super.* 62, 67, 537 *A.*2d 1340 (App.Div.1988).

■ In this case, we agree with the trial court's conclusion that the oral statements made by defendant in Cifelli's room did not involve custodial interrogation and were admissible. The police questioned defendant and other neighbors in connection with the early stages of a missing-child investigation. Because the questioning took place in defendant's house, not in a police station, the location of the questioning was not inherently intimidating. The interview was not lengthy in duration and defendant was not restrained in any way. The fact that defendant was permitted to drive his own car to the police station supports the finding that defendant was free to leave. Moreover, the fact that defendant witnessed both Jenin and Cifelli emerge from questioning should have indicated he was free to leave. There is no evidence that detectives considered defendant a suspect at that point, sought to detain him, or pressured him in any fashion. Accordingly, we also conclude that the initial statements could not, and did not, "taint" subsequent statements made pursuant to a valid *Miranda* waiver.

5. *Defendant's Agreement to See Jenin*

■ Defendant asserts that his request to see Jenin was tantamount to an invocation of his right to remain silent and to end all questioning. A request to end interrogation, however ambiguous, must be scrupulously honored by the authorities. *Michigan v. Mosley,* 423 *U.S.* 96, 103–04, 96 *S.Ct.* 321, 326, 46 *L.Ed.*2d 313, 321–22 (1975); *State v. Bey,* 112 *N.J.* 45, 64, 548 *A.*2d 846 (1988) (*Bey I* ); *State v. Harvey,* 121 *N.J.* 407, 415, 581 *A.*2d 483 (1990)(*Harvey I* ), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L. Ed.*2d 268 (1991).

In *Harvey, supra,* the defendant requested to speak with his father. *Id.* at 417, 581 *A.*2d 483. At the conclusion of their meeting, which lasted over three hours, the defendant made a statement to police. *Ibid.* The police did not issue new *Miranda*

warnings until after the statement was recorded. Immediately after his rights were read, the defendant requested an attorney. *Ibid.* The Court held that the defendant's request to speak with his father constituted a request to terminate the interrogation. *Id.* at 419–20, 581 *A.2d* 483. The defendant had maintained that he did not want "to talk about" the murder throughout the three days of questioning. *Ibid.* The Court reasoned that defendant would have invoked his rights earlier, had the police read them. *Ibid.*

This case is different. Defendant had been given an opportunity to invoke his rights several times prior to seeing Jenin. He never once invoked them. The meeting with Jenin was not in private, it occurred in the presence of officers. Defendant never requested to be alone with Jenin. The meeting was brief (only a few minutes), because it took defendant very little time to confess. Jenin was not called into the room on defendant's initiative. The meeting was arranged by the detectives. Defendant merely responded in the affirmative to the officers' suggestion that he talk to Jenin. In short, we find no evidence that defendant had any intention of invoking his constitutional right to silence or to terminate interrogation by agreeing to speak with Jenin.

We also see little merit in defendant's assertion that Jenin was acting as a police agent, and therefore the failure to readminister *Miranda* warnings prior to Jenin's involvement violated defendant's right to counsel. There is no evidence that Jenin was acting as a government agent. The police did not direct Jenin to elicit any information from defendant. Jenin's outburst and defendant's response were unexpected. Moreover, the rule regarding the use of government agents to elicit incriminating statements applies only when a defendant's Sixth Amendment right to counsel has been triggered by indictment and he is represented by counsel. *Maine v. Moulton,* 474 *U.S.* 159, 169–74, 106 *S.Ct.* 477, 483–86, 88 *L.Ed.2d* 481, 491–95 (1985); *Massiah v. United States,* 377 *U.S.* 201, 204–06, 84 *S.Ct.* 1199, 1202–03, 12 *L.Ed.2d* 246 (1964). *State v. Bey,* 258 *N.J.Super.* 451, 466, 610

A.2d 403 (App.Div.1992), *certif. denied,* 130 *N.J.* 19, 611 A.2d 657 (1992); *State v. Leopardi,* 305 *N.J.Super.* 70, 76, 701 A.2d 952 (App.Div.1997) *certif. denied,* 153 *N.J.* 48, 707 A.2d 152 (1998). Neither of those factors was present here.

### 6. *Totality of Circumstances*

▇▇▇ Defendant argues that the circumstances under which he was questioned—over a period of 44 hours with little sleep—rendered his statements involuntary because his will was overborne by the detectives.

The questioning began on the evening of June 29, 1994, shortly before midnight, and continued until 4:00 a.m. the following morning. Defendant was back at headquarters at 10:45 a.m. after only a few hours of sleep. He was engaged in a lengthy period of questioning, lasting until 6:25 p.m. when he confessed. Defendant was taken directly to the park to locate the victim's body, returned to custody immediately afterwards, and questioned in the car on the way back. Defendant was then placed in a cell, where he was disturbed several times. The questioning resumed at 3:00 p.m. the following day.

Although repeated questioning by the authorities when a defendant has had little sleep, combined with statements intimating that the defendant was not being truthful and the police had evidence against him, in certain circumstances, could render the defendant's statements involuntary, the record in this case does not support that conclusion. First, the questioning was not "around the clock" or continuous. Defendant was allowed to go home. During the periods he was at the station, the officers offered him many breaks. Moreover, defendant never indicated to officers that he was too tired or hungry to continue. His demeanor, appearance, and responses indicated to the officers that he was alert and in control.

There is also ample evidence indicating that defendant's confessions were the product of his own free will. The officers administered *Miranda* warnings to defendant several times and he waived

them each time. He never requested counsel or asked to terminate the interviews. He sat with police and went over his statements with them. He was allowed to make any corrections, but made none. The officers never threatened defendant or physically coerced him to cooperate or confess. In fact, defendant repeatedly stated his desire to cooperate in finding the victim. In short, there is no evidence that police used coercive tactics in obtaining any of the confessions.

Nor is there any evidence indicating that defendant was so mentally deficient as to be incapable of comprehending his constitutional warnings. Defendant went to high school through the eleventh grade and obtained a GED. No one testified, and defendant presented no evidence, to support his claim that he was incapable of understanding the police warnings. We therefore agree with the trial court that defendant was competent to waive his constitutional rights

Based on the totality of the circumstances, we find that defendant understood his rights and intelligently, knowingly and voluntarily waived those rights over and over again. The record reveals a defendant who was alert and responsive and who confessed by his own free will. Accordingly, defendant's statements were properly admitted into evidence.

### D. *The Exclusion of Jenin's Statement*

Defendant contends that the trial court improperly excluded a statement made to police by defendant's housemate Brian Jenin. Defendant contends the statement was against Jenin's penal interest in that it strongly indicated that Jenin knew of the victim's death before defendant confessed to the crime. Defendant argues that the exclusion violated his Fourteenth and Eighth Amendment rights under the United States Constitution, and his corresponding rights under the New Jersey Constitution, necessitating reversal of his conviction.

### 1. *The Facts*

On July 29, 1994, Jenin gave a formal statement to the police regarding his whereabouts on the day of the victim's disappearance. Jenin gave an informal statement to police on July 30. Immediately following that statement, Jenin was brought into the conference room where defendant was being questioned to speak with defendant. Following a brief exchange between the two, defendant confessed and told police where the victim's body was located.

On August 3, 1994, four days later, Jenin made a second formal statement to police. In that statement, Jenin recounted a conversation he and defendant had prior to July 29, *i.e.* before Jenin spoke to the police:

I asked him where the girls' (sic) body was. He just looked at me and said "The girls' (sic) in the Park."

Defendant sought to admit Jenin's August 3 statement at trial to impeach Detective Pukenas' trial testimony. Defendant argued that Jenin's statement conflicted with Pukenas' account and also was against Jenin's penal interest. In rebuttal at the pre-trial hearing, the State presented testimony by Cifelli's brother-in-law, Gregory Sandusky, who stated that Jenin told him about going to see defendant at the police station. Sandusky testified that Jenin told him he said "Jesse, it's all over," and defendant confessed. Although conceding it had admitted Jenin's statement as a statement against penal interest at the suppression hearing, the court concluded that Pukenas's testimony was credible and that Jenin's formal statement was unreliable and untrustworthy. The trial court rejected defendant's request to admit Jenin's second formal statement into evidence.

At trial, Pukenas testified that upon entering the conference room on August 3, Jenin stated, "They got you, they got you, they got you." Pukenas stated that Jenin told defendant he would need a friend on the outside and Jenin would be that friend. Defendant then confessed. On cross, Pukenas denied that Jenin said to defendant, "Tell him where the body is." The court

instructed the jury that this testimony was hearsay and could be considered only for a limited purpose. The statement was offered "so that there would be some context in [their] evaluation of all the facts and circumstances that existed at the time...." It was not substantive evidence.

### 2. *The Law*

A defendant has the right to "advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made." *State v. Garfole,* 76 *N.J.* 445, 453, 388 *A.2d* 587 (1978). An accused also has a constitutional right to introduce probative evidence tending to establish third party guilt. *Koedatich, supra,* 112 *N.J.* at 297, 548 *A.2d* 939. To be admissible, evidence indicating third-party guilt must have "a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." *Loftin I, supra,* 146 *N.J.* at 345, 680 *A.2d* 677; *State v. Millett,* 272 *N.J.Super.* 68, 98, 639 *A.2d* 352 (App.Div.1994). In other words, there must be specific evidence linking the third-person to the crime. *Loftin I, supra,* 146 *N.J.* at 345–46, 680 *A.2d* 677.

> In cases in which courts have held that the evidence was improperly excluded, some link was demonstrated between the third party and the victim or crime ... [In] cases in which courts have held that third-party evidence was properly excluded, the proffer of evidence did no more than "prove some hostile event and [left] its connection with the case to mere conjecture."
>
> [*Koedatich, supra,* 112 *N.J.* at 300–01, 548 *A.2d* 939 (citation omitted); *see also Loftin I, supra,* 146 *N.J.* at 345, 680 *A.2d* 677 (finding testimony concerning third-party guilt not admissible unless there is evidence linking third party to crime) ].

Whether a trial court abused its discretion in excluding evidence of third-party guilt involves an extremely fact sensitive inquiry. *Loftin I, supra,* 146 *N.J.* at 345, 680 *A.2d* 677.

The trial court was within its discretion in excluding Jenin's statement, given defendant's failure to submit any actual evidence linking Jenin to the crime itself. Nothing in Jenin's statement was against Jenin's penal, social or proprietary interest. It did not "subject [him] to civil or criminal liability." *See*

*N.J.R.E.* 803(c)(25).[11] He did not place himself at the scene of the crime, nor did it implicate him in any part of the crime. Defendant's attempt to create a case around Jenin's alleged culpability is without adequate foundation in the evidence. Therefore, we find that the trial court correctly concluded that Jenin's statement was not admissible.

E. *Accomplice Liability Charge*

Defendant asserts that the trial court's refusal to charge the jury on accomplice liability violated his right to a fair charge under the eight and fourteenth amendments to the United States and New Jersey Constitutions. Specifically, defendant asserts that the gaps in the physical evidence, the authorities' unwillingness to follow-up on leads regarding Jenin and Cifelli, and the fact that Jenin and Cifelli were in the house at the same time as the victim are enough to support an accomplice liability charge.

In the capital context, a charge on accomplice liability often can mean the difference between life and death. *Chew, supra,* 150 *N.J.* at 72, 695 *A.*2d 1301. The standard for charging accomplice liability is whether the record contains sufficient evidence from which the jury could have inferred that someone else killed the victim. *Biegenwald IV,* 126 *N.J.* at 18–19, 594 *A.*2d 172. The trial court, however, has no duty to charge a possible offense unless the facts clearly indicate the charge is appropriate. *Chew, supra,* 150 *N.J.* at 75, 695 *A.*2d 1301.

In denying defendant's request for an accomplice liability charge, the court found that defendant had not generated enough evidence to justify the charge. There was no evidence that Jenin

---

[11] *N.J.R.E.* 803(c)(25) states:

A statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true.

or Cifelli were involved in the murder. Defendant's own statements inculpated only himself. The DNA, fiber, and bite-mark analyses linked only defendant to the crime. In short, defendant was relying on mere speculation rather than the facts of the case to support his request.

Although we recognize that the standard for an accomplice liability charge is minimal, defendant fails to meet even that low threshold. There was an overwhelming amount of evidence against defendant and none implicating anyone else. Defendant repeatedly confessed to the crime; those confessions mentioned no other participants. The forensic evidence also unequivocally pointed to defendant. Defendant offered no alibi. Cifelli and Jenin's alibis were corroborated by independent evidence. Given the dearth of evidence implicating anyone else, we find that the trial court's refusal to give an accomplice liability charge was correct.

### F. *Admission of Bite–Mark Evidence*

The State's forensic odontologist, Dr. Haskell Askin, testified that the wound to defendant's right hand was, "to a reasonable medical certainty," inflicted by the victim. Defendant asserts that admitting this testimony constituted plain error due to the scientific unreliability of bite mark analysis. He claims that the admission of such evidence violated his Fourteenth and Eighth Amendment rights under the United States Constitution, as well as his corresponding rights under the New Jersey Constitution (Art. I, ¶ 10), and necessitates reversal or remand for a hearing regarding the evidence's admissibility, pursuant to *N.J.R.E.* 104. Finally, defendant argues that counsel's failure to request a hearing to challenge the admissibility of the evidence or to *voir dire* the witness regarding the evidence, amounted to ineffective assistance of counsel and mandates reversal.

### 1. *The Facts*

Dr. Askin is board certified by the American Board of Forensic Odontology. At the time of trial, he had performed dozens of bite-

mark comparisons and had qualified as an expert witness in four previous trials. Dr. Askin had been asked by the Chief Medical Examiner of Mercer County to examine the bite-mark on defendant's hand to determine if the wound was consistent with a human bite-mark. If it was, Dr. Askin was to evaluate the teeth and jaws of the victim in preparation for a bite-mark comparison.

Dr. Askin examined the victim's teeth and jaws. From this, he noted several unique characteristics. He then removed the lower jaw and photographed both the upper and lower jaw. He also made casts of the victim's teeth. Next, Askin went to Hamilton Township Police Headquarters and examined the mark on defendant's hand. He also examined defendant's mouth and teeth. Upon returning to his office, Askin used the models of the victim's teeth to make "test bites." He compared those marks to the marks on defendant's hand.

Askin testified that his examination established, to a reasonable degree of medical certainty, that: (1) the injury on defendant's hand was inflicted by a human bite; (2) given the positioning of the teeth, the bite was not self-inflicted; and (3) given the open, red, inflamed nature of the wound, the bite-mark appeared to have been inflicted recently. Based on the positioning and the angulation of the teeth, Askin further concluded that the bite-mark was inflicted by the victim. Defendant did not object to Askin's testimony regarding his procedures or findings.

### 2. *The Law*

*N.J.R.E.* 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In *State v. Harvey*, 151 *N.J.* 117, 169, 699 *A*.2d 596 (1997) (*Harvey II* ), we interpreted *Rule* 702 to mean the following:

(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the subject of the testimony must be at a state of the art

such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to explain the intended testimony.

[*Id.* at 169, 699 *A.2d* 596 (citing *State v. Kelly,* 97 *N.J.* 178, 208, 478 *A.2d* 364 (1984)).]

Defendant contests only the second factor, i.e. that bite-mark analysis is not at such a state of the art that the testimony could be deemed reliable. Because defendant did not challenge the admissibility of the evidence at trial, Askin was not asked whether the relevant scientific community, dentistry, generally accepts bite-mark evidence as reliable.

Judicial opinion from other jurisdictions establish that bite-mark analysis has gained general acceptance and therefore is reliable. *Harvey, supra,* 151 *N.J.* at 170, 699 *A.2d* 596 (stating test for general acceptance). Over thirty states considering such evidence have found it admissible and no state has rejected bite-mark evidence as unreliable. *Howard v. State,* 701 *So.2d* 274, 292–93 (Miss.1997)(Smith, J., dissenting) (citations omitted); *Commonwealth v. Cifizzari,* 397 *Mass.* 560, 492 *N.E.2d* 357 (Ma.1986); *State v. Armstrong,* 179 *W.Va.* 435, 369 *S.E.2d* 870, 877 (1988); *People v. Shaw,* 278 *Ill.App.*3d 939, 215 *Ill.Dec.* 700, 664 *N.E.2d* 97 (1 Dist.), *appeal denied,* 168 *Ill.*2d 618, 219 *Ill.Dec.* 574, 671 *N.E.2d* 741 (1996); *People v. Bethune,* 105 *A.D.2d* 262, 484 *N.Y.S.2d* 577 (1984). Moreover, bite-mark analysis is not a novel form of testing, *per se. Verdict v. State,* 315 *Ark.* 436, 868 *S.W.2d* 443, 447 (1993). Accordingly, the evidence was well within the trial court's discretion to admit. Defendant's claim fails under a plain error standard of review.

■ Even if defendant were correct and the bite-mark evidence was admitted improperly, any error was harmless. Detective Stanley testified that defendant admitted being bitten by the victim. In conjunction with the staggering amount and nature of the evidence against defendant, there is no possibility that admitting this evidence produced an unjust result.

### G. *Defendant's Mitigating Factors*

#### 1. *The Facts*

Prior to the penalty phase, the trial court held that it would not submit the following five of defendant's proposed "catch-all" mitigating factors to the jury: (1) defendant did not act alone in causing the death of Megan Kanka; (2) the conduct of defendant was substantially influenced by another person or other persons more intellectually mature than defendant; (3) defendant offered to plead guilty in exchange for a life sentence; (4) defendant will not be a danger to young girls in the future since it is virtually certain that he will spend the rest of his life in jail; and (5) defendant waived any *ex post facto* objections to *N.J.S.A.* 2C:11–3(b)(3) ("Joan's Law"), ensuring that he would be sentenced to life without parole if the jury returned a non-death sentence.

The trial court concluded that those proposed mitigating factors had no evidential support or were not valid mitigating factors.

#### 2. *The Law*

*N.J.S.A.* 2C:11–3c(5) provides that:

The mitigating factors which may be found by the jury or the court are:

\* \* \* \*

(h) Any other factor which is *relevant* to the defendant's character or record or *to the circumstances of the offense.*

[Emphasis added.]

*N.J.S.A.* 2C:11–3c(2)(b) provides:

The defendant may offer, *without regard to the rules governing the admission of evidence at criminal trials, reliable evidence relevant to any of the mitigating factors.*

[Emphasis added.]

*N.J.S.A.* 2C:11–3c(2)(a) further provides that a defendant need produce only some evidence that a mitigating factor exists to bring it into play and that he "shall not have a burden with regard to the establishment of a mitigating factor." The jury in a capital case must not be precluded from considering "any aspect of a defen-

dant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," pursuant to *N.J.S.A.* 2C:11–3c(5)(h). *State v. Loftin,* 146 *N.J.* 295, 368, 680 *A.*2d 677 (1996) (*Loftin I* ) (citing *Lockett v. Ohio,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964, 57 *L.Ed.*2d 973, 990 (1978)).

Although the "catch-all" factor has been interpreted broadly in New Jersey, *Loftin I, supra,* 146 *N.J.* at 368, 680 *A.*2d 677, the scope of that factor is not unlimited. *State v. Gerald,* 113 *N.J.* 40, 103, 549 *A.*2d 792 (1988). Only mitigating evidence that is relevant to a defendant's character, record, or to the circumstances of the offense may be considered. *Loftin I, supra,* 146 *N.J.* at 368, 680 *A.*2d 677 (citing *Gerald, supra,* 113 *N.J.* at 103, 549 *A.*2d 792; *State v. Davis,* 96 *N.J.* 611, 618, 477 *A.*2d 308 (1984); *accord Lockett, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 990). "Character" has been defined by this Court as embracing those qualities that distinguish a specific person. *Davis, supra,* 96 *N.J.* at 618, 477 *A.*2d 308. The "circumstances of the offense" refer to the "circumstances of the commission of the crime itself[,]" such as the level of defendant's participation in the crime and the egregiousness of the act. *Gerald, supra,* 113 *N.J.* at 104, 549 *A.*2d 792.

### 3. *Analysis*

The trial court properly refused to submit the proposed mitigating factors to the jury. Defendant offered no support that his roommates participated in or were responsible for the crime. Moreover, nothing in the records supports the notion that defendant was unduly influenced by Jenin or by anyone else. In the absence of reliable evidence establishing those facts, the trial court did not abuse its discretion in refusing to submit those mitigating factors to the jury.

Similarly, the fact that defendant offered to plead guilty in exchange for a life sentence also was properly rejected by the court. Defendant offered no evidence establishing that the offer

to plead guilty related to defendant's character or the circumstances of the offense. More importantly, there was simply no evidence that a plea offer ever was made. The defense was unwilling to waive attorney-client privilege to present evidence that defendant offered to plead guilty in exchange for a non-death sentence, and the State would not stipulate to that fact. The defense offered to have Krych testify that defendant told her he was willing to plead guilty to certain crimes that would subject him to a life sentence. Because Krych had no knowledge that defendant actually made an offer to the State, her testimony would have been irrelevant. Because defendant had no relevant, reliable evidence to support the submission of that mitigating factor to the jury, the trial court's decision was proper.

 The fact that defendant would spend his life in jail, would be ineligible for parole, and therefore would not be a continuing danger to young girls, also was properly excluded from the jury's consideration. In *Biegenwald IV, supra,* 126 *N.J.* at 49, 594 *A.*2d 172, we concluded that the fact that a defendant is serving a life sentence and will never be eligible for parole is not, by itself, a mitigating factor. Moreover, in *State v. Morton,* 155 *N.J.* 383, 466, 715 *A.*2d 228 (1998), we held that it was error to allow the defendant to submit evidence of parole ineligibility as mitigation. Parole ineligibility is not a mitigating factor. *Ibid.* It does not relate to defendant's character or the circumstances of the crime. It merely constitutes the passage of time over which the defendant has no control. *State v. Nelson,* 155 *N.J.* 487, 504, 715 *A.*2d 281 (1998) *cert. den.* —— *U.S.* ——, 119 *S.Ct.* 890, 142 *L.Ed.*2d 788, 67 *USLW* 3322 (1999) (holding that juries should be told that they are not to consider defendant's alternative sentence as an aggravating or mitigating factor); *Cooper, supra,* 151 *N.J.* at 404–05, 700 *A.*2d 306 (finding parole ineligibility not mitigating factor, as it would lead to incongruous result that "the more crimes a defendant committed, the more mitigating evidence he or she would be able to submit").

■ The fact that defendant would not be a continuing danger to little girls also is not mitigating evidence. That argument is based on the premise that defendant will be incarcerated for life and will have no contact with children. This court has repeatedly rejected the notion that the length of a defendant's potential non-death sentence is a mitigating factor. *Cooper, supra,* 151 *N.J.* at 404–05, 700 *A.2d* 306. Defendant cannot circumvent that conclusion by couching the same argument in different terms.

In sum, we agree with the trial court's determination that defendant's potential threat to young girls and alternative life sentence were not *proper* mitigating factors. Even if the court should have submitted to the jury the fact that defendant waived challenges to Joan's Law, we conclude that any error was harmless. The court's instructions prior to the penalty phase deliberations informed jurors that defendant waived his right to challenge Joan's Law. The court's penalty phase instruction also apprised jurors that defendant would receive a life sentence if not given the death penalty. Because the jury was aware of that information, further evidence about defendant's alternative sentence would not have changed the outcome of the jury's deliberations.

### H. *Refusal to Admit Krych's Report Into Evidence*

During the penalty phase, defendant sought to introduce into evidence a report prepared by Carol Krych, the forensic social worker retained by the defense to investigate defendant's background for mitigation purposes. Krych compiled approximately 450 pages of documentation and notes pertaining to defendant's childhood and social history, based on interviews with family members, teachers, friends, psychologists and social workers. Her findings were summarized in a 32–page Report (the "Report").

During direct examination, Krych testified to the interviews she had conducted, using the Report as a guide. The defense introduced into evidence fifty-seven exhibits, including defendant's father's arrest and conviction records and defendant's school

records. On cross-examination, the State produced contradictory documents and other evidence that called into question the reliability of the Report and of Krych's testimony.

Defendant moved the Report into evidence, arguing that the jury should be allowed to examine the Report and assess its reliability for itself. The State argued that it was Krych's credibility, and not that of the Report, that was at issue. Moreover, the State argued, the report was no different than a police report that ordinarily would not be admitted into evidence when the recording officer is present at trial and is subject to cross-examination. Because Krych had the opportunity to testify before the jury, the State argued that her Report was unnecessary.

The trial court excluded the Report, finding it had no probative force because Krych had testified about its contents and some of the witnesses she interviewed also had testified. The court noted that the 57 exhibits forming the basis for the Report had been submitted to the jury as evidence. Those exhibits would serve the same purpose as the Report. Moreover, the trial court agreed that Krych's Report was similar to a police report. Since a police officer's investigative report is not ordinarily submitted into evidence when the officer testifies, Krych's report also should not be submitted. The Report ran the risk of confusing the jury. Based on those factors, the court found the report to be cumulative and, hence, unnecessary evidence.

On its second day of deliberations, at 9:49 a.m., the jury sent the court a note stating, "[W]e are unable to locate Carol Krych's 32–page report. Please provide a copy." The court informed the jury they had all the documents required for their consideration.

At that point, defendant reiterated his request that the Report be admitted into evidence and submitted to the jury, especially since the jury was now requesting it. Defendant added that the Report, by itself, was probative of the catch-all mitigating factors on which the jury would be deliberating. It also formed the basis for conclusions made by defense mitigation witness Dr. Podboy. Submitting the Report also would save jurors time by allowing

them to find the important details of Krych's investigation without having to go through 450 pages of exhibits.

Interpreting the jury's note as an indication that the jury erroneously believed they were supposed to have the Report, rather than a request for the Report of the jury's own accord, the court refused defendant's request. The court simply did not believe that submitting the report would increase the jury's ability to determine the reliability issues. The court stated, "Why should the report go before them, but no other written documentation which counters or challenges the report?"

### 1. *The Law*

*N.J.S.A.* 2C:11–3(c)(2)(b) provides, in relevant part:

The defendant may offer, without regard to the rules governing the admission of evidence at criminal trials, reliable evidence relevant to any of the mitigating factors. If the defendant produces evidence in mitigation which would not be admissible under the rules governing admission of evidence at criminal trials, the State may rebut that evidence without regard to the rules governing the admission of evidence at criminal trials.

We have held that when there is any doubt about admissibility of mitigating evidence, that doubt should be resolved in the defendant's favor. *Bey III, supra,* 129 *N.J.* at 587, 610 *A.*2d 814; *State v. Savage* 120 *N.J.* 594, 638, 577 *A.*2d 455 (1990). Evidence that fails the admissibility test under the strict rules of evidence should be admitted if relevant, and the shortcomings go to the weight of the testimony, "properly relegating to the adversarial process the task of 'separating the wheat from the chaff.'" *Davis, supra,* 96 *N.J.* at 623, 477 *A.*2d 308 (quoting *Barefoot v. Estelle,* 463 *U.S.* 880, 889 n. 7, 103 *S.Ct.* 3383, 3398 n. 7, 77 *L.Ed.*2d 1090, 1109 n. 7 (1983)). The trial court ultimately retains discretion to exclude evidence if its probative value is substantially outweighed by its speculative nature and the risk of confusion. *Id.* at 623, 477 *A.*2d 308; *State v. Pitts,* 116 *N.J.* 580, 633, 562 *A.*2d 1320 (1989).

Whether the trial court abused its discretion in ruling that the Report was not admissible because it was merely cumula-

tive evidence and would confuse the jury is a close call. Based on this Court's tolerant standard governing the admissibility of mitigating evidence, the jury's inquiry about the Report, and the fact that the Report furnished the factual basis for Dr. Podboy's expert testimony, we believe the better result would have been for the trial court to admit the evidence. Nonetheless, the trial court's refusal to admit the Report into evidence was harmless error.

The only "prejudice" defendant cites is that the jury unanimously rejected, under catch-all factor c(5)(h), mitigating factors eight and twenty-four. Factor eight stated:

Jesse Timmendequas' childhood and adolescence were characterized by exposure to domestic violence, criminal activity, substance abuse, instability of the home, emotional and physical neglect, and severe physical and sexual abuse. His life was void of any normalcy. His parents did not serve as role models of normal behavior and treated him terribly. Also, the family was extremely poor and primarily existed on public assistance, especially during the time period that [Defendant's father] was in the home.

Although not all the jury members found factor eight to be present, they unanimously agreed on the following factor 25(a):

Jesse Timmendequas' childhood and adolescence were characterized by exposure to domestic violence, criminal activity, substance abuse, instability of the home, emotional and physical neglect, and possible physical and sexual abuse. His parents did not serve as role models of normal behavior and treated him poorly. Also, the family was poor and received public assistance.

Factor eight and Factor 25(a) are identical, except for the sentence "His life was void of any normalcy." The minimal difference between these two catch-all factors could not have changed the result of defendant's penalty phase.

Factor 24 stated:

Despite being evaluated and classified as mentally retarded with emotional problems by the public school's child study team, none of the professionals provided follow-up services such as counseling or further psychological evaluation for Jesse Timmendequas.

Krych specifically testified twice to the fact that defendant did not receive follow-up counseling in school. Thus, the jurors had the information necessary to find factor 24—the Report would not have supplemented that information. As to factor 24, the trial

court was correct in concluding that the evidence merely would have been cumulative.

We emphasize that this is not a case where the jury did not have the relevant evidence before it. The 450 documents that formed the basis for the report were placed into evidence for the jury to read. Krych testified for three days about the findings of her investigation. Defendant essentially alleges that the evidence could have been presented in an easier manner for the jury to review. Nevertheless, no evidence was concealed from the jury. We, therefore, conclude that defendant cannot show any prejudice resulting from the decision not to admit the Report into evidence. Even if the failure to admit the Report was error, it constituted harmless error since the jury had the information prior to its deliberations.

## I. *Victim–Impact Evidence*

Defendant, for the first time on appeal, asserts that the trial court's instructions on victim-impact testimony did not comport with the procedure outlined in *State v. Muhammad, supra,* 145 *N.J.* at 32, 678 *A.*2d 164, for weighing aggravating and mitigating factors under *N.J.S.A.* 2C:11–3c(6) and (5)(h). The trial court instructed jurors as follows:

[I]f you as a juror have not found to be present mitigating factor (h) or mitigating factors in addition to those listed, meaning if you haven't found affirmatively as to factors number 3 through 25, if no one found any of those, you then must not give any consideration to this evidence regarding the victim's character or the impact of the murder on survivors. And that is so, because it only may be used in terms of balancing or in terms of assessing the weight to be given to the evidence concerning the defendant's character or the circumstances of the offense.

Defendant now complains that the above instruction did not clearly inform jurors they could consider victim-impact evidence only if they first found mitigating factor c(5)(h). Defendant argues that the instruction confused jurors and suggested they could consider victim impact evidence in determining the existence of a specific mitigating factor. Defendant further asserts that the penalty verdict sheet misled the jury. Finally, defendant contends that neither the court nor the verdict sheet apprised jurors that

they were not required to use the victim impact evidence to lessen the weight of any mitigating c(5)(h) factor. We disagree.

The Court in *Muhammad, supra,* explained the proper use of victim-impact evidence, pursuant to *N.J.S.A.* 2C:11–3c(6), the "Victim Impact Statute":

> The victim impact statute provides that if the defendant presents evidence of his character or record pursuant to section 5(h), the State may present evidence of the murder victim's character and background and of the impact of the murder on the victim's survivors. That statute then directs the trial court to inform the jury that if the jury finds that the State has proven at least one aggravating factor beyond a reasonable doubt and the jury finds evidence of a mitigating catch-all factor, then the jury may consider the victim impact evidence presented by the State in determining the appropriate weight to give the catch-all factor.
>
> [145 *N.J.* at 36, 678 *A.*2d 164.]

The trial court's charge in this case comported with the procedures outlined in *Muhammad.* The jury specifically was instructed that they could not consider the victim-impact evidence unless they found at least one of the catch-all circumstances, listed on the verdict sheet as # 3 through # 25. The court repeatedly spoke of "factors 3 through 25" to ensure the jury understood it was required to consider each of those factors before considering the victim-impact evidence. The instruction also made clear that jurors could not consider the victim-impact evidence in determining whether other mitigating factors existed. Because the instruction was repeated numerous times, it is improbable that the jury misconstrued their duty and used the victim-impact evidence in determining the existence, rather than the weight of the factors.

The prosecutor in her summation also addressed the proper use of victim impact testimony. The prosecutor stated, "[i]f you gave credit to any of the defendant's character evidence . . . we refer to that as Factor H mitigation, you are then to weigh it against whatever weight you determine is appropriate for victim impact." "Although arguments of counsel can by no means serve as a substitute for instructions by the court, *Taylor v. Kentucky,* 436 *U.S.* 478, 488–89, 98 *S.Ct.* 1930, 1936–37, 56 *L.Ed.*2d 468, 477 (1978), the prejudicial effect . . . must be evaluated 'in light of the totality of the circumstances-including all the instructions to the

jury, [and] the arguments of counsel ....'" *Marshall I, supra,* 123 *N.J.* at 145, 586 *A.*2d 85 (citations omitted).

Reviewing the charge in conjunction with the prosecutor's comments in summation, defendant cannot demonstrate that the jury instruction regarding victim-impact evidence constituted plain error. The trial court clearly and properly explained the limited role the victim-impact evidence could play in the jury's deliberation. The prosecutor expounded on its appropriate use in summation. The court explained the procedure again when handing out the penalty verdict sheet. The use of the word "may" clearly conveyed to jurors that they were under no obligation to use the victim-impact evidence in their deliberations. *State v. Martini,* 131 *N.J.* 176, 272, 619 *A.*2d 1208 (1993), *cert. denied,* 519 *U.S.* 1063, 117 *S.Ct.* 699, 136 *L.Ed.*2d 621 (1997) (*Martini I*).

When the court's instruction is reviewed as a whole, it is clear that the jury understood how to utilize the victim-impact evidence. Moreover, there is no evidence that jury members used victim-impact evidence incorrectly in their deliberations. In the context of the entire record, we have no doubt that the jury understood and properly applied such evidence.

### J. Jury Instruction on Parole Ineligibility

Defendant asserts for the first time on appeal that the trial court improperly instructed the jury not to consider the fact that defendant never would be eligible for parole in determining the appropriate penalty. Defendant contends the instruction misled the jury into believing it should not consider the consequences of its sentence in determining the appropriate penalty. Therefore, he argues, the instruction violated his Fourteenth Amendment right to due process, his Sixth Amendment right to a fair trial, his Eighth Amendment right to be free from cruel and unusual punishment, and his corresponding rights under the New Jersey Constitution.

*N.J.S.A.* 2C:11–3b(3) mandates a sentence of life imprisonment without the possibility of parole for defendants convicted of mur-

dering a child in the course of a sexual attack. Although the provision was passed after the date of the offenses in this case, defendant waived all *ex post facto* challenges to the law. After discussion, the trial court and counsel agreed that the jury should be told the possible sentences defendant would face. The court relayed the information to the jury by administering the following instruction:

> Now, you are entitled to know the sentencing considerations under the law. This knowledge, particularly that the defendant will never be eligible for parole, should not influence your decision regarding the appropriateness of a sentence on Count 1, the knowing or purposeful murder charge. Your decision must be based only upon the aggravating and mitigating factors presented by the evidence in this penalty phase.

### 1. *The Law*

We continuously have stressed the importance of the balancing process that jury members must engage in throughout the penalty phase. This process has been defined not as a "fact-finding" mission, *Biegenwald II, supra,* 106 *N.J.* at 62, 524 *A.*2d 130, or a "numbers game," *Moore, supra,* 122 *N.J.* at 473, 585 *A.*2d 864, but rather as a "judgmental determination by the jury, based on conflicting values, of whether defendant should live or die." *Biegenwald II, supra,* 106 *N.J.* at 62, 524 *A.*2d 130. To conduct this balance fairly, penalty-phase jurors in a capital case must be told the sentencing options and understand the consequences of their decision prior to deliberation. *Bey II, supra,* 112 *N.J.* at 162–65, 548 *A.*2d 887; *Nelson, supra,* 155 *N.J.* at 502–03, 715 *A.*2d 281.

*N.J.S.A.* 2C:11–3f provides:

> Prior to the jury's sentencing deliberations, the trial court shall inform the jury of the sentences which may be imposed pursuant to subsection b. of this section on the defendant if defendant is not sentenced to death.

In *Ramseur, supra,* 106 *N.J.* at 311, 524 *A.*2d 188, we stated:

> The entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die. To hide from the jury the full range of its sentencing options, thus permitting its decision to be based on

uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence.

[*Id.* at 311, 524 *A*.2d 188.]

To secure this constitutional guarantee, we previously have held that the trial court must instruct the jury on the sentencing options available on the non-capital counts in cases where the defendant is to be sentenced contemporaneously for both capital and non-capital convictions. *Martini I, supra*, 131 *N.J.* at 313, 619 *A*.2d 1208. We further have held that when a defendant is already serving time, and the court believes there is a "realistic likelihood" that defendant will be sentenced consecutively if the jury returns a non-death sentence, the jury should be informed that a non-death sentence may be imposed consecutively rather than concurrently. *Loftin I, supra*, 146 *N.J.* at 372, 680 *A*.2d 677.

Most recently, in *Nelson, supra*, 155 *N.J.* at 505, 715 *A*.2d 281, we determined that when the jury is choosing between life and death, the jury should not be prevented from considering the likelihood that a defendant would spend his remaining life in prison. Such an instruction would conflict with our holding in *Ramseur* and impermissibly "hide from the jury the full range of its sentencing options. . . ." *Ramseur, supra*, 106 *N.J.* at 311, 524 *A*.2d 188. Therefore, we concluded:

In future cases, courts should explain to jurors what we mean when we say that the length of the possible sentences other than death should not influence the jury's determination concerning the appropriateness of a death sentence on a murder count. Something along these lines (as refined by the Trial Judges' Committee on Capital Causes) would suffice:

What I intend to convey when I tell you that your determination of the appropriateness of a death sentence should not be influenced by the sentences that I may impose on other convictions, or in the event you determine that death is not an appropriate punishment for this defendant, is simply that a capital defendant is not more worthy of life because he or she may face a longer confinement in prison than another. A defendant's worthiness for life should depend only on the circumstances of the offense and the aggravating and mitigating factors that have been presented. I have informed you of the potential non-capital sentences only so that you may be fully informed of the effect of your decision.

[*Nelson, supra*, 155 *N.J.* at 505, 715 *A*.2d 281.]

 Although the *Nelson* decision had not yet been issued at the time of defendant's trial, the trial court's instruction complied with *Nelson*'s dictates precisely. After informing the jury of defendant's parole ineligibility, the trial court instructed jurors they could not use the information to find defendant more or less worthy of death on the capital count. Rather, the court explained, jurors should make that determination based on the weighing of the mitigating and aggravating factors.

Such an instruction strikes the appropriate balance between the kind of "uninformed and possibly inaccurate" speculation by the jury about the alternatives to death, *Ramseur, supra*, 106 *N.J.* at 311, 524 *A.*2d 188, and the need to limit the penalty phase deliberation to considerations of the aggravating and mitigating factors. The instruction clarifies the jury's task and makes it clear that their decision is ultimately a choice between life without parole and death. *See Nelson, supra*, 155 *N.J.* at 505, 715 *A.*2d 281. We find that the trial court's instructions on what the jury should consider in reaching its sentencing decision were correct.

### K. *Defendant's Provisional Sentence Of Life Without Parole*

 When imposing the sentence on the purposeful murder charge, the trial court stated, "In the event the sentence of death is vacated by our Supreme Court, this Court provisionally imposes the sentence of life imprisonment without the possibility of parole." Defendant argues that portion of the trial court's judgment should be vacated.

Defendant's argument is meritless. Defendant waived any *ex post facto* challenge to the imposition of *N.J.S.A.* 2C:11-3b(3)(a)(b), which mandates an automatic sentence of life without parole for any defendant convicted of murdering a child while in the course of committing sexual assault. Because the court has no discretion regarding an alternative sentence to death for defendant, defendant was in no way prejudiced by the trial court's statement.

L. *Defendant Was Denied Equal Protection And Due Process When He Was Charged With A Crime Without Grand Jury Action On The Existence Or Non–Existence Of Aggravating Factors*

1. *The Facts*

In a motion argued on June 9, 1995, defense counsel argued that the aggravating factors presented by the State in the penalty phase were elements of the capital murder crime and should have been presented to the grand jury. Failure to do so, defendant contended, violated his State and federal constitutional rights to due process and equal protection. That motion was denied on the basis of this Court's decision in *Martini I, supra,* 131 *N.J.* at 222–228, 619 *A.*2d 1208, which concluded that the grand jury in death penalty prosecutions need not be given the opportunity to consider evidence going to the existence or non-existence of aggravating factors.

For the reasons we stated in *Martini I,* we reaffirm that it is not necessary to present aggravating factors to the grand jury under the New Jersey Constitution. *Ibid.* For the same reasons, we also find no violation of the federal Constitution. *See Poland v. Arizona,* 476 *U.S.* 147, 156, 106 *S.Ct.* 1749, 1755, 90 *L.Ed.*2d 123, 132 (1986), (cited in *Martini I, supra,* 131 *N.J.* at 225, 619 *A.*2d 1208) (finding that aggravating circumstances are not separate penalties, but are merely standards to help guide jury in deciding between life or death verdict).

M. *The New Jersey Death Penalty Statute Does Not Violate Customary International Law*

Defendant asserts that the New Jersey death penalty statute violates customary international law. We held in *Nelson, supra,* 155 *N.J.* at 512, 715 *A.*2d 281, that "international law does not require the invalidation of New Jersey's death penalty[,]" since the United States has not adopted any international human rights conventions invalidating the death penalty. We reject defendant's argument for the reasons stated in *Nelson.*

### N. *Constitutionality of the Act*

Defendant asserts that the New Jersey Death Penalty Statute violates the Eighth Amendment of the United States Constitution. This Court previously has held that the New Jersey Statute is constitutional. *Cooper, supra*, 151 *N.J.* at 379, 700 *A.2d* 306; *Ramseur, supra*, 106 *N.J.* at 166–211, 524 *A.2d* 188. Thus, we reject defendant's claim.

### O. *Cumulative Effect of Errors*

Defendant argues that if we find, as we do, that none of the trial errors standing alone warrant reversal of his death sentence, then the sentence cannot withstand their cumulative weight. Defendant argues that the trial court errors, together, contributed to his death sentence and make it constitutionally unreliable. *See State v. Orecchio*, 16 *N.J.* 125, 129, 106 *A.2d* 541 (1954) (noting that where "legal errors ... in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury").

As we noted in *Marshall I, supra*, 123 *N.J.* at 169, 586 *A.2d* 85,

The fact that capital cases are vigorously contested, protracted, and consistently implicate subtle and difficult legal issues virtually assures that in the course of each trial some errors and imperfections will be apparent. Trial judges, unlike appellate judges, make their rulings in the heat of trial, without the opportunity for deliberative review, and not even the most experienced and conscientious trial judges can be perfect.

"A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 *U.S.* 604, 619, 73 *S.Ct.* 481, 490, 97 *L.Ed.* 593, 605 (1953). That is true even in capital cases, where we " 'subject the record to intense scrutiny,' recognizing that a defendant's very life is at stake." *Marshall I, supra*, 123 *N.J.* at 170, 586 *A.2d* 85 (quoting *Bey I, supra*, 112 *N.J.* at 92–93, 548 *A.2d* 846).

We have carefully reviewed each of the errors identified in the course of this opinion. We are satisfied, in the context of a trial that produced overwhelming evidence of defendant's guilt, that the

combined effect of those errors was not clearly capable of affecting either defendant's convictions or his sentences.

### P. *Proportionality Review*

As authorized by the Capital Punishment Act, *N.J.S.A.* 2C:11–3e, defendant has requested that we determine whether his "sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Review of defendant's sentence shall be undertaken pursuant to a briefing and argument schedule to be established by the Clerk of the Court after consultation with counsel.

## VII

### *Conclusion*

In summary, defendant's conviction for murder and his sentence of death are affirmed. In addition, defendant's convictions for the related offenses are affirmed.

Finally, defendant's request for proportionality review is acknowledged and the matter will proceed according to a briefing and argument schedule to be established by the Clerk of this Court.

STEIN, J., concurring in part and dissenting in part.

I join in that portion of the Court's opinion that sustains defendant's capital-murder conviction. I conclude, however, that defendant's sentence should be set aside and the case remanded for a new penalty-phase trial. Under settled New Jersey law, evidence that a capital defendant had been convicted of similar offenses ordinarily would be inadmissible. If such evidence were to be admitted because it was germane to a material disputed issue in the trial, our cases mandate that the trial court instruct the jury in unmistakably clear terms about the permitted and prohibited uses of such other-crime evidence. Under our capital-punishment statute, a defendant's conviction of prior offenses,

except for murder, does not constitute a statutory aggravating factor and cannot be considered by the jurors deliberating on whether defendant lives or dies. The jurors deliberating in this penalty-phase trial did not know that. Ten of those jurors, however, knew that defendant had prior convictions and nine jurors believed that he had previously been convicted of sexual offenses. Notwithstanding that knowledge, defense counsel did not request and the trial court did not deliver a clear instruction informing the jury that they were absolutely prohibited from considering defendant's prior convictions in determining whether defendant should be sentenced to death. I regard the trial court's omission of that instruction to constitute plain error that requires reversal of defendant's death sentence because the error was "clearly capable of producing an unjust result." *R.* 2:10–2.

I

A

The unique feature of this death-penalty trial is that the selection of a jury that did not know that defendant had prior convictions for sex-related offenses would have been virtually impossible. As a direct result of the sexual assault and murder in July 1994 of defendant's victim, Megan Kanka, the New Jersey Legislature enacted in October 1994 the Registration Law, *L.* 1994, *c.* 133, and the Community Notification Law, *L.* 1994, *c.* 128, generally referred to as "Megan's Law," requiring the registration by and community notification of relevant information concerning prior sex offenders. The impetus for the enactment of Megan's Law was the discovery by law enforcement officials, subsequent to the murder of Megan Kanka, that defendant, who lived on the same street as the Kanka family, had prior convictions for sex-related offenses and that that information had never been communicated by police to residents in the neighborhood.

On the first day of jury selection the trial court provided prospective jurors with an overview of the case and informed them

that it involved the sexual assault and murder of a seven-year-old girl named Megan Kanka. The jurors also were provided with a detailed questionnaire that included questions about the jurors' knowledge of Megan's Law, their belief or suspicions concerning defendant's criminal record, and whether jurors could disregard any such belief or suspicion so that it would not interfere with their ability to decide the case fairly and impartially.

Of 332 prospective jurors questioned by the court and counsel, only five jurors disclaimed any knowledge that defendant had a prior criminal record, and sixty-six jurors stated that despite their belief or suspicion about defendant's record they could decide the case impartially. Of the twelve jurors that actually deliberated, ten jurors knew or suspected that defendant had a prior record and nine jurors suspected that defendant's prior record included a conviction for a sex-related offense.

B

There being no dispute that a clear majority of defendant's jurors believed or suspected that defendant had prior convictions for sex-related offenses, the critical question is how the trial court should have dealt with that fact in its instructions. That the jurors learned of defendant's prior record through the massive publicity about the homicide and Megan's Law rather than through evidence offered at trial is immaterial. In *Marshall v. United States,* 360 *U.S.* 310, 79 *S.Ct.* 1171, 3 *L.Ed.*2d 1250 (1959), addressing a similar context in which a jury learned of the defendant's prior convictions through newspaper accounts, the Court observed:

We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. It may indeed be greater for it is then not tempered by protective procedures.

[*Id.* at 312–13, 79 *S.Ct.* at 1173, 3 *L.Ed.*2d at 1252 (citations omitted.)]

That evidence of defendant's prior convictions would have been inadmissible if offered into evidence by the State is incontestable. *Evidence Rule* 404(b), the successor to former *Evid. R.* 55, provides as follows:

> **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

That evidence rule "perpetuate[s] New Jersey's long-standing common-law rule that excluded other-crimes evidence when offered solely to prove a defendant's propensity to commit crime." *State v. Stevens,* 115 *N.J.* 289, 299, 558 *A.*2d 833 (1989). Underlying both the Rule and its common-law antecedents "is the recognition that other-crime evidence may simultaneously be highly probative and extremely prejudicial." *Id.*. at 300, 558 *A.*2d 833. Notwithstanding its probative value, other-crime evidence offered solely to prove predisposition to commit crime is excluded under the Rule, as it was at common law. *Ibid. Accord State v. G.S.,* 145 *N.J.* 460, 468, 678 *A.*2d 1092 (1996).

Pursuant to the Rule, other-crime evidence is admissible to prove other facts in issue. The examples set forth in the Rule of the kind of facts to which other-crime evidence may be germane—such as motive, opportunity, intent, plan, identity, or absence of mistake—are not intended to be exclusive. *Stevens, supra,* 115 *N.J.* at 300, 558 *A.*2d 833. But there is absolutely no suggestion in this record that defendant's prior sex-related offenses, which occurred in 1980 and 1982, could have been relevant to any material issue in dispute in this prosecution.

Because of the acknowledged inflammatory characteristics of other-crime evidence, even if such evidence is relevant to a material issue in dispute our cases "mandate[] a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue

prejudice." *Id.* at 303, 558 *A.*2d 833. *Accord State v. Marrero,* 148 *N.J.* 469, 482–83, 691 *A.*2d 293 (1997); *State v. G.S., supra,* 145 *N.J.* at 468–69, 678 *A.*2d 1092; *State v. Cofield,* 127 *N.J.* 328, 336, 605 *A.*2d 230 (1992).

Finally, even in criminal prosecutions in which other-crime evidence is found to be admissible because its probative value exceeds its prejudicial effect, a court nevertheless must instruct a jury on the limited purpose for which such evidence may be used. *Evidence Rule* 105 provides:

> When evidence is admitted as to one party or for one purpose but is not admissible as to another party or for another purpose, the judge, upon request, shall restrict the evidence to its proper scope and shall instruct the jury accordingly but may permit a party to waive a limiting instruction.

In providing such a limiting instruction, courts must appreciate that for an average juror compliance with an instruction that permits the jury to consider other-crime evidence for one purpose but not for another is extremely difficult. Accordingly, in insisting that such limiting instructions be provided, we have urged trial courts that any such instruction "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." *Stevens, supra,* 115 *N.J.* at 304, 558 *A.*2d 833. But this Court's recent decisional law concerning other-crime evidence emphasizes that a clear limiting instruction is essential to avoid misuse by the jury of such evidence. *Marrero, supra,* 148 *N.J.* at 495, 691 *A.*2d 293; *G.S., supra,* 145 *N.J.* at 472, 678 *A.*2d 1092; *State v. Oliver,* 133 *N.J.* 141, 157–58, 627 *A.*2d 144 (1993) (affirming reversal of defendant's sexual assault convictions primarily because of inadequacy of limiting instruction on use of other-crime evidence); *Cofield, supra,* 127 *N.J.* at 341, 605 *A.*2d 230 (reversing defendant's convictions on drug-related offenses because of inadequacy of limiting instruction on use of other-crime evidence).

*State v. Brunson,* 132 *N.J.* 377, 625 *A.*2d 1085 (1993), reflects this Court's concerns about the admissibility of evidence of other

crimes that are similar in nature to the offense for which the defendant is being tried. *Brunson* involved an application of this Court's decision in *State v. Sands*, 76 *N.J.* 127, 386 *A.2d* 378 (1978), in which we held that whether evidence of a prior conviction may be admitted to impeach the credibility of a testifying criminal defendant is a decision that rests within the sound discretion of the trial court. The defendant in *Brunson* was charged with drug offenses, and the trial court ruled that if defendant testified, evidence of his prior conviction for similar drug offenses would be admissible. The defendant declined to testify and was convicted of the charged offenses. Reversing, we held that if a defendant's prior convictions are for crimes similar to the charged offense, the State may introduce as evidence to impeach the defendant's credibility only the degree of the prior crime and the date of the offense, but must exclude any evidence of the specific crime of which defendant was convicted.

We explained:

That method of impeachment will insure that a prior offender does not appear to the jury as a citizen of unassailable veracity and simultaneously will protect a defendant against the risk of impermissible use by the jury of prior-conviction evidence. The balance struck adequately vindicates the State's interest in using the prior conviction to cast doubt on the defendant's credibility without subjecting defendant "to the extraordinary prejudice that follows if the prior crime was specifically named or described." *Pennington, supra*, 119 *N.J.* at 607, 575 *A.2d* 816 (Handler, J., concurring in part, dissenting in part). "The difference between lack of credibility as a repetitive felon and lack of credibility as a repetitive car thief was negligible to the prosecution, catastrophic to the accused." *Bendelow v. United States*, 418 *F.2d* 42, 53 (5th Cir.1969) (Godbold, J., concurring in part, dissenting in part), *cert. denied*, 400 *U.S.* 967, 91 *S.Ct. 379*, 27 *L.Ed.2d* 387 (1970).

[*Id.* at 391–92, 625 *A.2d* 1085.]

## II

Because of the notoriety of defendant's crimes and the publicity that accompanied the enactment of Megan's Law, the jury's awareness of defendant's prior convictions for sex-related offenses was virtually unavoidable. The trial court had no opportunity to consider whether evidence of defendant's prior sex-related convictions was material to any issue in the case, or whether the

prejudicial effect of such evidence outweighed its probative value. If that opportunity had been afforded the trial court, evidence of defendant's prior convictions unquestionably would have been excluded from the trial. Because defendant did not testify, and the only possible relevance of the prior convictions could have been as impeachment evidence, we can be certain that the trial court would have excluded evidence of defendant's convictions. However, under the unique circumstances of this capital prosecution, the jury's exposure to information about defendant's prior convictions of sex-related offenses could not be prevented. The only means available to the trial court to remediate the unavoidably prejudicial effect of the jury's knowledge about defendant's prior convictions was to instruct the jury in the clearest and strongest terms that those prior convictions could not be considered by the jury in its deliberations on defendant's guilt and sentence. The failure of the trial court to provide such a limiting instruction arises as one of plain error because trial counsel apparently did not request such an instruction, and therefore reversal is required only if the error is "clearly capable of producing an unjust result." *R.* 2:10–2.

I conclude that the trial court's failure to instruct the jury in the guilt phase of the trial to exclude from consideration in their deliberations knowledge of defendant's prior convictions constituted harmless error. The evidence of defendant's guilt fairly can be described as overwhelming, and in that context the trial court's omission of an instruction about defendant's prior convictions was not clearly capable of producing an unjust result. In other circumstances we have concluded that deficiencies in limiting instructions about the use of other-crime evidence constituted harmless error. See *Marrero, supra,* 148 *N.J.* at 495–97, 691 *A.*2d 293; *G.S., supra,* 145 *N.J.* at 473–76, 678 *A.*2d 1092; *Stevens, supra,* 115 *N.J.* at 308–09, 558 *A.*2d 833.

In the penalty phase, however, the omission of an instruction to the jury prohibiting its consideration of defendant's prior convictions in determining defendant's sentence cannot be regarded as

harmless error. We addressed an analogous issue in *State v. Rose*, 112 *N.J.* 454, 548 *A*.2d 1058 (1988), a capital prosecution in which the State alleged as aggravating factors that defendant had murdered a police officer engaged in the performance of his duty, *N.J.S.A.* 2C:11–3c(4)(h), that the murder was committed for the purpose of escaping detection for another offense, *N.J.S.A.* 2C:11–3c(4)(f), and that the murder involved an aggravated battery to the victim, *N.J.S.A.* 2C:11–3c(4)(c). In the *Rose* penalty phase, after the jury convicted defendant of knowing or purposeful murder by his own conduct, defendant called expert witnesses to testify about the defendant's mental and emotional condition at the time of the homicide, and character witnesses to offer mitigating testimony concerning defendant's good character. On cross-examination of both the expert and character witnesses, the prosecutor questioned the witnesses in detail about prior "bad acts" of defendant, including questions about instances in which he allegedly had assaulted former girl friends, instances of threatened violence against black youths, and instances of disciplinary infractions in high school, in the army and in prison. We took note of the inflammatory nature of that cross-examination and cautioned trial courts that because of the strong possibility of prejudice to the defendant, close supervision of such cross-examination was essential. *Id.* at 504–05, 548 *A*.2d 1058. However, we held that the trial court's failure to instruct the penalty-phase jury on the limited relevance of the prior-bad-act evidence elicited by the prosecutor during cross-examination required reversal of defendant's death sentence.

We explained in detail the reasons for our conclusion:

> We need not resolve the question whether defense counsel made sufficiently clear their request for a limiting instruction concerning this testimony, although it is self-evident that on an issue of such critical importance there should be no cause for understatement or ambiguity. We hold, in view of the repetitive and highly inflammatory quality of the evidence of defendant's past misconduct that came before the jury in the penalty phase, both derivatively through the guilt phase and in the cross-examination of defendant's penalty phase witnesses, that the trial court's failure to instruct the jury on the limited relevance of this evidence was so clearly prejudicial that it requires defendant's death sentence to be set aside.

We have already reviewed in detail the evidence of defendant's past conduct to which the jury was exposed in both the guilt and penalty phases of the case. During the guilt phase the jury heard evidence of defendant's apparent racially-tinged motivation for purchasing the sawed-off shotgun as well as evidence of defendant's defiant possession and threats to use the shotgun during the school-yard incident. *Supra* at 473, 483-87 [548 *A*.2d 1058]. On the prosecutor's motion, this evidence was before the jury in the penalty phase.

Through cross-examination of defendant's expert witnesses in the penalty phase, the jury heard evidence (or references by the prosecutor) concerning past misconduct by defendant in high school, in the army, and in jail. *Supra* at 496 [548 *A*.2d 1058]. In addition, the jury heard extensive testimony and provocative references by the prosecutor to defendant's acts of physical violence toward his former girlfriends. *Supra* at 492–94, 497–98 [548 *A*.2d 1058]. The expert witnesses were also interrogated about the schoolyard incident and defendant's reason for buying the shotgun. *Supra* at 491, 494–96, 498 [548 *A*.2d 1058].

Virtually every character witness, other than defendant's relatives, was questioned aggressively by the prosecutor about defendant's tendency to "beat up" women. In addition, the cross-examination of some character witnesses included references to defendant's prior misuse of the shotgun.

All of this evidence of defendant's past conduct, to the extent it was admissible at all, was admissible only for a limited purpose. In the guilt phase, evidence of the schoolyard incident was admissible under *Evidence Rule* 55 to prove absence of mistake or accident; if admissible at all, evidence of defendant's reason for buying the shotgun was admissible for the same purpose. *Supra* at 485–90 [548 *A*.2d 1058]. In the penalty phase, evidence of defendant's past conduct was relevant to test the credibility and the conclusions of the expert witnesses, and in the case of the character witnesses was material to rebut their testimony to demonstrate defendant's good character as a mitigating factor.

The jury was never told about the limited relevance of any of this testimony.... When evidence is admissible for one purpose, but not for another, a limiting instruction is the appropriate device through which to restrict the jury's use of such evidence.

In the penalty phase of a capital case, the function of the jury has been sharply defined by the Legislature. The jury must determine if the State has proved beyond a reasonable doubt the existence of any aggravating factors, and if the defendant has proved the existence of any mitigating factors. The jury must then weigh only the aggravating factors against only the mitigating factors. *N.J.S.A.* 2C:11–3c(3). The jury is not permitted, in its weighing process, to add other evidence of defendant's past conduct to the weight it assigns to the aggravating factors, nor to consider other evidence of defendant's past conduct, except to the extent offered to rebut mitigating factors, as detracting from the weight it assigns to the mitigating factors.

In this case, however, the jury was totally unguided concerning the uses to which it could put the abundant evidence of defendant's past conduct that was adduced at trial. We therefore have no confidence that the jury did not consider such evidence improperly in the course of its weighing process. We concede that there

is no way to assure that a jury adheres scrupulously to the mandate of a limiting instruction. But in a death penalty context, and in the face of such abundant and inflammatory evidence of defendant's past conduct, the necessity for a careful and precise limiting instruction to this jury was clear and compelling. Its omission from the charge was prejudicial beyond a reasonable doubt and compels the reversal of defendant's death sentence.

[*Id.* at 505–08, 548 *A.*2d 1058 (citations omitted) (footnote omitted).]

In *Rose,* supra, the jury heard evidence not of prior convictions but of prior bad acts by the defendant, and this Court concluded that reversal of the death penalty was necessary because the jury was uninstructed about the relevance of that evidence to its penalty-phase deliberations. In this case the penalty-phase jury was informed about prior convictions for offenses similar to the instant offenses, but was not instructed that those convictions could not be considered in determining defendant's sentence.

The question whether a defendant's prior convictions can be considered in the sentencing phase of a death-penalty prosecution is a matter of legislative determination. See *Barclay v. Florida,* 463 *U.S.* 939, 956, 103 *S.Ct.* 3418, 3428, 77 *L.Ed.*2d 1134, 1148 (1983) ("The trial judge's consideration of Barclay's criminal record as an aggravating circumstance was improper as a matter of state law."); *Zant v. Stephens,* 462 *U.S.* 862, 887, 103 *S.Ct.* 2733, 2747, 77 *L.Ed.*2d 235, 256 (1983) ("Thus, any evidence on which the jury might have relied in this case to find that respondent had previously been convicted of a substantial number of serious assaultive offenses ... was properly adduced at the sentencing hearing."). The United States Supreme Court has held that no constitutional violation occurs if a state permits consideration of non-statutory aggravating factors in the penalty phase of a capital case. *Id.* at 878–79, 103 *S.Ct.* at 2733, 77 *L.Ed.*2d at 251.

Our Legislature, consistent with the recognition that reliance only on statutory aggravating factors diminishes the unpredictability of capital punishment, has restricted jury consideration in the penalty phase to a weighing of the statutory aggravating and mitigating factors. This penalty-phase jury, although instructed to weigh only statutory aggravating and mitigating factors, was informed of defendant's prior sexual assault convictions but was

never instructed that the significance of those prior convictions was not a permissible factor for consideration in the penalty-phase deliberations. In my view, that omission mandates reversal of defendant's death sentence and a remand for retrial of the penalty phase.

Justice HANDLER joins in this dissent.

KING, P.J.A.D. (temporarily assigned), dissenting in part and concurring in part.

For the reasons given by Justice Handler in IV (page 692 to 711, 737 *A.*2d page 153 to 165) of his dissenting opinion, I agree that prosecutorial misconduct tainted the trial proceeding insofar as the death sentence is concerned. Since the evidence of guilt was so overwhelming I do not think that such misconduct had the capacity to taint the guilt finding. I would remand for a new penalty-phase trial only. In all other respects I join the majority opinion insofar as it affirms the guilty verdict.

HANDLER, J., dissenting.

It has been often said that justice is blind. By that we mean judicial resolutions are not preconceived or preordained. The justice this Court metes out today seems to have come by way of a course selected to reach a specific destination—the execution of Jesse Timmendequas. Death is a punishment that we impose upon the worst among us. Yet, in seeking to administer this punishment, we cannot help but bring out the worst in ourselves. This case presents that danger of a system of justice failing in the face of its most extreme challenge—the prosecution of capital murderers. The Court has, by its decision, compromised well-established legal principles to justify defendant's death sentence.

One can say with certainty that the crime committed by Jesse Timmendequas was horrific, so uniformly condemned that it changed the legal landscape for sex offenses nationwide. *See Doe v. Poritz,* 142 *N.J.* 1, 17–19, 662 *A.*2d 367 (1995). With equal certainty, however, one can say that this defendant did not receive

the most basic right of our justice system and civilization: a fair
trial. To condemn to death a defendant who has been denied such
a fundamental right is not justice.

I

Defendant, Jesse Timmendequas, appeals his conviction for
capital murder and his death sentence. On May 30, 1997, defen-
dant was convicted of the kidnapping, sexual assault and murder
of seven-year-old Megan Kanka. He was sentenced to death on
June 20, 1997.

Defendant raises nineteen issues with this Court, most of which
do not warrant a remedy. Four of defendant's claims, however,
clearly require reversal.

First, the trial court erred in reconsidering and countermanding
its initial decision to empanel a jury from Camden County. That
reconsideration and reversal not only implicated and impaired
defendant's Sixth Amendment right to a jury selected from a fair
cross-section of the community, it also likely contributed to the
prejudice that is raised by another of defendant's claims of error—
a majority of the jury members had knowledge or suspected that
defendant was a long-time sex offender. The trial court's failure
to use all available methods to empanel an impartial jury thus
resulted in extreme prejudice to defendant, a level of prejudice
that this Court has heretofore held requires, at the very least, a
new penalty trial. Next, the prosecutor engaged in a pattern of
misconduct throughout defendant's guilt- and penalty-phase trials
that, in my view, requires reversal of defendant's conviction as
well as vacation of his sentence. Finally, the trial court committed
reversible error in failing to admit mitigating evidence pursuant to
this State's broad rules for admission of such evidence.

I, therefore, dissent.

II

Defendant asserts that the trial court's decision to reconsider its
initial order to empanel a jury from Camden County, which

resulted in the granting of the State's motion to empanel a jury from Hunterdon County, constituted a violation of his Sixth and Fourteenth Amendment rights to due process and a fair and impartial jury, and, therefore, that his conviction must be reversed and his sentence vacated. I agree with the majority that defendant's due process rights were not implicated by the trial court's second reconsideration of the venue issue. *See ante* at 562, 737 A.2d at 80. Unlike the majority, however, I find that defendant's Sixth Amendment rights were clearly circumvented.

Defendant's claim is based on two important factors: (1) the disparity in racial demographics between Hunterdon County and Mercer County; and (2) the level and inflammatory nature of press coverage in this case.

### A.

On September 22, 1995, due to the flood of publicity that inundated this case, *see id.* at 550–51, 737 A.2d at 73, defendant made a pretrial motion for a change of venue, in which he cited a total of 544 separate articles, including stories, columns, cartoons, advertisements, and letters to the editor, from Mercer County's two daily newspapers, the *Trentonian* and the *Trenton Times.* Analyzing the publicity in accordance with the standard used in *State v. Koedatich,* 112 *N.J.* 225, 271–73, 548 A.2d 939 (1988) (*Koedatich I* ), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), the trial court acknowledged the overwhelming and brazen press coverage of defendant's case, and determined that prejudice from the pretrial publicity must be presumed. A "change of venue," the court concluded, "is necessary to overcome the realistic likelihood of prejudice from pretrial publicity."

In determining the judicial remedy necessary to confront and combat the pretrial publicity, the trial court was mindful of the need for the replacement jury pool to reflect a cross-section of the community in which the trial would be held. The court also recognized that the replacement county must have the capacity to accommodate jury selection. *See State v. Harris,* 282 *N.J.Super.*

409, 417–18, 660 *A.*2d 539 (App.Div.1995), *appeal after remand*, 156 *N.J.* 122, 716 *A.*2d 458 (1998). Accordingly, the trial court ordered a change of venue to Camden County pursuant to *Rule* 3:14–2. In so doing, it noted,

[I]t is to be expected that publicity will reach new heights at the time of trial; perhaps unprecedented publicity. Even considering that which has been generated in the ongoing *Harris* case.

Subsequent to the court's ruling, the State requested a hearing on the location chosen by the court for the trial because the prosecutor had not yet presented evidence on demographics. The court allowed the State to submit a motion for reconsideration on the choice of venue. On November 21, 1995, the State did so. At the December 15, 1995, hearing, the State argued that the court should reconsider its ruling on venue in light of the constitutional rights of the victim's family, pursuant to the Victim's Rights Amendment to the New Jersey Constitution (VRA), *see N.J. Const.* art. I, ¶ 22. The State asked first that the court empanel a foreign jury from Camden in lieu of changing the venue of the trial. Recognizing the importance of protecting victims' rights and responding to the State's argument that a change of venue would violate the VRA because of the hardship it would cause for the victims, the court granted the State's motion on December 21, 1995, ordering that a foreign jury from Camden County be empaneled in Mercer County. The court also emphasized the invective nature of the press coverage of the case, and explained that the court's redetermination of venue did not impugn its original decision that maximum efforts must be taken to prevent and combat the prejudicial effects of the press coverage.[1] The court also took into account the similarity of Mercer and Camden

---

[1] The court stated, specifically:

First, the Court's decision of record of October 20, 1995, should be noted. There it was ordered that a change of venue should occur and the county that was selected by the Court was Camden. The discussion of record and the reasons expressed at that time are incorporated in this decision. Specifically, the finding made by the court that a realistic likelihood of prejudice from pretrial publicity existed in Mercer County is one that the Court continues to hold.

in terms of racial demographics and the fact that Camden could accommodate the selection of a jury for the case.

Following the order to empanel a foreign jury from Camden, the State made an informal oral request that the court consider empaneling a jury from Hunterdon County instead, an argument not presented in the State's original motion. In response to that request, the court ruled that its order to empanel a foreign jury would stand, but that it would consider the State's arguments in favor of other counties later.[2] On January 29, 1996, the court granted the State's motion to empanel the jury from Hunterdon County instead of Camden. In doing so, the court overruled its original finding that the racial demographics of Camden and the "readiness" of the Camden courthouse to accommodate a lengthy and cumbersome *voir dire* justified a Camden jury. The court pointed out that it had based its original decision to have the jury brought in from Camden County significantly on the similar racial demographics of that county and Mercer County, but accepted the State's argument that the racial demographics of the county should not be a paramount concern because both defendant and the victim were of the same race in this case. The court also noted that Hunterdon County would be an appropriate county from which to draw the jury because it had no pending death penalty cases and the court administrators, judges and Sheriff's officers to whom the court had spoken had confirmed that they had ample facilities to accommodate a lengthy jury selection process. Further, the court found that travel time for the jurors from Hunterdon to Mercer County would be less burdensome than it would be from any other county.

## B.

Defendant argues that the trial court's decision to empanel a jury from Hunterdon County violated his Sixth Amendment right

---

[2] The State, with the court's consent, had, in its first reconsideration motion, reserved the right to present demographic information in support of a subsequent jury selection motion if it succeeded on the change of venue issue.

to a fair and impartial jury under the United States Constitution and his comparable right pursuant to article I, paragraph 10 of the New Jersey Constitution. He asserts first that interlocutory motions for reconsideration of rulings in criminal cases are not authorized. I disagree with that contention and join the majority in its analysis of that issue, *see ante* at 553–54, 737 *A.*2d at 75. Nevertheless, I conclude that the State's motion for reconsideration of the foreign jury panel venue should have been denied by the trial court in this case because the decision to empanel a jury from Hunterdon County compromised defendant's constitutional rights.

The trial court reversed itself on venue for the second time based on its application of the American Bar Association (ABA) guidelines regarding change of venue and jury selection, presented in *Harris, supra,* 282 *N.J.Super.* at 421, 660 *A.*2d 539, and endorsed by this Court in *Harris, supra,* 156 *N.J.* at 148–49, 716 *A.*2d 458, and *State v. Feaster,* 156 *N.J.* 1, 51, 716 *A.*2d 395 (1998). Both the trial court and the majority misapply those guidelines.

The five ABA factors are:

(1) The nature and extent of pretrial publicity, if any, in the proposed venue;

(2) The relative burdens on the respective courts in changing to the proposed venue;

(3) The hardships to prospective jurors in traveling from their home county to the site of the trial and the burden imposed upon the court in transporting the jurors; [3]

(4) The racial, ethnic, religious and other relevant demographic characteristics of the proposed venue, insofar as they may affect the likelihood of a fair trial by an impartial jury; [and]

(5) Any other factor which may be required by the interests of justice.

[*Harris, supra,* 282 *N.J.Super.* at 421, 660 *A.*2d 539 (quoting *Criminal Justice Standards: Trial by Jury,* ABA Crim. Just. Sec. Standard 15–1.4 (3d ed. 1993) (*ABA Standards* )).]

First, the Court considers the nature and extent of pretrial publicity in the proposed county. Beyond dispute, the publicity

---

[3] The *Harris* court inserted the following in place of the third ABA factor: "[T]he relative hardships imposed on the parties, witnesses, and other interested persons with regard to the proposed venue...."

that preceded defendant's trial was "horrendous." *See ante* at 551, 737 *A*.2d at 74.[4] In analyzing the extent of the publicity, however, the Court underestimates the different levels of circulation in Camden and Hunterdon of the two inflammatory Trenton newspapers, the *Trentonian* and the *Trenton Times*. *See id.* at 558–59, 737 *A*.2d at 77–78 (noting that Court has allowed empanelment of juries with far greater disparities between level of publicity in defendant's county and that from which jury was empaneled). The Court's standard for determining whether the proposed county is an acceptable choice from the point of view of press coverage requires examination of only the *number* of relevant newspapers circulated in each county, to ascertain whether the county was "inundated with publicity about the murders," *ibid.* (quoting *Feaster, supra,* 156 *N.J.* at 51, 716 *A*.2d 395), and whether the " 'net effect was [ ] significantly different' " from that if the jury had been from defendant's proposed county, *id.* at 560, 737 *A*.2d at 78 (citing *Harris, supra,* 156 *N.J.* at 148–50, 716 *A*.2d 458). When the circulation *rates* of the Trenton newspapers are examined, however, Camden County emerges as a venue more likely than Hunterdon to have produced a jury not prejudiced by press coverage.

Rationalizing its rejection of a jury selected from Camden, the trial court observed that "there will be pretrial publicity found in any county in this state." Although the court's observation is correct, given the state-wide and even national coverage of this case, that does not obviate the need to take all steps available to

---

[4] Typical of the offensive coverage was a published letter from a *Trentonian* reader, entitled, "STONE THE CREEP[:]"

> The pervert who killed Megan Kanka should be wiped off the face of the earth—painfully. A public stoning would be nice. Better yet, take him into an abandoned house, nail his feet to the floor and give him an ax. Then set the house on fire. He can either cut off his own feet or burn to death.
> [*Back Talk, Trentonian,* Aug. 6, 1994, at 23.]

An editorial note in the same paper suggested, in response to a reader's call that defendant be "castrated, tattooed, or buried up to his neck in an ant hill with his head doused in honey[,]" that the tattooing be performed with a "rusty needle." Editorial, *Trentonian,* Aug. 24, 1999, at 30.

empanel a jury untainted by the prevalent, exceedingly prejudicial press coverage that plagued this case. Camden County presented the best possibility for such a jury. According to then-current statistics, Hunterdon County had a population of 107,776 as of 1991, or 39,000 households. Camden had a population of 502,824 or 181,800 households. The circulation of the *Trentonian* in Camden County in 1991 was 110, or .06% of Camden households; in Hunterdon County it was 1,342, or 3.44% of the households. The 1991 *Trenton Times* circulation in Camden was under 25, or .01% of households; in Hunterdon, the 1992 estimate was 1,796, or 4.62% of households. *See 1994–95 New Jersey Municipal Data Book (Data Book )*. Assuming no overlap, then, the two papers combined to reach .07% of the households in Camden County in 1991 and approximately 8.06% of the households in Hunterdon according to combined 1991 and 1992 estimates. *Ibid.* When calculating circulation according to population, 181,690 households in Camden did not receive either of the newspapers, as compared to 37,658 in Hunterdon. The rates of circulation of the newspapers in Camden and Hunterdon are significantly different. Even if the rates themselves do not connote "inundation," this Court's standard is designed to assess the possibility of prejudice by predicting whether a jury pool is likely to have been exposed to the case by press. Here we *know* the jury was exposed to prejudicial coverage of this case, so the circulation rates of the newspapers are relevant to indicate that Camden might have produced a jury pool that was not prejudiced by the coverage.[5] Based on those rates, the likelihood that potential jurors who may not have been exposed to the most inflammatory of the pre-trial publicity could be identified in Camden but not in Hunterdon is substantial.

---

[5] Moreover, the court had several opportunities later, upon motion by defendant, to replace the jury with one from Camden after the level of press infiltration in the Hunterdon pool was discovered. *See infra* at 667 n. 9, 737 A.2d at 139 n. 9.

The *Harris* factor relating to press coverage, therefore, certainly weighs in favor of defendant. Although it should not be dispositive in our analysis, an appropriate assessment does not produce a neutral outcome simply because, as the trial court asserted, there is bound to be publicity in any county. A trial court is required to " 'minimize the danger that prejudice [from extensive pretrial publicity] will infiltrate the adjudicatory process.' " *Harris, supra,* 156 *N.J.* at 149, 716 *A.*2d 458 (citations omitted). The court here did not take the requisite steps to fulfill that duty with regard to the press coverage.

Second, the majority finds that court officials in Hunterdon County assured the trial court that "jury selection would not disrupt their caseload." *Ante* at 559, 737 *A.*2d at 78. Noting the greater number of death penalty as well as non-capital criminal cases pending in Camden, the Court states that "[c]learly, the relative hardships imposed on the prospective courts favored Hunterdon County." *Ibid.* The majority exaggerates the weight of the evidence in favor of Hunterdon. Although this factor may seem to weigh in favor of the State, as a practical matter the factor is neutral. The record supports the finding that Camden could have accommodated a jury for this trial as well. In its October 20, 1995 order granting the State's motion to empanel a jury from Camden rather than to change the venue to Camden, the trial court recognized as much, stating:

> This Court is mindful of practical concerns with neighboring counties with regard to death penalty case involvement, case loads, and physical ability to accommodate this death penalty case. With those factors in mind, and with the knowledge of the discussion of the Appellate Division in *State v. Harris* as to racial demographics and the comparisons made between several cities, this Court orders that pursuant to *Rule* 3:14–2, the trial of this matter shall take place in Camden County.

Again, on December 21, 1995, reconsidering its change of venue decision, the trial court noted that "Camden County was designated since it was readily available to accommodate a domestic violence case and was uniquely acceptable with regard to concerns for racial demographics." I question the reliability of the State's assertion that five pending death penalty cases in Camden would have hindered jury selection in that county. Camden Court

records indicate that not a single death penalty case was tried in Camden county during the 1996 and 1997 calendar years.[6] I would point out, in addition, that the fact that Hunterdon had no pending death penalty cases and a significantly smaller number of pending indictments than Camden is misleading absent an assessment of the respective populations and resources of the two counties. Camden's population is four times that of Hunterdon. Therefore, the difference between the number of pending indictments and capital cases in the two counties for purposes of determining jury-member availability is not as stark as the majority makes it seem. In sum, this factor favors neither the defendant nor the State.

The third factor, the burden on the parties, witnesses, and jury members, weighs in favor of the State. The travel time from Camden to Mercer exceeds that from Hunterdon. I take issue, however, with the Court's willingness to accept the State's argument that because "the area in Camden where the jurors would be dropped off was relatively desolate[,]" described by a local law enforcement officer as "a dangerous area after hours," the burden on Hunterdon County jurors would be "less onerous." *Id.* at 560, 737 *A.*2d at 78. If our courthouses are unsafe, the remedy should be to make them safe, not to move the trials elsewhere.

The fourth salient consideration in determining the likelihood of a fair trial by an impartial jury is the racial demography of the potential counties. The trial court, in granting the State's motion to empanel a jury from Hunterdon, stated that it no longer believed that the racial demographic disparity between Hunterdon and Mercer Counties was an adequate justification for denying the State's motion. I agree with the Court that "racial demographics should not be the sole factor," *id.* at 561, 737 *A.*2d at 79, in a

---

[6] There was, in fact, one pending capital case that the trial court could correctly have taken into account when weighing the two venues—that of *State v. Nelson*, No. 146806–95 (Law Div. May 14, 1997). That case originated in Camden, but was held in Mercer County and decided by a Mercer County jury ~~in April and May of 1997,~~ due to the extreme press coverage.

court's determination of the county from which a foreign jury should be empaneled, provided a defendant's constitutional right to a fair and impartial jury is not circumvented. Moreover, the relevance of demographic factors is not to be measured against the defendant's or the victim's characteristics. The race, ethnicity, religion, education, gender, age, economic class, and social status of the parties cannot determine whether the jury is representative of the community at large. The collective character of defendant's community becomes the operative measure of his peers. This factor is one that is acknowledged to be the driving force behind our commitment to community representation in our justice system. It must therefore be afforded significant weight, because it directly implicates defendant's Sixth Amendment right to a fair cross-section of the community. *See* discussion *infra* at 662–64, 737 *A*.2d at 136–37.

As the Court correctly points out, the differences between the demographics in Camden and Mercer and those in Hunterdon and Mercer were comparable by most measures, including gender, per capita income, and percentage of college graduates. *Ante* at 560–62, 737 *A*.2d at 79. The racial disparity, however, between Mercer and Hunterdon was significantly greater than that between Mercer and Camden according to the most recently available census. In 1990, Hunterdon County was 96.3% White, 2.1% African–American, and 1.6% Hispanic; Mercer County was 75.0% White, 18.9% African–American, and 6.0% Hispanic; Camden County was 76.0% White, 16.2% African–American, and 7.2% Hispanic. *See Data Book, supra.* The racial demographics of Camden and Mercer Counties are almost identical, whereas a substantial disparity exists between the minority percentage population in Hunterdon County and that in Mercer. This factor clearly weighs in favor of defendant. The trial court recognized as much in its first two venue change orders.

In sum, factors one and four, pertaining to press coverage and demographics, weigh heavily in favor of defendant. Factor two is neutral. Factor three, which measures hardship to jurors, favors

the State, slightly. Because factors one and four directly implicate defendant's constitutional right to a fair trial, they must be given significantly more weight than the other factors. The trial court's decision to keep the trial in Mercer County because "[t]he rights of victims are a matter of constitutional dimension in our State," recognized that principle. The Court's failure to afford the defendant's constitutional rights the same deference in selecting a county from which to import a foreign jury is both inconsistent and indefensible. Whether the error requires reversal must then be considered.

## C.

The trial court abused its discretion by reversing its original finding that Camden was the appropriate county from which to empanel a foreign jury. The court not only failed to accurately assess the *Harris* factors, it compromised defendant's right to a fair and impartial jury as required by the Sixth Amendment and article I, paragraphs 5, 9, and 10 of the New Jersey Constitution. *See State v. Gilmore*, 103 *N.J.* 508, 524–25, 511 *A.2d* 1150 (1986) (holding that article I, paragraphs 5, 9, and 10, when read together, "guarantee that in all criminal prosecutions the defendant is entitled to trial by an impartial jury without discrimination on the basis of religious principles, race, color, ancestry, national origin, or sex ... [including] the right to trial by a jury drawn from a representative cross-section of the community."). The empanelment of a Hunterdon County jury resulted in two prejudicial outcomes: the resultant jury pool did not represent a cross-section of the Mercer County community as required by the Constitution and in accordance with the ABA guidelines; and, the Hunterdon County jurors had knowledge of highly prejudicial information that was not admitted at trial, regarding defendant and his alleged crime. Both results require reversal of defendant's conviction and vacation of his sentence. The first is discussed here.

This Court has emphasized the "right to trial by an impartial jury drawn from a representative cross-section of the community." *Id.* at 523, 511 *A.2d* 1150. In *Gilmore*, the Court reasoned:

> [I]n our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out.
>
> [*Id.* at 525, 511 *A.*2d 1150 (quoting *People v. Wheeler,* 22 *Cal.*3d 258, 148 *Cal.Rptr.* 890, 583 *P.*2d 748, 755 (1978)).]

*Gilmore* involved a challenge to the prosecution's use of peremptory strikes to exclude potential black jurors from a jury. Nevertheless, the case applies to the principal issue here—that is, the purpose behind the right to a jury pool representing a cross-section of the community. The comment to *Rule* 3:14–2 emphasizes the need for a fair cross-section:

> Where ... race is the demographic characteristic at issue, the change of venue must be to a county having the same racial demographics or a foreign jury must be drawn from a county having the same racial demographics as the county in which the crime was committed, even if there is no such contiguous county.
>
> [Sylvia B. Pressler, *Current N.J. Court Rules,* comment on *R.* 3:14–2 (1998) (citation omitted) (emphasis added).]

In *Harris, supra,* the Appellate Division held that

> the same state constitutional policies which underlie the limitations that *Gilmore* imposes upon a prosecutor's use of peremptory challenges to exclude members of a particular race from a jury also require a trial court to consider racial demographics in exercising its authority under *Rule* 3:14–2 to change the venue of a criminal trial or to impanel a foreign jury.
>
> [282 *N.J.Super.* at 417, 660 *A.*2d 539.]

That contention is supported by the ABA guidelines, which explicitly incorporate the Sixth Amendment right to a fair and impartial jury into the fourth factor. *See ABA Standards, supra* ("The racial, ethnic, religious and other relevant demographic characteristics of the proposed venue, *insofar as they may affect the likelihood of a fair trial by an impartial jury.*") (emphasis added).

The majority contends that because the case at bar presents no overt racial issues given that both the victim and defendant are of the same race, the right to a jury that represents a cross-section of defendant's community need not be paramount. *See ante* at

563–64, 737 *A.2d* at 80–81. Although the Court fully understands, and has held, that special attention must be paid to ensuring a racially representative jury in cases that present obvious racial issues, we have never recognized, and do not believe, that considerations of race may be discounted or ignored in effectuating a criminal defendant's right to a cross-section that is representative of the community in foreign jury or change of venue decisions, no matter what the race of the defendant and the victim. The community cross-section requirement is required as much to preserve representation of the community's diverse values, beliefs, and viewpoints as to respond to particular racial issues in the specific case. The constitutional right to a representative cross-section, which goes to the essence of a fair trial, therefore remains unyielding with regard to race even in the absence of a disparity in race between the victim and defendant.

In *Harris, supra,* the Appellate Division held that the disparity in racial demographics between Hunterdon and Mercer Counties was too great to guarantee a fair trial. 282 *N.J.Super.* at 420, 660 *A.2d* 539. The *Harris* court stated that the rights of the defendant, as well as the public's perception that the judicial system operated fairly, especially for those members of minority groups "who are underrepresented in the jury pool," were at stake in choosing a jury that adequately represented the community. *Id.* at 418, 660 *A.2d* 539 (referring to *Georgia v. McCollum,* 505 *U.S.* 42, 49, 112 *S.Ct.* 2348, 2354, 120 *L.Ed.2d* 33, 45 (1992)).

> [I]f a demographically similar community is chosen as the new venue, local values might be approximated, thereby preserving both the right to a fair trial and the key interests served by local community participation. Moreover, the reasons that favor local community participation in the jury also favor ensuring minority participation in the jury....
>
> > [*Id.* at 419, 660 *A.2d* 539 (quoting Note, *Out of the Frying Pan or Into the Fire? Race and Choice of Venue After Rodney King,* 106 *Harv. L.Rev.* 705, 715–16 (1993)).]

The court went on to offer other, preferable locations, one of which was Camden. The court noted:

> The 1990 census indicates that there is a gross disparity between the racial demographics of Mercer and Hunterdon counties, with blacks comprising only

2.06% of the residents of Hunterdon compared to 18.87% of the residents of Mercer. At the same time, there are a number of other counties that are approximately the same distance from Mercer as Hunterdon that have much larger black populations: in Middlesex, 7.98% of the residents are black; in Monmouth, 8.54%; in Burlington, 14.31%; in Camden, 16.24%.[7]

[*Id.* at 420, 660 *A.*2d 539.]

In this case, a jury from Camden would have preserved defendant's right to a fair cross-section of the community without compromising a majority of the other *Harris* factors for selecting a county for a foreign jury empanelment. Reversing its initial assessment of the appropriateness of empaneling a jury from Camden, the trial court plainly prized administrative convenience over defendant's right to a fair trial. That result is not supportable.

The Court asserts "there is no assurance that the composition of the jury pool would have been radically different in Camden County." *Ante* at 563, 737 *A.*2d at 80. That contention is, however, only speculative rationalization. The pool of 715 prospective jurors contained fifteen minorities—five African–Americans, six Asians, one Hispanic, and three East Indians. That two percent minority representation does not begin to approach the minority representation in Mercer County (twenty-five percent), and is not surprising given the small minority population in Hunterdon County (less than six percent). If the trial court had selected a jury pool from Camden instead of Hunterdon, the level of minority representation in the jury pool would have increased to a level commensurate with what the representation would have been in a pool from Mercer County; if it had not, defendant would have had a valid cross-section claim to make based on Camden's jury selection system. *See Taylor v. Louisiana,* 419 *U.S.* 522, 538, 95 *S.Ct.* 692, 702, 42 *L.Ed.*2d 690, 703 (1975) ("[J]ury checks, pools of names, panels or venues from which juries are drawn must not [be designed to] systematically exclude distinctive groups in the

---

[7] After remand from the Appellate Division, the trial court decided to empanel a jury from Burlington County, with a sixteen percent black population. *Harris, supra,* 156 *N.J.* at 149, 716 *A.*2d 458.

community and thereby fail to be reasonably representative thereof."). Given the relatively small percentage of overall minority representation in the disputed counties, that potential increase (almost twenty percent) cannot be glossed over as insignificant.

Finally, the Court's conclusion that "[t]here is no evidence that the racial composition of the jury venire affected the jury's ability to be impartial," *ante* at 563, 737 *A*.2d at 80, is not relevant to our assessment. A Sixth Amendment claim regarding a violation of the fair cross-section requirement is not subject to a harmless error analysis. Violation of this constitutional right requires reversal. In *State v. Bey*, 112 *N.J.* 45, 548 *A*.2d 846 (1988) (*Bey II*), the Court examined the standard of review for constitutional violations in death penalty cases:

> [I]n assessing the impact of error in either the guilt or penalty phase of a capital case, we ... determine reversibility on the basis of a qualitative determination that considers, in the context of the entire case, whether the error was clearly capable of affecting either the verdict or the sentence. The only exception involves "constitutional violations ... [that] by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless."
>
> [*Bey II, supra,* 112 *N.J.* at 94–95, 548 *A*.2d 846 (quoting *Satterwhite v. Texas,* 486 *U.S.* 249, 250, 108 *S.Ct.* 1792, 1794, 100 *L.Ed.*2d 284, 293 (1988).)]

The United States Supreme Court in *Satterwhite, supra,* held that Sixth Amendment constitutional violations that may be considered under a harmless error analysis and those that require automatic reversal are distinguished by whether or not the violation "pervade[s] the entire proceeding." 486 *U.S.* at 256, 108 *S.Ct.* at 1797, 100 *L.Ed.*2d at 293; *see also Coleman v. Kemp,* 778 *F.*2d 1487, 1541, n. 24 (11th Cir.1985). The failure to fulfill the Sixth Amendment right to a jury empaneled from a cross-section of the community can never be considered harmless.[8] We held in *Gil-*

---

[8] Although a violation of the cross-section requirement is not subject to a harmless error analysis, other constitutional violations with the potential to lead to a cross-section violation often will be. For example, we held in *Ramseur, supra,* 106 *N.J.* at 235, 524 *A*.2d 188, that a cross-section violation should not be assumed. In evaluating defendant's equal protection claim that the prosecutor's improper use of peremptory challenges to strike two black jurors was valid but

*more, supra,* that our Constitution provides for a "right to trial by an impartial jury drawn from a representative cross-section of the community," 103 *N.J.* at 523, 511 *A.*2d 1150, due to our profound commitment to achieving " 'overall impartiality by allowing the interaction of diverse beliefs and values the jurors bring from their group experiences,' " *id.* at 525, 511 *A.*2d 1150 (quoting *Wheeler, supra,* 148 *Cal.Rptr.* 890, 583 *P.*2d at 761).

> Under the New Jersey Constitution, the right to a trial by an impartial jury drawn from representative cross-section of the community is of "exceptional significance" and "goes to the very essence of a fair trial." *State v. Williams,* 93 *N.J.* 39, 60 [459 *A.*2d 641] (1983). Its infraction may not be treated as harmless error.
>
> [*Id.* at 543–44, 511 *A.*2d 1150.]

That holding is supported by the decision in *Harris, supra,* in which the Court found that the demographics factor of the ABA guidelines did not require reversal because the racial demographics of Burlington and Mercer Counties were "substantially similar." 156 *N.J.* at 150, 716 *A.*2d 458. The issue relevant to reversal, then, is the objective lack of similarity between the demographics of the two counties, rather than the actual evidence that the error in selecting a county affected the impartiality of the jury. The racial demographics of Hunterdon and Mercer Counties are simply not "substantially similar," as the court in this case, initially, recognized.

The Court contends "[t]he record reveals that the trial court took more than adequate measures to 'minimize the danger that prejudice would infiltrate the jury process.' " *See ante* at 566, 737 *A.*2d at 82 (citation omitted). The diverse beliefs and views of the Mercer County community, in which this trial would have been held if not for the press coverage, however, were not represented.

---

that the error was harmless, we held that defendant must also show that the cross-section requirement went unfulfilled to make out a Sixth Amendment claim. We also found that reversal was not required because the minority's representation on the grand jury, which consisted of nine black jurors, was not "reduced to 'impotence.' " *Ibid.* (quoting *Commonwealth v. Soares,* 377 *Mass.* 461, 387 *N.E.*2d 499, 516 n. 32, *cert. denied,* 444 *U.S.* 881, 100 *S.Ct.* 170, 62 *L. Ed.*2d 110 (1979)).

The amount of evidence leveled against defendant, *see id.* at 563, 737 *A.*2d at 80 (noting that "[g]iven the overwhelming evidence against defendant, it is highly doubtful that a jury from Camden would have reached a different verdict or sentence"), is irrelevant.[9] One cannot minimize the prejudice that inheres in the failure to provide defendant with a jury pool representing the diverse viewpoints of the community in which he should have been tried. Defendant's constitutional right to a fair and impartial jury was violated. Therefore, his conviction must be reversed. *See Gilmore, supra,* 103 *N.J.* at 544, 511 *A.*2d 1150 (reversing and remanding for new trial because of cross-section violation).

## III

Defendant claims that he was denied a fair trial because most of the jurors sitting on his case had knowledge or suspicion of his prior sex offense convictions. The Court holds that the trial court's refusal to strike for cause any jurors with knowledge of defendant's record was proper in light of the presumed impossibility of empaneling a jury without such knowledge. *Ante* at 568, 737 *A.*2d at 82–83. What is crucial, the Court asserts, is that the trial court prevented prejudice by conducting a thorough *voir dire* in which each juror was asked if he or she could remain impartial, *id.* at 572–73, 737 *A.*2d at 85, and by instructing the jury at various points in the trial to decide the case solely on evidence presented at trial,[10] *id.* at 575, 737 *A.*2d at 86–87. I believe that the Court's

---

[9] The majority's conclusion is not only irrelevant to our analysis, it is inherently insupportable. Although evidence of guilt is relevant to a jury's *conviction* of a defendant, such evidence does not establish a defendant's *blameworthiness*— the basis for the jury's ultimate sentencing decision. If that were so, a conviction based on overwhelming evidence of guilt would automatically result in a death sentence. The contention, therefore, that the *sentence* would not have been different "given the overwhelming evidence against defendant" is fundamentally misguided.

[10] The trial court did not repeat these admonitions when it charged the jury prior to the sentencing phase deliberations. The court stated only the following:

assessment of the efficacy of the trial court's palliatives is artificial and unrealistic. I disagree with both the Court's analysis and determination.

## A.

### 1.

On May 7, 1996, the United States Senate voted to require all states to implement some kind of sex offender notification system. The coverage of this national effort was widespread throughout our State and, indeed, the country. It was widely publicized that defendant was the instigation for the law. Some news stories explicitly alluded to defendant as a prior sex offender and referred to his two prior sex offense convictions.

The sex offender notification law in this State was named Megan's Law, after defendant's victim. On May 10, 1996, prior to *voir dire*, defendant moved to strike for cause all jurors who had knowledge of Megan's Law on the ground that anyone with this knowledge would likely make the association between Megan's Law and defendant, and necessarily conclude that defendant had a prior record as a sex offender. Defendant contended that probing the jurors on their knowledge would only spread, increase, and reinforce such knowledge, and thus could not correct the problem. The court rejected defendant's objection, opting instead to pursue extensive *voir dire* questioning. The trial court conducted *voir dire* over three months. Following examination of the extensive jury questionnaires, the court and the attorneys engaged in an extremely detailed oral questioning of each potential juror, referring to certain answers in the questionnaire that signaled potential

---

As jurors, you should decide this case in the same way that all reasonable persons approach any problem or any question. You should consider the evidence presented to you and, applying your knowledge and your life's experience, you should fairly and reasonably evaluate the evidence in light of your knowledge of how people behave, keeping in mind that it is the quality of the evidence presented, not the quantity or number of witnesses that controls.

bias of one form or another, and paying particular attention to whether the jurors read the Trenton newspapers and their knowledge of Megan's Law and defendant's criminal record. Each juror subsequently empaneled answered that he or she either had no knowledge of the prior convictions or could disregard that knowledge and use only the evidence presented at trial to decide the case at both the guilt and penalty phases. Throughout *voir dire* in this case, defense counsel asked that each juror who believed or suspected that defendant had been convicted of a prior sex offense be struck for cause. Those requests were denied in each case. On April 15, 1997, when a majority of the potential jurors had been questioned and an adequate number of them qualified by the court, defendant moved to have the panel excused and jury selection recommenced in Camden County because of the likelihood that the jury would be unable to remain impartial in light of their collective knowledge of defendant's criminal record. That application was also denied.

The result was that all but two jurors on the case knew or suspected that defendant had a prior record. Of those ten, nine at least suspected that defendant's prior record included a sex offense conviction, and one knew as much. In addition, several jurors had more general knowledge and preconceived notions about the case. Juror D., when asked during *voir dire* about her knowledge of the case, responded, "Well, I've heard that, that he did murder her." When the juror was asked what effect, if any, that knowledge might have on her if she were a jury member, she stated, "*I think* I can be impartial, that I can listen to both sides of it and hear what each side has to say, and I feel I can be impartial dealing with that." Juror C.B. told the court that he remembered seeing Representative Zimmer of the 12th District on television discussing Megan's Law. Juror C.B. made the connection between Megan's Law and defendant, which led him to believe that defendant had a prior sex offense conviction. When asked if he had worked for Zimmer or if he had heard anything from the broadcast that would sway him one way or the other, he responded, "No." Juror L. stated in his questionnaire that he

reads the *Trenton Times*. He noted that he had not read about the story regularly, but had read enough to state

[t]hat Megan Kanka was killed in a house across the street from where she lived in Mercerville. That the person that lived in the house was accused of murdering her. That she was in some way lured into the house or enticed into the house. And the person that lived there had a prior conviction for a sex offense.

In addition, Juror L. wrote on the questionnaire that he had seen parts of Megan Kanka's funeral on the news and that he remembered the pink ribbons Megan's family was wearing and people were putting around trees to remember Megan. He recalled seeing Megan's parents on television and "how upset they were."

These examples highlight the extent to which the press coverage in this case saturated the Hunterdon County jury pool and, indeed, the actual jury, contrary to the Court's impression that the chosen county "was clearly outside the circulation range of the Trenton newspapers." *Id.* at 559, 737 *A.*2d at 78 (citation omitted). Whether or not the number of Trenton newspapers circulated in Hunterdon County indicates "inundation," *see id.* at 559, 737 *A.*2d at 78, most of the jurors had knowledge of and biases with regard to this defendant, his crime, and, most importantly, his criminal record. The trial court, when it realized the extent of the jury's knowledge, erred by refusing defense counsel's renewed motion to discontinue the *voir dire* and empanel a jury from Camden. The *Harris* factors, at that point, overwhelmingly called for that remedy.

### 2.

The trial court's responsibility to preserve the integrity of the jury "under both the federal and state constitutions ... is at its peak in cases involving the death penalty." *State v. Williams,* 93 *N.J.* 39, 63, 459 *A.*2d 641 (1983) (*Williams I*); *see Ramseur, supra,* 106 *N.J.* at 324 n. 84, 524 *A.*2d 188. The Sixth Amendment right to a "trial by an impartial jury ... goes to the very essence of a fair trial." *Williams I, supra,* 93 *N.J.* at 60, 459 *A.*2d 641. "All doubts concerning a juror's 'sense of fairness or ... mental integrity' should be resolved by dismissing the challenged venireman." *State v. Singletary,* 80 *N.J.* 55, 65, 402 *A.*2d 203 (1979)

(quoting *State v. Jackson,* 43 *N.J.* 148, 160, 203 *A.*2d 1 (1964)); *see State v. Deatore,* 70 *N.J.* 100, 358 *A.*2d 163 (1976).

> [T]his Court [has] emphasized the right to trial by an impartial jury, secured by Article I, paragraph 10 of the New Jersey Constitution as well as the [S]ixth [A]mendment of the United States Constitution, that a jury panel be "as nearly impartial 'as the lot of humanity will admit.'" *State v. Williams (I),* 93 *N.J.* 39, 60–61 [459 *A.*2d 641] (1983) (citations omitted). "This requirement of fairness—and particularly jury impartiality—is heightened in cases in which the defendant faces death." *Id.* at 61 [459 *A.*2d 641]; *State v. Ramseur,* 106 *N.J.* 123, 324 n. 84, 524 *A.*2d 188 (1987).
>
> [*State v. Williams,* 113 *N.J.* 393, 409, 550 *A.*2d 1172 (1988) (*Williams II*).]

We give deference to trial court decisions on impartiality of jurors. *See State v. Marshall,* 123 *N.J.* 1, 87, 586 *A.*2d 85 (1991) (*Marshall I*) ("It has [ ] been observed that this [C]ourt is 'perhaps too far removed' from the realities of the *voir dire* to appreciate the nuances concealed by a 'bloodless record'; therefore, deference to the trial court is usually prudent.") (quoting *Williams II, supra,* 113 *N.J.* at 411, 550 *A.*2d 1172 (internal citations omitted)). Nevertheless, I believe that the trial court here failed to fulfill its duty to " 'minimize the danger that prejudice [from extensive publicity would] infiltrate the adjudicatory process,'" *Koedatich I, supra,* 112 *N.J.* at 268, 548 *A.*2d 939 (quoting *Williams I, supra,* 93 *N.J.* at 63, 459 *A.*2d 641), which resulted in an overwhelming likelihood that defendant's trial was prejudiced.

In *State v. Feaster,* No. 50254–94 (Law Div. Mar. 27, 1996), the trial court recognized that particular prejudice that inevitably results when jurors are cognizant of the defendant's commission (or alleged commission) of another crime similar to the one for which he stands trial. In Feaster's case, the court was concerned that the jury not have knowledge of a second murder for which defendant had been charged but not convicted. The trial court began jury selection in Gloucester County, but as "[p]roblems associated with Gloucester County jury selection soon became apparent ... it was difficult to determine whether potential jurors knew of the second murder without asking the question directly." *Feaster, supra,* 156 *N.J.* at 48, 716 *A.*2d 395. In spite of continued

efforts by the trial court to conduct a thorough and searching *voir dire,* it finally concluded that a jury could not be empaneled from Gloucester:

> I simply do not have the confidence level that I feel I should have to be assured that this process will yield a fair and impartial jury, consisting of no one who is likely to have heard about the other murder and this defendant's implication in it.
>
> [*Id.* at 49, 716 *A.*2d 395.]

Accordingly, the court selected Salem County for jury selection and began the lengthy process again.

In *Bey II, supra,* 112 *N.J.* 45, 548 *A.*2d 846, the Court reversed the defendant's conviction because the trial court failed to individually examine the jurors to determine their possible exposure to midtrial publicity that revealed the defendant's connection to another murder for which he had been indicted at the time of trial. The Court held that

> [j]urors exposed to this publicity could have discovered that the second murder was committed close in time and in a similar manner to the [murder on which they deliberated]. It is hard to imagine publicity with a greater capacity to prejudice a defendant's case. The trial court itself concluded as much, as during jury selection it excused for cause any juror who knew of the second indictment.... We believe the repeated coverage in the local press created a realistic possibility that at the time of defendant's motion, the information may have reached one or more of the jurors.
>
> [*Id.* at 90, 548 *A.*2d 846.]

A similar problem was flagged in *State v. Biegenwald,* 126 *N.J.* 1, 25, 594 *A.*2d 172 (1991) (*Biegenwald IV*), but we held that no prejudice resulted because "[t]he *voir dire* of the one deliberating juror who indicated awareness of more than one murder [did] not reflect awareness of any facts not to be presented and considered during the sentencing proceeding."

In *Marshall I, supra,* we declined to reverse the defendant's conviction in response to defendant's claim that the jury was so tainted by pretrial publicity that it could not have been impartial. In doing so, however, we stated:

> We find no indication that any juror was so tainted by pretrial publicity as to affect the deliberative process. We emphasize that any deliberating juror who indicated exposure to pretrial publicity also disclaimed any detailed knowledge about the case.... Finally, we note the significant differences between trying the case in

Ocean County and in Atlantic County. Neither the victim nor defendant was prominent in Atlantic County. There was no indication in the record that the Atlantic County community was hostile toward defendant or predisposed to his guilt. We are convinced that there was no "realistic likelihood" of prejudice from pretrial publicity.

[123 *N.J.* at 78–79, 586 *A.2d* 85.]

"Once it is established that a juror has been exposed to pretrial publicity, then, in order to vindicate a defendant's right to an impartial jury, the *voir dire* must *unequivocally* establish that the potential juror can put that information or opinion aside." *Williams II, supra,* 113 *N.J.* at 433, 550 *A.2d* 1172 (emphasis added). In *Williams II, supra,* we reversed the defendant's conviction on the ground that the *voir dire* was inadequate to ensure an impartial jury. The Court described the problem using several examples, including the *voir dire* of juror Minnick, who had stated that she might have an opinion as to the defendant's guilt. In spite of juror Minnick's contention that she could put her opinion aside and be impartial, as well as the fact that she had no specific recollections of the facts of the case, nor familiarity with the defendant's name,[11] we noted that the *voir dire* "was insufficiently probing to fulfill [its] role [as] an indispensable mechanism for assuring the impartiality of a jury." *Williams II, supra,* 113 *N.J.* at 435, 550 *A.2d* 1172.

---

[11] The court's *voir dire* consisted, in part, of the following:

MS. MINNICK: To tell you the truth, I really don't remember a lot of it. I remember what happened, and you know, very—I mean it was a year ago, and I know that I read it, but I don't remember specific details, you know.

THE COURT: What do you remember generally about it?

MS. MINNICK: That a girl was raped, murdered, stabbed, and it happened at night, and that's all I really remember was what happened.

THE COURT: That's it.

MS. MINNICK: Yeah, I really don't remember specific details.

. . .

THE COURT: Anything that was in those articles dealing with Mr. Williams specifically.

MS. MINNICK: No, the name really wasn't familiar.

[*Williams II, supra,* 113 *N.J.* at 434, 550 *A.2d* 1172.]

In *Biegenwald IV, supra,* we responded to the defendant's claim that a juror with knowledge of facts pertaining to unrelated murder investigations of the defendant should have been struck for cause. The defendant claimed that although counsel had peremptorily excused the juror, the juror's subsequent presence in the jury room required reversal because of the possibility that she "might [have] trigger[ed] mass recall of inadmissible evidence by the other jurors." 126 *N.J.* at 27, 594 *A.*2d 172. Rejecting the defendant's claim that his motion for a mistrial should have been granted, the Court held:

> Although the argument that the juror should have been excused for cause is persuasive, we find the failure to have excused her unproblematic for several reasons. Foremost the juror did not deliberate; she was excused peremptorily shortly after she had been qualified. Consequently, the juror's presence in the jury room was brief and ended before the jury was exposed to the evidentiary phase, which, particularly in a murder case such as this one, can understandably pique the urge to discuss the case.
>
> [*Id.* at 27–28, 594 *A.*2d 172.]

This Court noted with approval in *Harris, supra,* that one precaution taken by the trial court that lessened the need for reversal was the court's decision to strike any juror for cause who read the *Trentonian* regularly. 156 *N.J.* at 149, 716 *A.*2d 458. Likewise, in *Koedatich I, supra,* the Court noted, as one of its justifications for not reversing the trial court's decision not to order a change of venue, that the court had "discharged any juror who stated that he or she had read of the prior murder." 112 *N.J.* at 282, 548 *A.*2d 939.

Prior crimes evidence carries with it the gravest possibility of prejudice that a defendant may face in a criminal trial. Jurors are likely to be particularly swayed in the guilt phase by the notion that if defendant previously committed one sex offense, he likely committed the one for which he is being tried; and in the penalty phase by the belief that if defendant has a prior record, he is likely to reoffend in the future. *See* Theodore Eisenberg, Stephen P. Garvey, & Martin T. Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing,* 83 *Cornell L.Rev.* 1599, 1633 (1998) (examining jury considerations in capital sentencing and

noting that "among those aggravating factors relating to the defendant, the two most powerful in jurors' minds were the defendant's prior history of violent crime and the jurors' belief in future dangerousness") (citing Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 *Colum. L.Rev.* 1538, 1560 (1998)). One of defendant's prior sex offense convictions is the most prejudicial sort because it involves the sexual assault of a child, precisely the crime for which defendant was tried in this case. In light of the fact that none of the jurors seemed to know how long ago defendant committed the prior offense, the potential for damage in both the guilt and the penalty phases by knowledge of the convictions is extreme. The trial court recognized this and conducted an in-depth *voir dire* with the jury members to determine the extent of their knowledge concerning defendant's priors. By doing so, the court hoped to determine in advance which jurors had made an association between defendant and Megan's Law, acknowledging that such an association implied knowledge or awareness of defendant's prior convictions, and that "gross prejudice ... on the defendant, should this connection occur during the deliberation process, or at some other earlier point ... [with] the clear capacity to produce an unjust result," must be prevented.

Time and time again, this Court has stated in no uncertain terms that prejudice resulting from juror knowledge of a defendant's similar prior convictions or bad acts is likely to taint the impartiality of the jury and effectively requires that jurors with such knowledge be struck. Here, the jurors had far more knowledge of defendant and his crime than in any of the aforementioned cases. In *Bey II*, we reversed defendant's conviction even though we only suspected that jurors might know of the defendant's similar indictment. The similar acts here are even more prejudicial than those in *Bey II* because they are convictions. In *Biegenwald IV, supra*, we did not reverse defendant's conviction under a plain error standard only because the juror's knowledge related to defendant's other murder indictment that did not exceed information presented at trial, and the prejudice was there-

fore minimized by a limiting instruction. Here, we review a juror's knowledge of defendant's identical prior conviction, evidence of which was not presented at trial and was therefore not accompanied by a limiting instruction. Moreover, not only do we suspect that some of the jurors may have known of defendant's prior sex offense conviction, we are certain they did. Some of the jurors also had specific knowledge of the facts of the case itself, had seen the victim's family in their grief, and had heard public officials comment on the crime. Defendant and the victim were well-known throughout the State and evidence of wide-spread hostility towards defendant is incontrovertible. Some jurors had even heard that defendant was guilty.

The protestation by jurors that they would not be influenced by and could remain impartial when presented with this kind of knowledge is simply not sufficient to generate confidence and reliability. *See Williams II, supra,* 113 *N.J.* at 434, 550 *A.*2d 1172 (reversing defendant's sentence due in part to juror's contention that she had "in a sense" formed an opinion as to defendant's guilt, in spite of her contention she could remain impartial). This Court, in *Harris, supra,* effectively ruled that jurors with knowledge of a defendant's similar prior convictions or bad acts must be struck for cause, relaxing the rule in that case only because the juror involved did not participate in deliberations. The Court's failure to remain loyal here to the rule established in *Harris* is insupportable. In doing so, the Court ignores the "gross prejudice that [is] visited on [a] defendant" when jurors with knowledge of his similar prior convictions, or even alleged bad acts, are empaneled.

## B.

Even were I to believe that the trial court's *voir dire* was adequate in that it eventually resulted in a proclamation from each juror that he or she had the full capacity to remain impartial and follow the trial court's instructions, I maintain that defendant's conviction must be reversed and his sentence vacated. Although

jurors may well believe they have the ability to lay aside prior knowledge, and fully intend to do so, we simply cannot realistically expect or trust that all jurors have the ability to accomplish this in the face of the kind of overwhelmingly inflammatory evidence at issue here. *See State v. Brunson*, 132 *N.J.* 377, 386–87, 625 *A.*2d 1085 (1993) (citing jury study by Professors Roselle L. Wissler and Michael J. Saks concluding that admission of "prior-conviction evidence [with a limiting instruction] did not affect the predisposition of jurors to doubt the credibility of criminal defendants," but that evidence did affect jurors' dispositions on guilt, with "the highest conviction rate resulting when the prior crime was the same as the charged offense"). Justice Stein, dissenting, states that the jurors' knowledge of defendant's prior convictions requires vacation of defendant's sentence because the trial court did not specifically instruct the jurors to disregard their knowledge of defendant's priors in their deliberations. *See post* at 641, 737 *A.*2d at 123 (Stein, J., dissenting). I do not think that the proposed instruction, if undertaken by the trial court, would have had the prophylactic capacity to block out juror prejudice. The instruction might have even magnified that prejudice by tainting the deliberations of the two jurors who had no suspicion of defendant's criminal background. Nevertheless, I agree with Justice Stein that defendant's sentence must be vacated and a new penalty trial conducted. I believe, moreover, that the logic and import of his reasoning demands an additional remedy. I conclude that we must also reverse defendant's conviction, despite the overwhelming evidence of guilt. *Cf. id.* at 640, 737 *A.*2d at 123 (Stein, J., dissenting) (joining majority opinion affirming defendant's capital murder conviction). The error is so fundamental and profound that it goes to the essence of a fair trial and constitutional judicial review.

1.

Our case law requires that a defendant's sentence rendered by a penalty-phase jury with knowledge of a defendant's similar prior convictions must be vacated, regardless of the extensiveness of the *voir dire* and the jurors' contentions that they could remain

impartial. This Court has all but required a dual two-tiered jury for the prosecution of cases in which the State offers evidence of a prior murder to prove the existence of an aggravating factor pursuant to the death penalty statute. The Legislature has explicitly provided that "for good cause, the court may discharge [the guilt-phase] jury and conduct the [penalty] proceeding before a jury empaneled for the purpose of the proceeding." *N.J.S.A.* 2C:11–3(c)(1). This Court applied Section (c)(1) in *Biegenwald IV, supra,* in which the State submitted to the court the prior murder aggravating factor, holding:

> [W]e recognize that our finding that defendant is entitled to *voir dire* potential jurors on the possible blinding impact of the c(4)(a) factor most likely will require a two-jury system for all capital cases in which the State seeks to prove that factor.
>
> [126 *N.J.* at 43–44, 594 *A.*2d 172.]

The Court was concerned about the prejudice that would result from the process of *voir dire,* implying that no amount of questioning by the trial court to determine a jurors' ability to remain impartial when faced with prior murder evidence would suffice.[12]

Although the Court has allowed for exceptions to the dual jury requirement, *see Harris, supra,* 156 *N.J.* at 160, 716 *A.*2d 458, it has expressly cautioned the lower courts that prior convictions for sex offenses should be treated differently:

> We can envision circumstances in which evidence of other "unsanitized" convictions, such as child sexual abuse, might pose a potential for impermissible spillover into the penalty phase thus requiring two juries.
>
> [*Ibid.* (citing *State v. Erazo, supra,* 126 *N.J.* 112, 132–33, 594 *A.*2d 232 (1991)).]

The Court in *Harris* acknowledged that knowledge of similar prior convictions of distinctive crimes, such as child sexual abuse, is bound to be used improperly during deliberations even if instruc-

---

[12] Although the Court ruled that the trial court had no responsibility *sua sponte* to strike for cause one juror who had an awareness that the defendant was involved in more than one murder, it ruled so on the ground that the juror did not seem to have knowledge of any facts that would not have been presented during the sentencing phase of the trial. *Biegenwald IV, supra,* 126 *N.J.* at 25, 594 *A.*2d 172. That is not the case, of course, for the members of the jury here.

tions are given to warn against such use. Now, faced with that situation, the Court ignores this basic truth.

I agree with my dissenting colleague who explains, with regard to influence on a jury's deliberations, that no practical difference exists between the admission of prior convictions as evidence at trial and the jurors' knowledge of the convictions from sources external to the trial. *See post* at 642–43, 737 *A.2d* at 124–25 (Stein, J., dissenting) (citing *Marshall v. United States,* 360 *U.S.* 310, 312–13, 79 *S.Ct.* 1171, 1173, 3 *L.Ed.*2d 1250, 1252 (1959)). The damage wrought by prejudicial information learned outside the trial may be even more extensive and indelible than that resulting from evidence admitted at trial. At trial, evidence is received simultaneously with limitations on its permissible use by the trial court. In the guilt phase, we allow such evidence but require a contemporaneous limiting instruction explaining to the jurors specifically that they may not use evidence of similar prior convictions to conclude the defendant has a propensity to commit such crimes. In the penalty phase, if the evidence has not been integrated into the testimony, we require an instruction that the jury may not consider the evidence. When jurors' knowledge is based, as here, not on evidence admitted at trial, but on media accounts read before trial, the court is not required to administer a limiting instruction to the jury that their knowledge of defendant's priors cannot play a role in their deliberations because the information has not been admitted into evidence. Justice Stein believes that the trial court should have done so anyway in both the guilt and penalty phases.[13] *See id.* at 645, 649, 737 *A.2d* at 126, 129 (Stein,

---

[13] Justice Stein asserts that the trial court never had the opportunity to consider if the evidence was admissible because defendant did not testify, thereby making us unsure if the trial court would have admitted the evidence— although we can surmise that it undoubtedly would not have. *See post* at 645–46, 737 *A.2d* at 126 (Stein, J., concurring). That characterization is slightly misleading: we are not unsure if the evidence was material because the trial court never had the opportunity to consider it; rather, we know that it was immaterial. The fact that defendant did not testify renders the evidence immaterial because its only possible value would have been as impeachment evidence in

J., dissenting). I am not so sure. In spite of our requirement that limiting instructions must be administered when other crimes evidence is properly admitted, the Court has remained skeptical of the value of these instructions in certain cases. *See Brunson, supra*, 132 *N.J.* at 385–86, 625 *A.*2d 1085. More importantly, had the trial court instructed the jurors to disregard any knowledge they might have had of defendant's prior record, I believe the instruction would have served only to arouse the suspicions of the two jurors who had no knowledge of defendant's record—inducing them, perhaps, to make the "forbidden connection" at the most critical moment, just before deliberations. Thus, such a limiting instruction would have been impractical, and likely prejudicial and mischievous. Defense counsel's failure to request one surely represents a fair, if not forced, tactical decision based on the overwhelming potential of an instruction to escalate the prejudice against defendant.

Nevertheless, I agree with Judge Stein that the only remedy available to the Court is to remand for a new penalty trial in Camden with the expectation that the extra 143,932 [14] households not receiving the Trenton newspapers will allow for the selection of an impartial jury. If this endeavor were to prove impossible, as it may after the inevitable tidal resurgence of press coverage that a retrial would trigger, defendant may not be sentenced to death. *Cf. State v. Martini,* 160 *N.J.* 248, 290, 734 *A.*2d 257 (1999)

---

the event that defendant's credibility was at issue. Because defendant did not testify, the evidence was not relevant at trial. We therefore need not consider if it should have been "sanitized" or limited by an instruction—the fact is, the jurors simply should not have known about the prior record at all. Our case law providing guidelines on when evidence must be sanitized and a limiting instruction given in dealing with admissible prior crimes can, however, certainly strengthen the point that such evidence is inherently, if not inevitably, prejudicial.

[14] This number represents the difference between the number of households not receiving the Trenton papers in Camden and those not receiving them in Hunterdon (181,690 and 37,658, respectively). *See supra* at 657, 737 *A.*2d at 133.

(Handler, J., dissenting) (*Martini V*) (holding where circumstances prohibit sentencing trial before fully informed jury, State must desist from capital prosecution).

## 2.

### a.

Despite the overwhelming evidence of guilt against defendant, I contend that his conviction must be reversed as well. Existing case law dictates such a result, as does the special nature of defendant's crime and prior convictions. This Court has held that when a *voir dire* leaves any doubt as to the ultimate impartiality of the jury, reversal of both the guilt-and penalty-phase verdicts is required. *Williams II, supra,* 113 *N.J.* at 445, 550 *A.*2d 1172. "No matter how convinced we may be of defendant's guilt, unless we are similarly convinced of the jury's impartiality, we cannot allow the death penalty to be imposed." *Ibid.* I believe that the nature of defendant's crime—a sex offense—combined with the incredibly wide-spread pretrial coverage of defendant and Megan's Law resulted in a likelihood that defendant's trial was prejudiced, in spite of the *voir dire* responses of jury members that, at least superficially, indicate their intentions to remain impartial.

Before the jurors began deliberations for the guilt phase, the court instructed them to "apply" their "knowledge" and "life's experience," and "evaluate the evidence in light of [their] knowledge of how people behave...." That directive had tremendous potential to neutralize or negate the intended prophylactic effect of the few, non-specific admonitions the court gave the jury to disregard non-evidence. *See supra* at 667 n. 10, 737 *A.*2d at 139 n. 10. The invitation to the jury to use their common knowledge of how people behave suggested to the jurors that they could apply not only their knowledge of human behavior in general, but their understanding about the behavior of sex offenders in particular. A careful analysis of jury responses during *voir dire,* in light of the publicity surrounding Megan's Law, suggests that the instruction actually may have encouraged some of the jurors to improperly use their knowledge of defendant's prior sex offense convictions

in their deliberations; the instruction surely did not impel the jurors to disregard that knowledge or to disregard their preconceptions or neutralize prejudices.

After Megan Kanka was sexually assaulted and murdered, her parents actively led the movement to enact Megan's Law as an effort to deter and prevent similar sex crimes in the future. That law, collectively referred to as The Registration Law, *N.J.S.A.* 2C:7–1 to 5, and the Community Notification Laws *N.J.S.A.* 2C:7–6 to 11, was enacted on October 31, 1994. The Law specifically targets released sex offenders, whether they murdered their victims or not. The distinction seems to be rooted in the notion that sex offenders are not only vicious in nature, but are also dangerous and prone to reoffend when released. That assumption is supported by the press coverage surrounding the Megan's Law effort, as well as in the legislative history of the Law. On statewide and nationwide levels, public officials, commentators, and the media repeatedly documented the recidivist tendencies of sex offenders. The *Trentonian* printed a story entitled, "Experts Say Child Molesters Nearly Impossible to Cure." Mary M. Mooney, *The Trentonian*, Aug. 2, 1994, at 7. Another story carried the headline, "Stats Show There May Be: Molester Hiding on Every Block," documenting that nearly forty percent of sex offenders will commit another crime. Mark A. Wallgore, *The Trentonian*, Aug. 4, 1994, at 1–3. The *Trenton Times* published similar articles, noting the importance of having some way to notify people when a "dangerous sexual predator" is among them, and alluding to Megan Kanka, "who [was] brutally murdered, allegedly by [a] neighbor[ ] whose history of sex crimes was unknown to [her] communit[y]." Editorial, *Defending Megan's Law, Trenton Times*, Jan. 5, 1995, at A16. Throughout the campaign to pass Megan's Law, Hamilton Mayor Jack Rafferty expressed the following view:

> I know this is an old cry, but these people like Jesse Timmendequas should not be allowed on the street. They should be incarcerated or executed ... You just can't fool with them.

[Raymond Hennessey, *Who's Living Next Door?*, *The Trentonian*, Aug. 1, 1994, at 10.]

Assemblyman Holzapfel stated, "People like Jesse Timmendequas can never overcome their dark urges." Dave Neese, *Lawmakers pledge Action Against Sickos, The Trentonian*, Aug. 16, 1994, at 4. Representative Zimmer referred to defendant's case in helping to push through the federal legislation requiring that states adopt notification laws.[15] Brian Kladko, *Megan's Unfinished Legacy*, *Asbury Park Press*, June 23, 1997, at 14. At the same time, the leader of the State Assembly, Garabed Hayatain called a special session of the Legislature to push through a set of anti-crime measures, including community notification laws for sex offenders. *Ibid.*

With the passage of Megan's Law in 1994, the Legislature basically codified the theory that a defendant who commits one sex offense is likely to commit another—the very theory that the jury is prohibited from invoking during its guilt-phase deliberations.

The Registration and Notification Laws represent [ ] the conclusion by the Legislature that those convicted sex offenders who have successfully, or apparently successfully, been integrated into their communities, adjusted their lives so as to appear no more threatening than anyone else in the neighborhood, ... that the characteristics of some of them, and the statistical information concerning them, make it clear that despite such integration, reoffense is a realistic risk, and knowledge of their presence a realistic protection against it.

[*Doe, supra*, 142 *N.J.* at 13, 662 *A.2d* 367.]

In *Doe, supra*, the Court detailed the remedial nature of the Law, citing numerous studies documenting the recidivist tendencies of sex offenders, and in summary made the following statement:

Concerning the basic facts, ... there is no dispute: as far as society is concerned, sex offenses of the kind covered by the law are among the most abhorrent of all offenses; the relative recidivism rate of sex offenders is high compared to other offenders; treatment success of sex offenders exhibiting repetitive and compulsive characteristics is low; and the time span between the initial offense and re-offense can be long.

[*Id.* at 15 n. 1, 662 *A.2d* 367.]

---

[15] Juror C.B. stated in *voir dire* that he had seen Representative Zimmer speak about Megan's Law on television. *See supra* at 670, 737 *A.2d* at 140.

Although many of the jurors selected here did not express knowledge of the details of Megan's Law or defendant's case when questioned in *voir dire,* they all knew about the Law. The jurors heard about it on the news, discussed it with friends, or read about it in papers. That, when combined with the inevitable suspicion or belief that defendant previously had been convicted as a sex offender, required a more in-depth and forceful *voir dire* than was administered by the trial court. Illustrative questioning regarding Megan's Law by the trial court is included in the *voir dire* of juror S.D., *viz:*

Q: Megan's Law is talked about in this, and you have—you indicate you've heard of Megan's Law. Your understanding again is what, your words?

A: Notification can be given to people if a sex offender moves into the neighborhood or is in their neighborhood.

Q: Do you have any opinions about it?

A: I agree with it.

Q: Are you aware of the origins of Megan's Law, how it came to be?

A: I had always thought it was as a result of Megan Kanka, what happened to her and, basically, you know, what's going on here.

Q: And do you believe the defendant has any connection with all of that, therefore?

A: I feel that it had something to do with why the law came about.

In addition, the questioning of the court explored the possibility that the juror could disregard her knowledge of defendant's prior offenses, *viz:*

Q: [W]ould your knowledge, as you think it through, of the defendant and the potential of a criminal record, your suspicion or belief that he has a criminal record, enter into your thinking if you are involved in the penalty phase of this trial?

A: I would base the penalty phase on just this trial alone, not anything in the past.

Q: Well, there may be things in the past that are brought up, but if a matter of a defendant's record is not something that's brought up, could you exclude that from your thinking and not base any of your decision-making on that suspicion or belief that you have?

A: Yes.

Q: Do you have any reservation about your ability to do that?

A: No.

The deficiency in this *voir dire*, in my view, is the Court's failure to inquire into *why* the juror agrees with Megan's Law, *i.e.*, what it is about sex offenders that requires such a law. The juror's belief that she could disregard defendant's prior record in light of her apparent feelings about Megan's Law is a grossly inadequate gauge of her impartiality. Because the underpinning of Megan's Law is the assumption that sex offenders are more likely to recidivate than other offenders, it was singularly important to find out from the jurors whether the danger of recidivism and some notion about how sex offenders behave, influenced their approval of the Law. Some jurors may have been able to dispel this concern by stating that they believed sex offenders were no more likely to recidivate than other types of criminals, but that because sex offenses were so much more egregious than other crimes it was more important to protect against the possibility of re-offense, however slim the likelihood. On the other hand, some may have expressed strong belief that there was something distinctive about sex offenders—that sex offenders were likely to re-offend more often than not. The strength of that sentiment, combined with a suspicion that defendant had been convicted of a sex offense once and perhaps twice before, would likely have created the kind of "blinding impact" that even a juror with the best intentions of remaining impartial would not be able to ignore.[16] *See Biegenwald IV, supra,* 126 *N.J.* at 43–44, 594 *A.*2d 172.

Although in some instances, the trial court was able to draw out more complex feelings from the jurors about what they thought of Megan's Law, the court never tried to determine *why* any of the jurors thought the Law might be beneficial. The court had the following exchange with Juror B.:

---

[16] Not only might the suspicion of defendant's record have been used, even if subconsciously, by a juror in determining that defendant was guilty, it may also have had a significant impact on the penalty phase. Jurors may have concluded that a repeat sex offender is unlikely to benefit from rehabilitation and therefore should be sentenced to death because of the grave risk that were he ever to emerge from prison again, he would commit another offense; or, alternatively, because he is unsalvageable and not worth keeping alive, even in prison.

Q: What's your general knowledge of Megan's Law? . . .

A: Okay. My understanding is that, you know, that a convicted—a convicted sex offender, upon his release, must notify the neighborhood, or wherever he lives—his residence must be made known to the public.

Q: What's your view of that? That being your understanding of it, how do you feel about it?

A: I have mixed emotion.

Q: How do you mean?

A: Insofar as I could understand what the law is trying to do, but by the same token, if somebody has committed a crime, and has paid their debt to society, I don't know if people should interfere with his privacy as to where to live.[17]

Although the juror expressed ambivalence about the Law, his concern for the offender's privacy rights may not in any way be an indication that he does not believe sex offenders are likely to recidivate. The fact that Juror B. stated that he "could understand what the law is trying to do" indicates he generally believes the Law has a valid purpose, but we cannot surmise from his words what he believes that purpose to be or how strongly he feels. Repeatedly, jurors who believed defendant had been previously convicted as a sex offender stated that they agreed with the Law or had mixed feelings about it, but they were never pressed to disclose and explain their reasons.

The *voir dire* of Juror S. is particularly problematic:

Q: And what is your feeling about the law: agree, disagree?

A: I'd have to say, overall, I agree with it.

Q: Okay, anything about your feelings about Megan's Law that might impact or interfere with your ability to judge this case, the guilt or innocence of the defendant charged in the indictment that I outlined to you?

A: I don't—I don't think so. I don't think there would be a problem listening to the evidence and deciding which way it goes.

Q: Well, that is your obligation to decide the case on the evidence that is adduced and brought before you in the course of the trial, but you gave that one some pause when I asked you. What is your hesitancy, what is your thinking in this area?

---

[17] Juror B. indicated on his questionnaire that he assumed defendant had a prior conviction of a sexual nature, though the juror was not sure if it was a charge or simply an accusation.

A: I'm just trying to put myself in that situation, where you actually come down to it and you have to make a big decision.

The court probed Juror S. to try to get at the nature of his hesitancy, but the juror had not yet been asked about defendant's prior criminal history, except on the questionnaire. Therefore, Juror S. was likely uncertain about what, exactly, the court was asking. Even if unable to put it into words, Juror S. was initially unsure as to his ability to remain impartial. That should have been a warning signal to the trial court and grounds for dismissal. *See Williams II, supra,* 113 *N.J.* at 433, 550 *A.*2d 1172 ("Once it is established that a juror has been exposed to pretrial publicity, then, in order to vindicate a defendant's right to an impartial jury, the *voir dire* must *unequivocally* establish that the potential juror can put that information or opinion aside.") (emphasis added). Later, Juror S. responded to the court's question as to whether he could put aside his belief that defendant had a prior sex offense conviction: "I think I could put it aside, yes." The court eventually received a more definitive answer from the juror, but the exploration, in my view, was inadequate to insure against prejudice.

Even the *voir dire* of the two jurors who stated they did not believe defendant had a prior conviction as a sex offender, Jurors D. and P., evokes cause for concern. In light of the trial court's comment that "gross prejudice" would be "visited on the defendant" should one of the jurors in the middle of the trial or deliberations make the connection between Megan's Law and defendant's prior record without telling the court, it was equally necessary to explore their views on Megan's Law. Juror P. recognized that Megan's Law was instigated by defendant's case, and Juror D. suspected that a connection existed between the case and the Law, but neither had reached or expressed the next logical conclusion—that defendant had a prior criminal history as a sex offender. The danger that they may have done so at some point during the trial, however, is very real, and we have no way of knowing if that danger came to fruition. Juror D. was not asked how he felt about Megan's Law. Juror P. expressed in no

uncertain terms that she agreed with Megan's Law, but was not asked why. Juror P. expressed hesitancy about her ability to be impartial, stating "I think I could judge fairly." If either juror reasoned at some point during the trial that defendant must have a prior sex offense conviction because he had been the catalyst for Megan's Law, their motivations for endorsing Megan's Law would have become critical.

Finally, Juror A.C. was not adequately screened by the trial court. Like Juror B., Juror A.C. expressed mixed feelings about Megan's Law, and stated that he believed defendant's case triggered the Law. He also stated that he believed it likely that defendant had previously been convicted as a sex offender. Juror A.C. stated that to the extent that he agreed with Megan's Law it was because he "would love, you know, the community to be, you know, safe[,]" which suggests his belief that the Law is required because sex offenders are likely to re-offend.[18]

---

[18] Another statement by Juror A.C. highlights that the potential for bias may have had added significance in the penalty phase. When questioned by the assistant prosecutor, Juror A.C. indicated that he felt serial killers were beyond rehabilitation:

Q: Okay. I think you have changed your opinion about the death penalty because you feel that some people are not capable of being rehabilitated?

A: Right.

Q: Okay. What—when you look at a situation or a person, what, what gives you the opinion that this person is not capable of being rehabilitated and that person is capable of being rehabilitated?

A: If I, if I looked at, you know, a serial killer, I mean, where is this guy going, man? I mean, I really believe there's no hope for someone like that.

Q: Okay.

A: I think he's real, just beyond hope situation.

That discussion underscores the juror's tendency to condemn someone who has offended repeatedly. When viewed in light of the fact that defense counsel later alerted the Court that the juror appeared to be sleeping or dozing during the penalty phase while defense witness Carol Krych was testifying about defendant's social history, this concern carries added weight: Had Juror A.C. already written off defendant as someone for whom there was no hope of rehabilitation by the time the penalty trial began?

The trial court, while conducting a thorough *voir dire* in many ways, did not manage to determine the reasons behind the jurors' support for Megan's Law, and therefore lost the opportunity to fully assess the extent to which they would be able to completely disregard their suspicions that defendant had a prior criminal record. This Court's concerns, expressed in *Biegenwald IV, supra,* 126 *N.J.* at 44, 594 *A.*2d 172, that jury members cannot be counted on to remain impartial in all instances, even when they have stated that they can, should guide its decision in this case. In spite of the jurors' promises, some expressed more tentatively than others, that they could judge defendant only on the evidence presented at trial, the risk of prejudice here was simply too great to overlook.

Although the trial court, if requested, might have permitted defense counsel to question the jurors further on the foundation of their feelings about Megan's Law,[19] counsel's failure to pursue this line of questioning in these circumstances cannot be determinative. In *Biegenwald IV, supra,* the Court stressed that defense counsel's failure to compensate for the trial court's inadequate *voir dire* could not be dispositive:

> We acknowledge the paucity of objection by defense counsel. However, whatever lack of zealousness and vigor one might ascribe to defense counsel in no way diminishes our duty to ensure that defendant is sentenced by a fair and impartial jury....

> [*Id.* at 42, 524 *A.*2d 130.]

In the prosecution of a capital case, the responsibility to assure the selection of a fair and impartial jury is that of the court, and it is not delegable.

### B.

In *Coleman, supra,* 778 *F.*2d at 1541, the court stressed that a harmless error analysis should not be applied to the penalty phase of a capital trial. The determination that a death sentence is to be

---

[19] There is no claim by defendant that the trial court limited the *voir dire* in any significant way.

imposed is intrinsically and inherently subjective and therefore defies any conclusion that deathworthiness as the basis for the sentence of death is or is not based on "overwhelming evidence." When the defendant's prior conviction is similar to—or, in this case, exactly the same as—the crime for which a defendant is being tried, and the jury becomes aware of it, the potential for prejudice cannot be doubted. We have required admissible evidence of prior similar crimes to be "sanitized" in the guilt phase because of the real and unacceptable risk that the jury will interpret that evidence as tending to demonstrate the defendant's propensity to commit such crimes. *Brunson, supra,* 132 *N.J.* at 391–92, 625 *A.*2d 1085. That sanitizing requirement is based on the premise that in dealing with like crimes, instructions regarding the limited use for which the jury is permitted to consider the evidence of such prior crimes are ineffective.

> Commentators generally agree that the use of prior-conviction evidence is fraught with a high risk of prejudice, and they express skepticism about the effectiveness of an instruction to the jury to limit its use of the evidence to an assessment of defendant's credibility.
>
> [*Id.* at 385, 625 *A.*2d 1085.]

" 'The theory of 'limited use' under which such explosive evidence is put before the jury fails to correspond to the actual effect of the evidence even in the minds of the most sober and conscientious jurors.' " *Id.* at 386, 625 *A.*2d 1085 (quoting H. Richard Uviller, *Evidence of Character to Prove Conduct: Illusion, Illogic, and Injustice in the Courtroom,* 130 *U. Pa. L.Rev.* 845, 882 (1982)); *see id.* at 386–87, 625 *A.*2d 1085.

The Court constructed its rule for dealing with like crimes in recognition of the concern that limiting instructions are inadequate to ensure fair and impartial comparative evaluation of those crimes. It held that when a prior conviction is the same or similar to the charge before the jury, only the degree of the crime and the date, not the nature, of the offense may be revealed to the jury. *Brunson, supra,* 132 *N.J.* at 391, 625 *A.*2d 1085. The Court then reversed Brunson's conviction because the evidence of his prior record of drug offenses, similar to the offense under review by the

Court, had not been sanitized. *Id.* at 393, 625 *A.*2d 1085. In *Brunson,* the defendant offered no actual evidence of prejudice resulting from the unsanitized evidence—the Court fully understood that such unsanitized evidence is *per se* inadmissible due to the high risk that the jury will misuse it in spite of thorough limiting instructions. *Id.* at 391, 625 *A.*2d 1085. As such, when the jurors have "unsanitized" knowledge of a defendant's prior sex offense convictions—acknowledged by this Court to be different from other crimes, *see Harris, supra,* 156 *N.J.* at 160, 716 *A.*2d 458, and as information particularly likely during guilt-phase deliberations to provoke belief in the defendant's criminal propensity—reversal of defendant's conviction is unquestionably required, regardless of how the jurors come upon that knowledge.

## C.

Part of the difficulty with these issues is that the remedies for the kind of rampant press coverage that characterized this case are not obvious. Although it is true that the trial court may have been able to avoid some of the problem by empaneling a jury from Camden instead of Hunterdon, and erred by not attempting to do so, the fact that Megan's Law coverage was so widespread diminishes the strength of the argument that empaneling a jury from Camden would have made a significant difference. At least in Camden, however, defendant would have been tried by a jury selected from a pool representing a cross-section of the community.

In spite of the difficulty in finding a solution, and the reluctance, perhaps, to recognize defendant's habitual "nature"—the singular reason that makes defendant more detestable in the eyes of the public—as the one factor that entitles him to a new trial, hesitancy over the necessary remedy should not evolve into doubt or paralysis in doing what is required. There should be no question that in these circumstances defendant's sentence must be vacated and his conviction reversed.

## IV

Defendant also claims that the State engaged in prosecutorial misconduct throughout the guilt and penalty phases. The Court acknowledges that some of the prosecution's tactics were impermissible, but concludes the misconduct was not "so egregious as to deny defendant a fair trial.'" *Ante* at 596, 737 *A.2d* at 99 (quoting *State v. Moore*, 122 *N.J.* 420, 462, 585 *A.2d* 864 (1991)). I disagree. Throughout defendant's trial, the prosecution deliberately attempted to inflame the jury, to present defendant as an inhuman pervert—most notably by eliciting information regarding defendant's prior sex offense convictions—and to denigrate the defense by characterizing defense counsel and defense witnesses as deceptive and biased. All of this was done continuously, in spite of repeated warnings by the trial court. Such misconduct had the clear capacity to affect the jury and prejudice defendant.

### A.

Prosecuting attorneys are "afforded considerable leeway in making opening statements and summations." *Williams II, supra*, 113 *N.J.* at 447, 550 *A.2d* 1172. At the end of trial, they are allowed to sum up the State's case " 'graphically and forcefully.' " *Feaster, supra*, 156 *N.J.* at 58, 716 *A.2d* 395 (citation omitted). In general, prosecutorial misconduct, measured in isolated instances or by cumulative effect, will not stand as a basis for reversal unless it is so prejudicial as to have deprived the defendant of a fair trial. *Id.* at 59, 716 *A.2d* 395; *State v. Zola*, 112 *N.J.* 384, 426, 548 *A.2d* 1022 (1988); *Ramseur, supra*, 106 *N.J.* at 322, 524 *A.2d* 188.

Nevertheless, prosecutorial misconduct is a chronic malady of the criminal justice system. *See Williams II, supra*, 113 *N.J.* at 456, 550 *A.2d* 1172; *State v. Spano*, 64 *N.J.* 566, 568–69, 319 *A.2d* 217 (1974). Too often, prosecutors lose sight of the fact that their principal obligation is not to convict, but to see that justice is done. *Marshall I, supra*, 123 *N.J.* at 152–53, 586 *A.2d* 85. As a result,

despite the restrictive standard for gauging prosecutorial misbehavior, *see Feaster, supra,* 156 *N.J.* at 59, 716 *A.*2d 395, prosecutorial misconduct does lead to reversals of criminal convictions. *See, e.g., State v. Farrell,* 61 *N.J.* 99, 102–07, 293 *A.*2d 176 (1972) (reversing conviction for armed robbery); *State v. Welsch,* 29 *N.J.* 152, 158, 148 *A.*2d 313 (1959) (reversing conviction for public indecency); *State v. West,* 29 *N.J.* 327, 149 *A.*2d 217 (1959) (reversing conviction for violation of Securities Law); *State v. Landeros,* 20 *N.J.* 69, 74–75, 118 *A.*2d 521 (1955) (reversing conviction for assault), *cert. denied,* 351 *U.S.* 966, 76 *S.Ct.* 1025, 100 *L.Ed.* 1486 (1956); *State v. D'Ippolito,* 19 *N.J.* 540, 546–48, 117 *A.*2d 592 (1955) (reversing conviction for perjury); *State v. Jenkins,* 299 *N.J.Super.* 61, 69, 690 *A.*2d 643 (App.Div.1997) (reversing conviction for third-degree attempted burglary); *State v. Gregg,* 278 *N.J.Super.* 182, 191, 650 *A.*2d 835 (App.Div.1994) (reversing conviction for aggravated manslaughter and assault), *certif. denied,* 140 *N.J.* 277, 658 *A.*2d 300 (1995).

Repeated and extended prosecutorial misconduct intended to induce improper inferences and reinforce impermissible impressions are particularly prejudicial, and will overcome evidence of guilt. *See, e.g., State v. Frost,* 158 *N.J.* 76, 87–88, 727 *A.*2d 1 (1999). Especially in "close and sensitive" cases involving sexual assault, and more so where the victim is a child, improper appeals by prosecutors "calculated to arouse sympathy for the victim and hate and anger against the defendant have a strong potential to cause a miscarriage of justice." *State v. W.L.,* 292 *N.J.Super.* 100, 110–11, 678 *A.*2d 312 (App.Div.1996) (reversing conviction for sexual assault of child); *see State v. Acker,* 265 *N.J.Super.* 351, 357, 627 *A.*2d 170 (App.Div.) (reversing conviction for second-degree sexual assault upon children under thirteen), *certif. denied,* 134 *N.J.* 485, 634 *A.*2d 530 (1993); *State v. Bruce,* 72 *N.J.Super.* 247, 251–52, 178 *A.*2d 233 (App.Div.1962) (reversing conviction for rape).

"[S]crupulous[ ] review" of allegations of prosecutorial impropriety is especially called for in contexts where the State is

seeking the death penalty. *State v. Biegenwald*, 106 *N.J.* 13, 40, 524 *A.*2d 130 (1987). "'Because death is a uniquely harsh sanction, this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters....'" *State v. Rose*, 112 *N.J.* 454, 524, 548 *A.*2d 1058 (1988) (reversing death sentence where cumulative effect of prosecutor's penalty phase statements deprived defendant of right to fair trial) (quoting *Ramseur, supra*, 106 *N.J.* at 324, 524 *A.*2d 188).

Defendant's case is thus particularly sensitive: He was charged not only with the sexual assault of a young girl, but also capitally, for her murder.

### B.

In the guilt phase of the trial, the overwhelming theme of the prosecution was the degradation of defendant's character. That was accompanied by a simultaneous effort to evoke sympathy for the victim through the presentation of highly prejudicial testimony and arguments often irrelevant to the central issue of defendant's guilt. The prosecution continually referred to defendant's lack of emotion or remorse following the crime; it portrayed defendant as sexually perverted, specifically by alluding to defendant's prior convictions as a sex offender. In light of the jurors' knowledge and awareness of defendant's prior sexual offenses, the prejudice that undoubtedly redounded from this kind of misconduct is obvious. Finally, the State set the stage for the penalty trial by continuously depicting defendant as cold, emotionless, and void of remorse.

### 1.

The State's guilt-phase misconduct is best illustrated by the assistant prosecutor's closing argument, which drew together the themes alluded to throughout the trial. After the Court dissects and desiccates the tangled strands of prosecutorial misconduct that enveloped this case, many of the prosecution's improprieties, considered in isolation, do not appear egregious. Those impro-

prieties, however, must be considered as interrelated and in light of the State's highly inflammatory and improper closing. Reviewed in that context, defendant's claim of excessive prosecutorial misconduct clearly prevails.

The most egregious portions of the prosecutor's closing, many of which were, notably, omitted from the majority's opinion, follow:

What kind of man could do such awful deeds? What kind of man could commit such evil acts? The kind of man who could cavalierly dump a child's body and make his next stop a WAWA. The kind of man who could, after executing her daughter, look Maureen Kanka in the eye, within minutes, and not flinch. The kind of man who had the unmitigated gall to offer to hand out fliers for the child whose life he had just snuffed out. The kind of man who, over the course of two days, could talk about the rape and murder and the brutalizing of a child and never show a shred of emotion. The kind of man who could talk about Megan's death and blame her because his hand hurt. The kind of man like the defendant.

The defendant killed to protect his own self interest. He killed, he claims to protect himself, because he didn't want Megan to get loose. He didn't want Megan to tell on him. He didn't kill in a rage. He didn't kill in a panic. He didn't kill by accident. This killing was so cold and so calculating that it is chilling in the extreme.

He killed Megan because she posed a threat to him. And as a threat, he had to exterminate her like you would step on a bug. He proved throughout this entire investigation that he would do anything to protect himself. He would do anything in his own self interest. He proved he would connive, manipulate, lie, deceive, and even kill if he thought it would help him.

. . .

He scooped up Megan's body, put it in the toy box and dumped her in the weeds. What did he do next? He went to a WAWA. You have heard statement after statement that he gave regarding his actions. You have heard words out of his mouth about his activities. Did you hear one word about reflection, concern, introspection about what he had done to Megan? He had just committed some of the most heinous acts a human being can commit. Did you hear in those statements one word of remorse? He dumped her body, and his only concern was to get to a WAWA to get cigarettes and a newspaper.

After the WAWA, he proceeded home. He crossed the street, and that's where he encountered Maureen Kanka. He had just dumped her daughter. Maureen is out, distraught, looking for her missing little girl. The defendant was able to stand there, looked that mother in the eye [sic], and not flinch.

. . .

Detective Pukenas hoped against hope that Megan might still be alive, but the defendant knew better. And indeed, she was dead. A little blue shirt was all that she wore, on her side, plastic bags over her head, her body covered with insects. It was a sight so tragic and perverse that every person who saw it will be haunted forever. And we will be haunted as well. Just the photograph of her body outlined in the weeds was so deeply disturbing for each and every one of you, because this wasn't TV, this wasn't a movie. This wasn't an actress who would get up when the scene was done. This had been a real live, breathing child. And this was a real death at his hands.

The prosecutor's provocative recreation of the crime was also graphic and extreme:

Dr. Ahmad told that you [sic] with all the variables, she couldn't say how long until Megan became unconscious. It could have been two minutes, three minutes, longer, shorter. But the defendant himself, in his statement, said that the struggle in the door with the belt around her neck lasted five minutes. Five minutes, Megan, in pain, in terror, the belt being wrapped around her neck. You can almost hear her gasping for air.

We will never know how long her conscious terror persisted. We will know—we will never know how long it took until darkness overtook her. We will only know that the last face she saw on this earth was the face of the man committed to her destruction. However long it was, it was an eternity for Megan. We may not know the exact sequence of events, but we do know that whatever the sequence, it was so repulsive, so disturbing, so unsettling, so horrific, that it permeates to your very soul.

. . .

You have seen the pictures of the bags over Megan's head. In your worst nightmares, did you ever think you would see such evidence of callousness? In your darkest moments, did you ever dream you would see such inhumanity? Is there any adult alive on the face of the planet who doesn't know the effect of putting plastic bags over someone's head? Could his intent have been any more crystalline? Could there be any question what he was intending?

And then, the prosecutor offered this finale, after which defendant objected:

Members of the jury, sexual violation in the park. Is there any image more despicable? Is there any act more depraved than that one? After all that he had done to that child, and he had to violate her one more time. He didn't rip the bags off her head to try to save her. He stuck his finger in her vagina. Can there by any question of his intent?

He dumps her, and then he drives off. This was a man who wanted to kill, intended to kill, meant to kill, chose to kill, and did kill purposely or knowingly by his own conduct.

It is hard for most of us, as human beings, to understand the unmitigated evil that this case represented. It is hard for most of us, as human beings, to understand that any adult could intentionally kill a child. It would have been beyond reprehensible if he had just committed the sexual acts and let her live. But if he had done that, she would have been damaged, she would have been hurt, but she would have been alive. But she [sic] chose not to do that. He chose to take the gigantic step that raised these acts from the horrific to the catastrophic.

It is the brutality, the senselessness, the cold, calculating nature of these acts that is so appalling, and so clearly tells you his intent.

> This was not just a man who killed. This was a man who killed without a shred of emotion. A man who killed without a scintilla of concern. You heard his statements over the course of two days. Did you ever once hear in any of those statements that it was an accident? Did you ever once hear him say in any of those statements, I didn't mean this to happen? Did you ever once hear him say in any of those statements, I would do anything if I could change the results? You didn't, because he didn't ever say anything like that.

In those statements, did you once, even once, hear him mention anything about Megan or concern for what she had suffered? Megan would never laugh and never smile again, and he blamed her for the wound on his hand. Megan was on a morgue table, and he wanted a band-aid.

Members of the jury, there are images from this case that will live with all of us. All of us who have seen and heard things in this case, these images will live with us forever. Some of them come from the descriptions that you have just heard from the testimony, acts so perverse, so offensive, that they shock our collective conscience. Other images will come to you from normal every day [sic] things that suddenly have become sinister, different.

The belt. Something most of you men wear every day. You will never be able to look at a belt again and think of it only as a piece of wearing apparel. You will now forever see it as an instrument of destruction, something capable of being wrapped around a child's neck, something capable of making grooves in a child's neck, being used as a leash, something used to destroy, to choke, to strangle, to annihilate.

> A toy box. Before this trial, I am sure that the image of a toy box was something that brought great joy. It conjured up childhood happiness, laughter, all of the treasures that would be found inside. You will never again be able to look at a toy box and think of childhood treasures. Instead, you will see in your mind's eye Megan. It is no longer a toy box. It was a coffin. Megan's crumpled, battered body inside. Will that image ever fade? I don't think so.

A park. Before this case, you would think of a park as a place that was bucolic, idyllic, peaceful. A place where families would go to enjoy life, where children could run and play. Now, it will invoke images of death. It was a place where the

defendant chose to dump Megan's body, a place now defiled by his despicable acts. Megan, cast aside like so much garbage.

Plastic bags. Something most of us see or use every day. Will you ever be able to look at a plastic bag again and not think of the ultimate horror? You have seen the pictures of Megan's head encased in those particular bags put on by the defendant. Those bags, ties tightly around her neck, each bag guaranteeing that death would follow. Each bag a declaration by the defendant that he wanted her dead. A child playing with a dog. Is there any image that does more to evoke childhood than that one? It brings to mind all that childhood is, innocence, happiness, laughter, trust—

. . .

You will think what might have been. Megan died without ever knowing why. You know that Megan had to be thinking why, why, and she would never have known. No one on earth deserves to die as Megan did. In pain, in terror, in anguish. No one on earth deserves to die that way.

Megan died at the hands of a man who knew no mercy, who knew no decency, who showed no humanity. There are not words to express the outrage. There are no words that can express the horror. There are no words that can express the disdain.

There is only one word that can begin to do justice, and that one word must come from you. And that word is guilty.

Confronted with this vivid presentation, the court instructed the jury prior to guilt-phase deliberations simply to distinguish "emotional words [ ] or phrases that have a tendency to inflame from descriptive language," urging them to disregard the former. *Ante* at 586, 737 *A*.2d at 93.

a.

The most vivid theme of the prosecution, used throughout the trial and illustrated most prominently in the closing, was the degradation and dehumanization of defendant. The prosecution, well attuned to the jurors' awareness of defendant's prior convictions as a sex offender, alluded in many ways to those convictions. In addition to portraying defendant as a sex pervert, the prosecution also attempted to leave the jury with the overall sense that defendant was disgusting and sleazy, a pariah to be avoided.

In the opening statement, the prosecutor described defendant's interest in Megan as longstanding and his thoughts with regard to her as "anything but pure." In contrast, the prosecutor remarked

that Megan, as she "walked into that house ... couldn't know about the defendant." *See id.* at 577, 737 *A.*2d at 87. The prosecutor elicited from Detective O'Dwyer the following reading from defendant's statement:

Q: What was your intention of bringing her into the house?

A: My intentions were just to feel her up and kiss her and try to get her not to say anything. I didn't want to hurt her physically, but I knew I was hurting her mentally by what I was doing.

Q: What do you mean by feel her up?

A: Rub my hands up and down her legs and feel her butt. I learned that my main attraction to younger girls was the softness of their skin.

. . .

Q: What attracted you towards Megan?

A: A lot of times during the summer she would be sitting on the curb across from my house on the curb or in the street. She would write with chalk in the street. She would wear loose shorts with no panties underneath, and I would see this as she had her legs open.

Q: Were you sexually aroused by observing Megan's actions with her legs open and had no underwear? Had no underwear? I'm sorry.

A: I got a reaction from it, but I never got a hard on from it.

Q: What reaction would you get from this?

A: I would get sweaty palms and my heart would race. I would go back into the house.

Q: Did you masturbate when you went back into the house after observing Megan?

A: No. If I still felt aroused at night, I would pull out magazines that I had and would masturbate to them.

Q: What type of magazines do you have?

A: Triple X, porno magazines that come from the recycle shed work that I became attracted to upon seeing them.

Q: Did any magazines involve child pornography?

A: No. They were all adults, and I have never seen child pornography magazines. I never tried looking for one.

Q: Were you under the influence of any drug or alcohol during this time span of this incident?

A: No.

Q: What do you think is the reason for what you are doing?

A: The softness of the skin and the hairlessness of the body is what I am really attracted to.

During the testimony of Detective O'Dwyer, the prosecutor wore latex gloves while handling defendant's clothing in front of the jury. She did not do so while handling the victim's clothing. Defense counsel objected to this at sidebar. The prosecutor replied that it was her normal practice, and the court allowed the practice to continue.

The portrayal of defendant as a sexual deviant continued as the prosecutor elicited testimony from Officer Shaw, who described the "small portion of a print, as if it could have been made by a smaller person" found in defendant's bedroom. Defense counsel objected to this description, but the court did not strike the testimony. The court allowed Shaw to explain that the fingerprint did not match the victim's, thus leaving the jury with the impression that defendant had previously had young girls in his bedroom other than the victim.

The prosecutor's closing crystallized the impermissible implication:

> He had been lusting for this child for weeks or months, as he told Sergeant Stanley on Sunday. He had been watching little girls for weeks and months, and getting those feelings for them. It is an image that is so appalling that it is hard to put into words. He had been lusting after this child.

### b.

The prosecution relentlessly portrayed defendant as inhuman, cold, remorseless and void of emotion. In the State's opening, the prosecutor described how defendant denied having seen the victim when asked by her mother if he knew where Megan was:

> At the point in time that the defendant had this conversation with Maureen Kanka, he had already kidnaped, brutalized and murdered Megan. Yet he was able to stand there, look that child's mother in the eye and tell her he hadn't seen Megan since earlier that night.

The prosecutor then described defendant's calculated disposition of the victim's body:

> And [after the murder] he realized he had—ironically—a toy chest, a toy chest that he had converted into a tool box. And he thought that Megan's body would fit nicely into this toy chest.

The prosecutor contrasted defendant's demeanor following the crime with the relatively emotional response of the investigating officers, needlessly highlighting the tragedy of the crime by describing the victim's clothes:

> It wasn't until they got out of the car and ran over to the area that all hope was extinguished. There was Megan, lying on her side, naked, except for a little blue and pink shirt. Her head covered with plastic bags. It was a difficult and emotional sight for every law enforcement officer in that park, but their job was not done ... They had to secure the scene and body for further forensics. Detective Pukenas and McDonough returned the defendant to the police station. In the car, after leading the police to her body, the defendant *coldly, unemotionally* described what he had done to Megan ...
>
> [emphasis added.]

Defendant did not object to these statements at trial, but now contends that they laid the foundation for the prejudicial themes of defendant's lack of emotion and sexual perversion.

The State continued its assault on defendant's lack of emotion during the examination of several witnesses. The lead prosecutor asked Detective Pukenas about defendant's demeanor in the police car as defendant recounted the murder to the accompanying officers:

> Q: Detective, let me ask you, on the way back in the car, as he's giving this narrative of what happened, what was his tone of voice?
>
> A: It remained a normal tone of voice. He was telling us what happened. He was very cooperative. Nothing really had changed in his demeanor of his tone of voice.
>
> Q: Was there any point in time in the telling of this story that he got emotional?
>
> A: No.
>
> MR. GREENMAN: Objection, Judge.
>
> THE COURT: Objection overruled.
>
> Q: Was there any point in time in the telling of this version where his voice cracked?
>
> A: No.
>
> Q: Or wavered?
>
> A: Never.
>
> Q: Did you ever see him shed a tear?
>
> A: Never once.
>
> Q: On the way back, in the car, did he at any time indicate any concern about Megan?

> A: Not at all. I think he was the only one not crying.

Defendant objected again and the court sustained the objection. The court then gave a limiting instruction to the jurors, telling them to disregard the last statement regarding defendant's emotional state. Ignoring the court's warning, the prosecutor continued in the same vein:

> Q: Detective, did he ever in the car on the way back say that it was an accident?
> A: He never said that.
> Q: Did he ever say that he didn't mean to kill her?
> A: He never indicated that at all.
> Q: Did he ever say he was sorry that he killed her?
> A: He never said that.
> Q: Did he ever say any words whatsoever that indicated remorse?
> A: Nothing like that at all.

Pukenas also testified that defendant maintained the same control in the interview room during his written confession, and stated on redirect that during interrogation, defendant was "talking a little bit more than he had prior to that ... [b]ut not in any tone of voice that would indicate remorse." Again, counsel objected and the objection was sustained. The court told the jury to disregard the witness's conclusory statement about defendant's remorse.

On direct examination of Sergeant O'Dwyer, the prosecutor continued impermissible inquiry into defendant's emotional state at the time of his first statement to the police:

> Q: During the giving of this statement by the defendant, did his tone of voice ever change?
> A: No, ma'am.
> Q: Was there any point in time when he gave this statement that his voice cracked with emotion?
> A: No, ma'am, never.
> Q: Was there any point in time during the giving of this statement that there was a catch in his voice as if to indicate an emotional reaction?
> A: No, ma'am, none.
> Q: Detective, was there any point in time during this statement that he had to stop to compose himself?
> A: No, ma'am, never at any point.
> Q: At any point in time did he have to stop to collect his thoughts?
> MR. GREENMAN: Objection, Judge.

THE COURT: The objection is sustained.

Q: Was there any point in time when he cried during this statement?

A: No, ma'am.

Q: At any point in time, did he ever say he regretted what he did to Megan?

A: No, never.

. . .

Q: And Detective, when you asked him how he felt, and his response was, I am trying not to cry—remember that question and answer?

A: Yes, I do, ma'am.

Q: Do you know if he was trying not to cry because he had killed Megan, or because he had been caught?

MR. GREENMAN: Objection, your Honor.

THE COURT: Objection sustained. Please disregard that, ladies and gentlemen. Ms. Flicker, there was no reason for that question whatsoever.

Q: Do you know why he responded as he did?

MR. GREENMAN: Objection, your Honor. An interpretation by this witness, I object to. That's up to the jury to decide.

THE COURT: Only if something further was said. There was some inquiry. So it's overruled to that extent. If there was something further said.

Q: Was there anything further said?

A: No, ma'am.

The prosecutor then asked Detective O'Dwyer to read defendant's statement to the jury. In doing so, the witness broke down in tears and the court allowed him to take a break. Several of the other testifying officers also rendered emotional testimony. Defense counsel objected to O'Dwyer's reading of the statement, claiming that the emotional delivery was a "farce." The trial court allowed the testimony, nevertheless.

Sergeant Charles Stanley testified regarding his interrogation of defendant immediately following Dr. Askin's examination of defendant's hand wound. The prosecution asked Stanley the following questions:

Q: Now, did something else happen at the beginning of your interview with the defendant?

A: Yes. After Dr. Askin's examination of the defendant, and the defendant's hand was apparently, had been manipulated for the purpose of taking photographs,

and that he was complaining that the wound was bothering him, and he also mentioned—he was also blaming Megan for inflicting that wound upon him.

. . .

Q: Was there any further mention of the hand?

A: Yes. He continued to complain about his hand being hurt and, again, he felt that Megan was responsible, and he blamed her for that injury.

Q: Sergeant, during this process with the defendant on that afternoon, did he at any time say that he regretted what he had done to Megan?

A: No.

Q: Did he ever say it was an accident?

A: No, he didn't.

Q: Did he ever say that he was sorry?

A: No.

Q: Did he ever show any emotion?

A: The only emotion that he ever displayed when, was when he was being a little upset about his hand wound, and he was upset about [sic] Megan had inflicted that wound upon him. But even that was—he wasn't grievously upset about it, but he was complaining about it.

Q: Did you see him physically demonstrate any type of emotion when he talked about it—when he gave the statement?

A: No.

Defense counsel objected and the objection was sustained.

c.

Finally, the State improperly played on the emotions of the jurors by constantly referring to the victim, both in death and in life. The prosecution emphasized the victim's innocence and naive trust of defendant, as well as the more gruesome aspects of her death and examination of her body. The prosecutor began this improper tactic in her opening, referring to Megan entering defendant's house with "her head [ ] filled with vision of a puppy." Dr. Askin testified that he had removed the victim's lower jaw during the autopsy. The prosecutor referred to the jaw removal several times, and induced Dr. Askin to discuss it on direct. That testimony prompted the court to call counsel to sidebar, where he

reprimanded the prosecutor.[20] The court, however, did not administer a curative instruction to the jury. The theme of the victim's innocence was prevalent during the State's summation. *See supra* at 580–85, 737 *A.*2d at 89–92.

2.

The Court holds that "[a]fter carefully examining the record and recognizing that some of the prosecutor's remarks were improper, we are fully satisfied 'that it was the weight of the evidence, particularly the damning statements uttered by defendant himself, that led to this capital murder conviction rather than the prosecutor's improper comments....'" *Ante* at 596, 737 *A.*2d at 99 (quoting *Feaster, supra,* 156 *N.J.* at 63–64, 716 *A.*2d 395). Unfortunately, defendant's damning statements were presented through the haze of the prosecutor's damning and unprofessional conduct. Even under a plain error standard of review, I find that the cumulative effects of the State's misconduct had a clear capacity to corrupt the impartiality of defendant's jury. As long as we are in doubt, we cannot, in good conscience, take a human life.

Although I agree with the Court that portions of the prosecutor's opening statement that simply alluded to evidence that would be presented at trial did not constitute reversible error, *see id.* at 589, 737 *A.*2d at 95, and that much of the State's examination of witnesses was proper to demonstrate defendant's motive, intent,

---

[20] The court admonished the prosecutor for needlessly and improperly pursuing this line of questioning:

Let me tell you something I have a bigger problem with, and that's four times now you've asked questions that resulted in the responses, with the removal of the lower jaw. I asked you very specifically, was it relevant as to where the lower jaw was used for making the impressions. You said it was. It wasn't. I think that's inflammatory stuff. I've looked at the reaction of these jurors every time you've done it. Then on the fourth time, again, you said, that the lower jaw was removed, and the upper jaw was in the mouth, and you asked a question. There was absolutely, positively no reason to repeat that.

I'm going to warn you, Mr. Korngut, be very careful in terms of your examination in this kind of area. If it's probative, if it's relevant, that's one thing. I don't think it is.

bias, or voluntary waiver, *see ibid.*, those conclusions are counter-balanced and offset by the State's repeated derogatory allusions to defendant's character—which has absolutely no bearing on the issue of defendant's guilt. Those allusions were made in a highly inflammatory manner, often without an accompanying limiting instruction by the court. For instance, the prosecutor's expressions of revulsion and contempt for defendant by wearing plastic gloves while handling his clothes, dramatically and graphically, if subliminally, conveyed to the jury the that defendant was a loathsome, less than an ordinary human being. In addition, the prosecutor improperly elicited evidence indicating that defendant was guilty of prior sex crimes. Officer Shaw's testimony that fingerprints of a "smaller person" other than the victim were found in defendant's bedroom easily laid the groundwork for an inference by the jury that defendant was a pedophile, a chronic molester, who had another child in his bedroom and was guilty of sexual misconduct with that child. The State's elicitation of Officer Shaw's testimony was patently improper.

The prosecutor also engaged in impropriety by condemning, indeed ridiculing, defendant for complaining about the pain he felt in his hand. The prosecutor portrayed defendant as contemptible, asserting that his pain was petty weakness or simple vanity when compared with the profound suffering the victim experienced before dying, conjuring the feeling that if anyone deserved to experience the throes of death, it was defendant. In *Gregg, supra,* the Appellate Division reversed a conviction for aggravated manslaughter and assault resulting from a drunken driving accident because the prosecutor made similar remarks. 278 *N.J.Super.* at 191, 650 *A.*2d 835. The court noted that "while we have no doubt that the evidence respecting defendant's post-crash behavior was relevant, albeit to a limited degree and for a limited purpose, it is regrettably clear that the prosecutor abused this evidence by using it for the primary purpose of portraying defendant as an utterly vile, contemptible and despicable person." *Id.* at 189–90, 650 *A.*2d 835. Such is the case here. Although the evidence regarding defendant's hand and defendant's lack of remorse is

relevant to the limited extent that it goes to the voluntariness of the defendant's confession, the multitude of allusions to defendant's lack of remorse suggests that the "primary purpose" of the evidence, contrary to State's claims, was to encourage the jury to despise defendant.

The prosecutor's repeated reference to the fact that Dr. Askin removed the victim's lower jaw during an autopsy in order to make a model of her teeth was also highly improper. The trial court recognized as much and harshly reprimanded the prosecutor. It was painfully obvious to the court, and surely was to the jury as well, that this invasion of the victim's body was, even in death, a defilement that was defendant's fault, made necessary because of the need for forensic evidence caused by defendant's crime. The court, however, did not repeat its admonition to the jury. Therefore, one must assume that this graphic and gratuitous tactic had a prejudicial effect that was amplified by the ongoing efforts of the prosecution to inflame the jury.

Many of defendant's other claims of misconduct are, when examined in isolation, not substantial. When placed in the mosaic of the entire prosecution, however, they serve to reinforce the prejudice that infected the jury's understanding of the gravity of the evidence, as well as the jury's perception of the strength of the evidence when making the final determination of defendant's guilt and blameworthiness.

Ultimately, the cumulative effect of the prosecutor's guilt-phase misconduct and its exploitation of admissible evidential testimony was epitomized by the prosecutor's closing. In its summation, the State is given the opportunity to tie all the evidence together, and thus the potential to rejuvenate the prejudicial effect of misconduct otherwise cured or counteracted. *See Farrell, supra,* 61 *N.J.* at 106, 293 *A.*2d 176 ("[B]ecause the prosecutor represents the government and people of the State, it is reasonable to say that jurors have confidence that he will fairly fulfill his duty to see that justice is done whether by conviction of the guilty or acquittal of the innocent. His comments in summation whether proper or

improper carry with them the authority of all he represents. It is unlikely a juror will believe a prosecutor would intentionally mislead him.") (citation omitted); *see also Berger v. United States*, 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935) ("It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions; insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."). The prosecutor's closing in this case was highly prejudicial. This was an emotional case, and the prosecutor exploited it as such. On summation, the prosecutor made a multitude of references to the victim's impeccable character accompanied by degrading remarks on the defendant's character.

> Any capital trial will necessarily involve testimony and physical evidence pertaining to the victim. This evidence, though admissible, cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately intertwines irrelevant emotional considerations with relevant evidence. There are occasions when evidence relating to the victim's character and personality may be probative of critical aspects of the trial, *e.g.*, defendant's assertion of self-defense or provocation. Where, however, as in the matter before us, the victim's character has no bearing on the substantive issue of guilt or the penalty to be imposed, the prosecution may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury.
>
> [*Williams II, supra*, 113 *N.J.* at 451–52, 550 *A.*2d 1172.]

In *Williams II*, the Court found "[t]he prosecutor's remarks were clearly improper and should have been stricken from the record and the jury properly instructed to disregard them." *Id.* at 452, 550 *A.*2d 1172.[21] The prosecutor's remarks in this case

---

[21] In *Williams II, supra*, the Court expressly objected to the following passage from the prosecutor's opening remarks:

> Beverly Mitchell had so much to live for. Bright, beautiful, educated, religious, a member of her church choir. Beverly taught school in the Trenton school system. She taught special education. She was working part-time as a receptionist at the Bellevue Care Center to earn some extra money. You see, Beverly was due to be married in 1983. That very day, December 30, 1982, Beverly and her mother spent the day before Beverly

similarly contrasted the victim's life and dreams with the terror she felt at the moment of her death. And, as in *Williams II*, this prosecutor depicted the victim as an angel at the mercy of a defendant who was morally destitute. Yet, in comparison to the comments made by the prosecution in this case, the statements made in *Williams II* are considerably mild. The comments in *Williams II* did not approach the level of prejudice inherent in this prosecutor's outrageous soliloquy on the meaning of childhood and the relevance of dogs, toy chests, and parks. That is precisely the kind of commentary that has no bearing upon the issues in the case, that engenders confusion and emotional turmoil, and threatens to inflame and provoke the jury. *See id.* at 452, 550 *A.*2d 1172; *State v. Pennington,* 119 *N.J.* 547, 566–67, 575 *A.*2d 816 (1990); *Marshall I, supra,* 123 *N.J.* at 161, 586 *A.*2d 85.

The prosecutor in this case not only presented defendant as the victim's destroyer, she characterized him as a sexual pervert and predator as well. To a certain extent, the evidence adduced with regard to defendant's sexual perversion was proper to show intent or motive to commit the crime of sexual assault. There are, however, limits to the propriety of such commentary. In *W.L., supra,* the Appellate Division reversed a defendant's conviction for sexual assault and endangering the welfare of a child in large part because the prosecutor alluded explicitly to defendant's history of sexual perversion. 292 *N.J.Super.* at 111, 678 *A.*2d 312. The prosecutor's summation and opening statement in *W.L.* were

---

went to work at the Bellevue Care Center, they spent the day looking for an apartment, an apartment that Beverly and her husband-to-be would share when Beverly started her new life. Beverly looked forward to 1983 with such joy, such hope, such promise. But it was not to be. The defendant, James Edward Williams, changed all of that. He changed it brutally, savagely, permanently. In a few moments of unspeakable horror, the defendant destroyed all of Beverly's dreams. In a few moments of unimaginable terror, the defendant destroyed all of Beverly's plans. In those few moments of a living nightmare, the defendant destroyed all of that joy, all that hope, all that promise. In those few moments, he destroyed Beverly Mitchell. She would never live to see her wedding day.

[*Id.* at 448, 550 *A.*2d 1172.]

comparably egregious to the prosecutor's summation in the present case, and played on similar themes. *See id.* at 105–10, 678 *A.*2d 312. Improper statements regarding defendant's sex interest are particularly likely to have been prejudicial in this case because they relate to a key issue. *See Feaster; supra,* 156 *N.J.* at 61–62, 716 *A.*2d 395 (noting that "[t]he qualitative difference distinguishing those comments from the others discussed above lies in their relation to key issues in the case"). In light of the jurors' knowledge of defendant's prior criminal history as a sex offender, comments regarding defendant's sexual obsession and perversion take on added weight. Therefore, although evidence of defendant's sexual perversion was relevant to show defendant's intent, the prosecutor's excesses in making such a presentation were especially prejudicial.

The trial court's most remarkable error was to allow the prosecutor to proceed undeterred with her excessively provocative summation. The court's post-summation instructions to the jury recognized that this was an emotional case and, therefore, that the summations were understandably emotional as well. That reasoning is logical, but legally incorrect. The prosecutor's conduct was " 'clearly and mistakably improper' " and "substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *State v. Roach,* 146 *N.J.* 208, 219, 680 *A.*2d 634, *cert. denied,* 519 *U.S.* 1021, 117 *S.Ct.* 540, 136 *L.Ed.*2d 424 (1996). I reiterate: "No matter how convinced we may be of defendant's guilt, unless we are similarly convinced of the jury's impartiality, we cannot allow the death penalty to be imposed." *Williams II, supra,* 113 *N.J.* at 445, 550 *A.*2d 1172.

## C.

The standards that govern prosecutorial misconduct at the guilt phase also apply at the penalty phase of a capital trial. Just as the State's guilt-phase prosecution was founded on the suggestive portrayal of defendant's bad character, the penalty-phase prosecution was punctuated with repeated attempts to traduce defense

counsel. Defendant raises issue with four portions of the prosecution's penalty-phase presentation, and, regarding each, criticizes the prosecution for portraying defense counsel and defense witnesses as deceptive, and for characterizing them as liars. Such commentary by the prosecutor, defendant argues, appealed to the jury's emotions and, in effect, turned the jury against the defense team on a personal level. The Court disagrees, noting that "[a]lthough we strongly disapprove of attacks on the integrity of defense counsel, we do not think that is what occurred here." *Ante* at 596, 737 *A*.2d at 99.

I recognize that much of the prosecutor's questioning and presentation at the penalty trial was acceptable and based on the record. Nevertheless, I believe the prosecutor's repeated requests for the jury to discredit the evidence presented by the defense, in conjunction with contemporaneous suggestions that the jury base its decision upon information that was not presented at trial, went far beyond the realm of fair comment on the strength of defendant's case. The prosecutor treaded the line of propriety when she urged the jury to disregard defense mitigation evidence and testimony as untrue. A juror is required to base his or her decision only upon the evidence presented, not upon speculation about what was not presented. It is well-established that a prosecutor who implies or reveals knowledge of evidence beyond the scope of that presented at trial is guilty of misconduct. *See Feaster, supra,* 156 *N.J.* at 59, 716 *A*.2d 395; *Harris, supra,* 156 *N.J.* 122, 716 *A*.2d 458; *Roach, supra,* 146 *N.J.* at 219, 680 *A*.2d 634; *Rose, supra,* 112 *N.J.* at 519, 548 *A*.2d 1058; *see also State v. Johnson,* 120 *N.J.* 263, 296, 576 *A*.2d 834 (1990) (noting that a prosecutor's summation " 'is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom' ") (quoting *State v. Bucanis,* 26 *N.J.* 45, 56, 138 *A*.2d 739, *cert. denied,* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958)). In essence, the prosecutor asked the jurors in this case to speculate about what defendant did not present in the penalty phase. Such misconduct requires that defendant's sentence be vacated.

## D.

As a result of the prosecutorial misconduct in defendant's guilt and penalty-phase trials, the Court should reverse defendant's conviction and death sentence and grant a new trial.

## V

The trial court initially refused to allow into evidence defense witness Carol Krych's thirty-two page report (the Report), a summary of over 450 pages of documentation on defendant's abusive childhood. The court revisited the issue on June 20, 1997, when, in the middle of the penalty phase, the trial court received a note from the jury requesting the Krych Report. Defense attorneys Lependorf and Greenman, Assistant Prosecutor Flicker and the court then engaged in the following discussion:

COURT: What I have done historically with a question such as this is to simply advise the jury that they have all of the evidence that was admitted by the Court for their consideration, period. I normally give that instruction just before the jury is discharged to deliberate, I know I did it in the guilt phase, I did not do it again in this phase. It's not part of the general instructions in the manual of capital cases, and I didn't see a need to augment it, obviously. This question may have been avoided had I done that. Ms. Lependorf, you wanted to place something on the record.

LEPENDORF: I think Mr. Greenman will.

GREENMAN: I'll do it, Judge. I think there's a number of reasons, Judge that you should reverse your decision not to let DP-51 into evidence.

COURT: What is the number?

GREENMAN: DP-51. The first reason is obviously the jury wants it.

COURT: No, that's not necessarily true, they simply say they can't locate it.

LEPENDORF: Don't they say, please supply or something?

COURT: Please provide a copy. I think they think we made a mistake.

LEPENDORF: Well, one, I would interpret that meaning they do want it, and if not, ask clarification from the jury. But more importantly, in thinking about this again, Judge, this is a critical document for so many reasons. It's not just simply like a police report. This is a fundamental document that we have prepared in support of all our mitigating factors, and I say all of the mitigating factors because it's not only the H factors that this report is relevant (sic), but this report was the basis for Dr. Podboy—at least this was the main report that Dr. Podboy relied on in coming to some of his conclusions.

The prosecution chose to challenge Carol Krych, and claimed that she was biased in preparing this report; claimed that the report itself was biased in the direction of the defense, that it misquoted people, that it was slanted. There were a number of phrases used in Ms. Flicker's summation that attacked Carol Krych, and her impartiality.

I think that the jury should have this report to make its determination on a number of things. One, as to whether or not Carol Krych was biased in preparing this document; two, to decide whether or not Dr. Podboy's opinions were based on a biased or unbiased report. And I think those are serious questions that this jury may have to decide in the case, because the Prosecutor raised them in her summation.

COURT: Well, they're always serious question (sic) whether or not the stuff upon which an expert's opinion is based is in fact credible. There's nothing new in this case as to that.

. . .

GREENMAN: [M]y belief is that the jurors, rather than going through 450 pages, whatever, are looking for the summarization, which Carol's report in fact is. And Carol's report refers to specific exhibits as she goes along, describing various things, but it's a summarization of what's in all those documents.

Following a response by the State comparing the Report to inadmissible police reports, and objecting to the fact that the State only had one week to put together any countervailing report, the court rendered its decision:

I'm not going to allow the Krych report in. I think all the evidence they have is in. I think it would be improper to put it in at this point. We've had discussion on that before. It is similar to a police report. I think it would have undue influence if it were in before the jury.

They've heard her testify at length, hour after hour, after hour at length, concerning the report, and they've also heard testimony that challenged that, and they're well-equipped in my judgment, to deal with that. And in my judgment, the report has no place before the jury, certainly not at this point after the matter is in the jury's hands and they're deliberating on it. And the argument that this may have happened in other capital cases is of no moment as far as I'm concerned.

The Court concludes that it would have been "better" for the trial court to admit the Report, but that failure to do so was harmless error. *Ante* at 633, 737 *A.2d* at 119. I agree that the court should have admitted the Report, but would not dismiss that error as harmless. When there is doubt as to admissibility of mitigating evidence, such doubt must be resolved in the defen-

dant's favor. *See State v. Bey,* 129 *N.J.* 557, 587, 610 *A.*2d 814 (1992) (*Bey III* ).

### A.

The mitigating evidence here was not only relevant to the mitigating factors presented by defendant, it might have been crucial to the jury's finding on one of those factors. The Report would have prevented confusion, providing a crucial road map for the jury through Ms. Krych's investigation, and pinpointing those issues that she felt were most relevant to the deliberations on mitigation. The difficulty faced by the jury in having only the 450 supporting documents is highlighted by the fact that during the direct and cross-examinations of Ms. Krych, the trial court stated at side bar,

> ... my first thinking is with regard to these questions, I think they're allowable because of the nature of the responses that I've heard so far. [Ms. Krych] has compiled a report. We don't have notes. There may be a question of, frankly, mixing up what one kid did as opposed to what another kid did. I really don't know. There is a mass of material here....

Later, the assistant prosecutor expressed her difficulty with the documents:

> We subpoenaed all of the school records, the records which Ms. Krych had and reviewed because in the school records are indeed letters, and as I was going through it this morning, I came across a couple of documents that were not given to us, I think. There is so much material that it's a little hard to know.

Even Ms. Krych had trouble remembering what was contained in the materials. Upon cross-examination by Assistant Prosecutor Flicker, the witness expressed this difficulty:

> Q: Ms. Krych, is there a single note in Jesse Timmendequas' school records that his mother, Doris, did not show up for any appointment?
>
> A: I—my memory is there is some reference to that, though I don't know exactly where it is. There is some reference to that.
>
> Q: Well, if there is a reference, I'd like you to find it.
>
> DEFENSE COUNSEL: Judge, objection.
>
> COURT: Yes?
>
> COUNSEL: We have 500 pages here, Judge. Can we do that at the break, for judicial economy?
>
> COURT: I'll give the witness an opportunity to see if she can find it.

. . .

Q: Would you answer my question?

GREENMAN: *Judge, objection. I think she's trying to answer the question.*

A: I don't exactly know—

If the person who prepared the Report was unable to recall the contents of the documents on which it was based, the process of sifting through 450 pages to find indications of mitigating factors undoubtedly only would have added to the jury's difficulty and/or confusion in determining the existence of mitigating factors.

When the trial court is unsure of the nature of a jury's request during deliberations, the court should "bring the jury into the courtroom in order to resolve [the] uncertainty." *State v. Brown,* 275 *N.J.Super.* 329, 646 *A.*2d 440 (App.Div.1994); *see State v. Graham,* 285 *N.J.Super.,* 337, 342, 666 A.2d 1372 (App.Div.1995) ("[W]hen the jury's question is ambiguous, the judge is obliged to clear the confusion by asking the jury the meaning of its request . . . The trial judge should not have assumed the jury's meaning."). In *Graham, supra,* the jury submitted a note to the court stating simply, "Police Report. Grand Jury Report." 285 *N.J.Super.* at 341, 666 *A.*2d 1372. The trial judge, without discussing with counsel the meaning of the request, told the jurors they could not have the reports because they had not been admitted into evidence. The court noted counsel's objections. *Ibid.* The Appellate Division, upon review, held that the trial court would have been justified in withholding the reports if they were indeed what the jury was requesting, because they were inadmissible. The court stated, however, that it was nonetheless important for the trial court to get clarification from the jury. *Id.* at 341–42, 666 *A.*2d 1372. If the jurors, for instance, had wanted parts of the testimony regarding the reports read back to them, the trial court would have been obliged to do this for them. *Id.* at 342, 666 *A.*2d 1372.

The court's comment that in its judgment the jury is "well-equipped" to deal with the lengthy testimony of Ms. Krych contradicts those principles. The documents from which the jury

was to make its findings on mitigating factors were 450 pages in length. The jurors' request most likely indicated their desire to avoid having to sift through every document one-by-one in order to refresh their memories on Ms. Krych's conclusions regarding defendant's childhood. The trial court was obliged, at the very least, to get clarification.

Even without the jury's request, however, the Report should have been admitted. The trial court's comparison of the Report to a police report offered by the State, which is usually not admitted into evidence because it is considered hearsay, is completely insupportable. The Rules of Evidence do not apply to a defendant submitting mitigating evidence in the penalty phrase. *See* *N.J.S.A.* 2C:11–3(c)(2)(b) (allowing defendant to admit mitigating evidence without regard to the rules of evidence, while State is required to abide by these rules).

In addition, the court's contention that the Report was cumulative and would only have confused the jury is unsupported by the record. To the contrary, the Report provided a basis for the conclusion of testifying witness Dr. Podboy and would clearly have helped to clarify the facts for the jury, rather than to confuse. This Court's holdings on admission of mitigating evidence dictate a finding that the trial court erred in refusing to admit the Krych Report.

### B.

Despite concluding that the Report should have been submitted to the jury, the Court holds that the error was harmless. *See ante* at 633, 737 *A.*2d at 119. I disagree. The potential that the jury's penalty-phase deliberations were hindered by the court's omission is significant.

We have no way of knowing if the jurors requested Ms. Krych's report to aid them in determining the existence of mitigating factors or simply because they thought they were supposed to have it—the trial court called it a "housekeeping" request. The fact that the jurors requested the report in the middle of delibera-

tions, however, suggests that the request was not simply the result of a desire to inventory the documents, but rather stemmed from jurors' need for the Report to resolve an issue in the case. In addition, the court engaged in a lengthy instruction on the issue prior to the sentencing phase:

> I'm telling you—and I want you to trust me on this one—you've got all the evidence. If you don't have it, it means, it simply was not put into evidence or allowed into evidence by me. I say this from experience, because when I didn't say that, I would get a note, probably within the first ten minutes, you forgot to give us ... We won't forget a thing.

In light of this very specific message to the jury that they should not submit a note to the court asking for evidence that they thought they were supposed to have, it seems the jury likely had some other motivation in mind.

The potential effect of the Krych Report is marked by the fact that the jury failed to find Factor 24 as part of the c(5)(h) catch-all factor. Factor 24 read as follows:

> Despite being evaluated and classified as mentally retarded with emotional problems by the public school's child study team, none of the professionals provided follow-up services such as counseling or further psychological evaluation for Jesse Timmendequas.

Ms. Krych testified twice to the fact that defendant did not receive follow-up counseling in school. Had the jurors remembered these two pieces of testimony, they would have had the necessary information required for a finding on the existence of Factor 24. According to the Court, the Report would not have supplemented that information in any meaningful way; therefore, the Court contends, Ms. Krych's testimony obviated the need for the Report in order for the jury to make a finding of Factor 24. *See id.* at 633–34, 737 *A.*2d at 119. Ms. Krych, however, testified over an extended period of time. In that time, she mentioned defendant's lack of counseling only twice. Some or all of the jurors could easily have forgotten such information. To determine the existence or non-existence of Factor 24 by examination of the documents alone would have involved the difficult task of sifting through 450 pages to find, first, the evidence of the Child Study Team examination, and second, the absence of any evidence of

follow-up counseling or evaluations. Had the jury been able to review the 32–page report, a brief but comprehensive and accurate summary of defendant's school history of evaluation, and supplement that with the State's documents on defendant's school history, they likely would have found Factor 24.[22]

Several jury members commented during *voir dire* on their belief in the importance of counseling and their willingness to take into account mitigating factors that would diminish defendant's culpability for his acts. During *voir dire*, Juror M. indicated that not all defendants are able to change their behavior without the help of intervention:

Q: Now, in terms of mitigation, let me just ask you a couple of questions. There may be some information about the defendant's background, childhood traumas, things of that nature.

What, if any feelings, do you have about an individual who had a bad childhood? Do you think someone can overcome a bad childhood?

A: Yes, I believe people are capable of overcoming a bad childhood. I don't believe it always happens or it's always possible, but I believe at times it can.

Q: And do you think they can do that on their own without intervention by a therapist?

A: Some may be able to, some may not.

Juror P. also indicated that treatment would be important when someone is identified at a young age as experiencing abuse in his childhood:

A: Um-hum. I think that probably if he was abused and he was committing an act when he was young, and he didn't get help, of course, usually, he would continue doing this, and whether he was a child or adult, I mean the act itself, no matter what age, I guess is not—is very bad.

When questioned by the prosecutor on *voir dire*, Juror R. responded:

Q: What do you think about individuals like pedophiles—and you mentioned something about the value of getting counseling [sic]. Do you think that's

---

[22] The jurors' finding of several other components of defendant's catch-all submission, including the majority of Factor 25(a), which documents defendant's childhood exposure to domestic abuse and is largely based on Ms. Krych's testimony, *see ante* at 633–34, 737 A.2d at 119, indicates that the jury did not have an overall mistrust of Ms. Krych.

important for individuals who may have that, some sort of sickness or antisocial behavior, and are aware of it and know of it, do you think there is a value of trying to get self-help for such behavior?

A: I always think there's value in that, uh-huh.

These comments highlight the value that some of the jurors placed on counseling and indicate that they might have regarded the fact that defendant did not receive such counseling as mitigating. If the jurors were seeking the Report in order to help in their determination of the existence of Factor 24 and were simply unable to find the evidence they sought in the tome of documents they had to sort through, there is compelling evidence that this oversight by the court contributed to the jury's sentence for defendant. Factor 24 is compelling enough evidence of mitigation that if found by the jury, it may have weighed heavily against the aggravating factors favoring a death verdict in this case. Evidence that those responsible for defendant's psychological well-being at a young age failed to take the necessary steps to explore signs of emotional problems might be extremely compelling during the phase of the trial in which jurors are exploring what level of responsibility to attribute to a defendant for his or her crime:

> Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a " 'reasoned *moral* response to the defendant's background, character, and crime.' "
>
> [*Penry v. Lynaugh*, 492 *U.S.* 302, 327–28, 109 *S.Ct.* 2934, 2951, 106 *L.Ed.*2d 256, 284 (1989) (quoting *Franklin v. Lynaugh*, 487 *U.S.* 164, 184, 108 *S.Ct.* 2320, 2333, 101 *L.Ed.*2d 155 (1988) (internal citation omitted) (O'Connor, J., concurring)).]

The trial court should, without question, have submitted Ms. Krych's report to the jury. When an error is of constitutional dimensions, the Court must be convinced " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Satterwhite, supra,* 486 *U.S.* at 258–59, 108 *S.Ct.* at 1798, 100 *L.Ed.*2d at 295 (reversing defendant's death sentence because of Sixth Amendment violation in penalty phase) (quoting *Chapman v. California,* 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 827,

17 *L.Ed.*2d 705, 710 (1967)); *see also Bey II, supra,* 112 *N.J.* at 114–15, 548 *A.*2d 846 (Handler, J., concurring). We cannot know, beyond a reasonable doubt, that the court's failure to submit the Report to the jury did not affect defendant's sentence. Accordingly, defendant's death sentence must be vacated.

## VI

The Court's disposition of this case is deeply disturbing. Defendant's right to a fair and impartial jury representing a cross-section of the community, the violation of which has the power to pervade the entire trial process, was clearly circumvented by the trial court. In addition, the prosecutorial misconduct in this case reached an extreme level, not only for capital cases, but for criminal cases generally. The Court's failure to recognize that creates a dangerous precedent, and a substantial risk that such conduct will be tolerated in other criminal prosecutions and that defendants will in the future be excoriated and subjected to extreme prejudice while attempting to defend themselves against criminal charges. Further, the Court's holding that the trial court did not commit reversible error by refusing to submit crucial mitigating evidence to the jury is plainly insupportable in light of our permissive jurisprudence on the admission of such evidence at the critical point between life and death.

Most troubling is the Court's disposition of defendant's claim that the jury's knowledge of his prior sex offense convictions does not require reversal. Quite apart from the fact that this disposition controverts existing principles of due process and fundamental fairness recognizing such knowledge as highly prejudicial in any case, the Court's failure to reverse on these grounds has broad implications for future trials involving Megan's Law defendants—*i.e.,* those who have been convicted of at least one sex offense, and are being tried for another committed after the defendant's registration pursuant to Megan's Law. The guilt of these future defendants may well be significantly more in doubt than defendant's was in this case; and the press coverage will

surely always be relentless, undoubtedly ensuring that most potential jurors in these cases will have knowledge of the defendants' prior sex offense convictions.

Because of the particular circumstances created by Megan's Law, as well as the general societal belief in the inevitable recidivism of sex offenders, the Court must be vigilant to prevent potentially innocent prior sex offenders from being convicted on less than reliable evidence, and, in capital prosecutions, to prevent guilty sex offenders from being sentenced to death by a jury with knowledge of the defendant's prior record. The Court's decision today not only imposes a grave injustice on the defendant before us, it carries with it the possibility that even greater injustices will characterize our administration of capital punishment in the future.

Because death is the ultimate, irreversible punishment, the Court has always recognized that it must apply different, heightened procedural safeguards in death penalty cases. *See Ramseur, supra,* 106 *N.J.* at 190, 524 *A.*2d 188. That recognition has not been translated into practice, and this case brings into sharp relief the emptiness of that promise. Rather than elevating the rights of defendant, the Court in this case has diluted his procedural and substantive protections and compromised his constitutional rights. That result has surfaced in other capital cases as well. It is illustrated most compellingly by the subtle yet steady influence that current capital punishment jurisprudence has on non-capital criminal case law, a weakening and loosening of the protections afforded all criminal defendants. *Cf. State v. Simon,* 161 *N.J.* 416, 499–502, 737 *A.*2d 1, 46–48 (1999) (Handler, J., dissenting). This court professes to accord capital defendants heightened protections: searching *voir dire* and death qualification of jurors, stern measures to counteract pretrial publicity, scrupulous and begrudging acceptance of guilty pleas and the waiver of trial by jury, careful assessment of the admissibility of evidence, generous allowance of mitigating evidence, insistence on effective assistance of skilled counsel, the indispensability of appeal of a capital

verdict, searching and comprehensive appellate review, and required post-conviction review. Steady abandonment of these protective standards can be found in case after case where they are stretched to tolerate significant transgressions that demonstrate the defendant has not been fully protected and has not received a fair trial.

Courts see least clearly when faced with the most atrocious crimes. In a case such as this one, the prospect of a retrial is daunting and discouraging. No one wants to experience the reenactment of defendant's nightmarish crime, the emotional toll that would be exacted in conducting another trial, the reopening of the wounds of the victim's surviving family, not to mention the expenditure of the extensive resources that would be required to secure a death sentence a second time. In combination, these are reasons that make finality almost irresistible. They are also powerful, but impermissible, reasons for the Court to relax the procedural and substantive safeguards available to defendant—to tolerate a trial permeated with scurrilous publicity, a jury with knowledge of defendant's inadmissible prior sex offense convictions, persistent prosecutorial misconduct, and the exclusion of clarifying mitigating evidence—in order to sustain the death sentence, and thereby end defendant's capital prosecution. That avenue, however, is not open. We are faced here with errors that would, in any other case, inexorably lead to conclusion that the defendant did not receive a fair trial.

The Court attempts to look clearly and dispassionately at death—both that of the victim and that faced by defendant—and to apply principles of fairness conscientiously. Yet, as La Rochefoucauld's maxim expresses, death, like the sun, cannot be looked at steadily. The Court, in its attempt to look directly at death, loses its vision. Rather than applying the required legal principles objectively, the Court today affirms defendant's conviction and sentence without a glance at fundamental principles of criminal justice and without heed for the influence of its reasoning on our jurisprudence. The sacrifice we make when we sentence a

defendant to life imprisonment instead of death pales in comparison to what we gain by holding that a defendant who cannot receive a fair trial in this State simply cannot be put to death, no matter how certain and clear his guilt. By abandoning principle and yielding judicial integrity in order to put the defendant to death, we lose, with even greater finality, the essence of fairness that is the heart of our criminal justice system.

*For affirmance*—Justices POLLOCK, O'HERN, GARIBALDI and COLEMAN—4.

*For affirmance in part; reversal in part*—Justice STEIN and Judge KING, Appellate Division (temporarily assigned)—2.

*For reversal*—Justice HANDLER—1.